# In the United States Court of Federal Claims

**Nos. 24-172C; 24-406C; 24-446C; 24-448C; 24-461C; 24-467C; 24-471C**
**Filed: February 3, 2025**
**Redacted Version Issued for Publication: February 27, 2025[1]**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **GOVWAVE, LLC, et al.,** | \* |
|  | \* |
|  | \* |
| **Protestors,** | \* |
|  | \* |
| **v.** | \* |
|  | \* |
| **UNITED STATES,** | \* |
|  | \* |
| **Defendant.** | \* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**Eric Valle** and **Jonathan Williams**, PilieroMazza PLLC, Washington, DC, for protestor GovWave, LLC.

**Taylor Holt** and **Emily Chancey**, Maynard Nexsen PC, Huntsville, AL, for protestor Futron, Inc.

**Kathy Potter** and **Sharon Roach**, Potter & Murdock, P.C., Washington, DC, for protestor Government Acquisitions, Inc.

**John Tolle**, Baker, Cronogue, Tolle & Werfel, LLP, McLean, VA, for protestor DH Technologies, Inc.

**Nicole Pottroff** and **Greg Weber**, Koprince McCall Pottroff LLC, Lawrence, KS, for protestor Enterprise Technology Solutions, Inc.

**Matthew Long**, Moore & Lee, McLean, VA, for protestor Unicom Government, Inc.

**Olivia Lynch** and **Emily Golchini**, Crowell & Moring LLP, Washington, DC, for protestor Advanced Computer Concepts, Inc.

**Kristin Olson**, Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant. With her were **Miles J. Wright**, Trial Attorney,

---

[1] This Opinion was issued under seal on February 3, 2025. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

Commercial Litigation Branch, **Isabelle Aubrun**, Trial Attorney, Commercial Litigation Branch, **Corinne A. Niosi**, Assistant Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brett A. Shumate**, Acting Assistant Attorney General, Civil Division. Of counsel **Maj. James Kim** and **Maj. Joshua Fix**, Trial Attorneys, Contract Litigation & Intellectual Property Division, U.S. Army Legal Services Agency, Fort Belvoir, VA, and **Alex M. Cahill**, Attorney-Advisor, Army Materiel Command Legal Center-Rock Island Arsenal, Rock Island, IL.

## O P I N I O N

<u>**HORN, J.**</u>

Protestors GovWave, LLC (GovWave), Futron, Inc. (Futron), Government Acquisitions, Inc. (Government Acquisitions), DH Technologies, Inc. (DH Technologies), Enterprise Technology Solutions, Inc. (Enterprise Technology Solutions) Unicom Government, Inc. (Unicom), and Advanced Computer Concepts, Inc. (Advanced Computer Concepts) each filed pre-award bid protests in the United States Court of Federal Claims challenging the decision of the Department of the Army, Army Contracting Command – Rock Island (Army) to exclude the protestors' offers in response to Solicitation W52P1J-20-R-0082 (the Solicitation).[2] Each of the seven protestors were eliminated from the competition for failing to comply with the Army's "strict compliance requirements" during Step 1 of the evaluation process.

## FINDINGS OF FACT

The Army's April 15, 2021 Acquisition Plan related to the Solicitation at issue in the above captioned protests explains:

> This acquisition is a follow-on to the Information Technology Enterprise Solutions-3 Hardware (ITES-3H) Multiple Award Indefinite Delivery Indefinite Quantity (IDIQ) contracts awarded in February 2016. The purpose of this acquisition is to support Army, Department of Defense (DoD) and all Federal Agency Information Technology (IT) infrastructure and infostructure goals with a full range Commercial Off-The-Shelf (COTS) hardware and related incidental software and services that meet the definition in Federal Acquisition Regulation (FAR) 2.101, Definitions, for "commercial items."

> Army Contracting Command – Rock Island (ACC-RI), in support of CHESS [Computer Hardware, Enterprise Software and Solutions], intends to award

---

[2] The court notes that although the agency has not yet made awards under the Solicitation, and, therefore, the protestors cannot protest an award decision to another offeror or offerors in a post-award bid protest, at this time, unlike a pre-award bid protest in which offerors challenge the Solicitation itself, the seven protestors have been evaluated, at the first step of a three step evaluation procedure for the procurement established by the agency, and eliminated from the competition by the agency for non-compliance.

at least 17 Firm Fixed Price (FFP) IDIQ contracts, with up to 7 awards reserved for small business. The ITES-4H ceiling is $10,000,000,000.00 with a five-year base period and one five-year option period. Ordering will be decentralized and open to all DoD and Federal Agencies. The IDIQs will allow the Government to realize cost savings, provide visibility and oversight through contractor reporting and analysis of CHESS IT e-Mart data, and streamline the acquisition process.

(capitalization in original; alteration added).[3] The April 15, 2021 Acquisition Plan continued:

The intention of this acquisition is to integrate, modernize and refresh the existing IT equipment for client, server, storage, and network environments while providing standardized interfaces. The acquisition provides an ordering vehicle for authorized users to meet equipment requirements. The contractors will be required to perform in a fully responsive, complete and flexible manner over the entire contract life, recognizing the dynamic nature of the IT environment: changes in the requirements of users, standards, regulations, and technology, as well as the various commercial alternatives available for purchase, leasing and licensing.

The Solicitation, as amended, projects evaluating offers in three separate steps in order to make a best value award. The Solicitation provides:

EVALUATION FACTORS FOR AWARD

M.1 BASIS FOR CONTRACT AWARD

The awards will be made based on the best overall (i.e., best value) proposals that are determined to be the most beneficial to the Government, with appropriate consideration given to the four evaluation factors:

---

[3] As explained on the Army's website:

Computer Hardware, Enterprise Software and Solutions (CHESS) is the Army's designated primary source for commercial IT. CHESS provides a no-fee, flexible procurement strategy through which an Army user may procure commercial-off-the-shelf (COTS) IT hardware, software, and services via an e-commerce (IT e-mart) based process. CHESS offers simple, straightforward contract vehicles through its online Army e-commerce ordering system, the IT e-mart (https://chess.army.mil). These contracts provide continuous vendor competition for best value and consolidation of requirements to maximize cost avoidance and leverage the Army's buying power.

https://www.eis.army.mil/programs/chess (last visited Feb. 27, 2025).

Technical Factor, Price, Past Performance, and Small Business Participation. In the evaluation, the technical factor is more important than the Past Performance factor and the past performance factor is more important than Small Business Participation. All non-priced factors combined are significantly more important than Price. Although Price is not the most important factor, the closer the ratings in the non-price factors, the more significant price becomes. The Government will perform a trade-off analysis of the non-priced factors with price to select the best value proposals that provide the best value to the Government. To receive consideration for award, a rating of no less than Acceptable must be achieved for the technical factor (to include each subfactor) and the Small Business Participation factor. Additionally, any Other Than Small Business Offeror must have an acceptable Small Business Subcontracting Plan to receive an award in accordance with FAR 19.702(a). Offerors are cautioned that awards may not be made to the lowest priced proposal. An award will not be made to any Offeror with a deficiency in any factor.

## M.2 NUMBER OF CONTRACT AWARDS

The Government intends to award at least 17 Firm Fixed Price (FFP), Indefinite Delivery, Indefinite Quantity (IDIQ) type contracts as a result of this solicitation. Each contract will have a base period of 5 years, with one available 5-year option period.

i. The Government will first reserve an anticipated seven awards for small businesses. The Government will select these small business awardees based on a trade-off analysis of all factors, including price, to select the small business Offerors who represent the best value to the Government.

ii. Next, the Government will consider all remaining Offerors, without regard to size status, to make the remaining awards. The Government anticipates making at least 10 additional awards to the remaining Offerors without consideration of size status. These Offerors will be selected on a trade-off analysis of all factors, including price, to select the Offerors who represent the best value to the Government.

## M.3 EVALUATION METHODOLOGY

This is a competitive best value source selection in which competing Offerors will be evaluated against four evaluation factors: Technical, Price, Past Performance, and Small Business Participation. The contract award decisions will be determined based upon the evaluation of each Offeror's complete proposal against the evaluation criteria identified below. Selection of awardees will be accomplished as follows:

Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as STRICT COMPLIANCE REQUIREMENTS in the Instructions to Offerors of this RFP [Solicitation] shall render the Offerors proposal [sic[4]] non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

Step 2 - Review of Part A - Equipment List: The Offerors Equipment List will be evaluated on an Acceptable/Unacceptable basis. To determine technical acceptability, the Government will evaluate an Offerors Equipment List using statistical sampling. In this regard, the Government will evaluate a percentage of the proposed items in the Equipment List (i.e., the statistical sample) to determine if the Offerors proposed Equipment List meets the Governments minimum requirements indicated in Column C of Attachment 0002.[[5]] All Offerors Equipment Lists will be evaluated for the same items

---

[4] The Army in the Solicitation and evaluation documents consistently and incorrectly uses the phrase "the Offerors proposal." The court does not add a "[sic]" after each grammatically incorrect use of the phrase "the Offerors proposal" going forward in the Opinion.

[5] The Solicitation included a list of attachments to the Solicitation:

LIST OF ATTACHMENTS

| List of Addenda | Title | Date | Number of Pages | Transmitted By |
|---|---|---|---|---|
| Attachment 0001 | STATEMENT OF WORK WITH APPENDIX A-B | 26-JAN-2022 | 046 | |
| Attachment 0002 | EQUIPMENT LIST | 31-AUG-2023 | 054 | |
| Attachment 0003 | PERFORMANCE REQUIREMENTS SUMMARY | 22-MAR-2021 | 004 | |
| Attachment 0004 | PRICE MODEL BASE PERIOD - 5 YEARS | 09-AUG-2023 | 024 | |
| Attachment 0005 | DELETED By AMD 0029 | | | |
| Attachment 0006 | SMALL BUSINESS PARTICIPATION COMMITMENT DOCUMENT | 28-AUG-2023 | 002 | |
| Attachment 0007 | PAST PERFORMANCE QUESTIONNAIRE | 24-AUG-2023 | 006 | |
| Attachment 0008 | STANDARDS AND POLICIES | 22-MAR-2021 | 006 | |
| Attachment 0009 | EVAULATION OF CONTRACTOR PERFORMANCE FORM | 22-MAR-2021 | 004 | |
| Attachment 0010 | CONTRACT DATA REQUIREMENTS LIST EQUIPMENT FAILURE REPORT | 22-MAR-2021 | 001 | |
| Attachment 0011 | CONTRACT DATA REQUIREMENTS LIST ORDER TRANSACTION REPORT | 22-MAR-2021 | 001 | |
| Attachment 0012 | CONTRACT DATA REQUIREMENTS LIST VENDOR STATUES REPORT | 22-MAR-2021 | 001 | |
| Attachment 0013 | ITES-4H PAST PERFORMANCE QUESTIONNAIRE POINT OF CONTACT LIST | 09-SEP-2021 | 001 | |
| Attachment 0014 | DELETED By AMD 0029 | | | |
| Attachment 0015 | FORMAT FOR QUESTIONS | 09-AUG-2023 | 001 | |
| Attachment 0016 | DELETED By AMD 0029 | | | |
| Attachment 0017 | DELETED By AMD 0029 | | | |
| Attachment 0018 | ITES-4H Q&A (AMENDMENT 0009) | 26-JAN-2022 | 145 | |
| Attachment 0019 | ADDITIONAL ITES-4H Q&A (AMENDMENT 0012) | 22-MAR-2022 | 033 | |
| Attachment 0020 | DELETED By AMD 0030 | | | |
| Attachment 0021 | DELETED By AMD 0030 | | | |
| Attachment 0022 | ITES-4H Q&A (AMENDMENT (0030) | 13-SEP-2023 | | |
| Attachment 0023 | ITES-4H Q&A (AMENDMENT 0031) | 28-SEP-2023 | | |

as part of the statistical sample. In the context of this evaluation, Acceptable is defined as the Government determining that all items evaluated in the statistical sample meet or exceed the Governments minimum requirements as identified in Column C of Attachment 0002. Unacceptable is defined as the Government determining through statistical sampling that the Offerors Equipment List does not meet the minimum requirements identified in Column C of Attachment 0002. If the Government determines through statistical sampling that an Offeror does not meet a minimum requirement identified in Column C of Attachment 0002, the Government will not further evaluate the Offerors Equipment List and the statistical sampling evaluation will stop. The Offerors proposal will be deemed Unacceptable and will not proceed to Step 3.

Step 3 - Evaluation of Part B - Technical, Past Performance, Price and Small Business Participation proposals: The Government intends to evaluate proposals and may conduct discussions. If discussions are determined to be necessary by the Government, a Competitive Range consisting of the most highly rated proposals based on the Technical Part B, Past Performance, Price and Small Business Factors will be established. The Government may engage in Communications under FAR 15.306(b) as necessary to determine which Offerors should be included in the Competitive Range. The Competitive Range, if necessary, will be established considering the Governments intent to make seven awards to small businesses, and thereafter make at least 10 unrestricted awards to all remaining Offerors. Any proposal, which does not have a realistic chance of receiving award, will not be included in the Competitive Range.

---

Relevant to the above captioned protests, Attachment 0005 was removed by Amendment 0029. Attachment 0005 was titled: "Price Model - Option Period - Five Year," and the Solicitation explained

Attachment 0004 - Price Model - Base Period - 5 Years. Attachment 0004 has been revised to include a tab at the bottom for Option Period pricing input, in lieu of separate documents for the base period and option periods. Offerors are required to utilize this revised Price Model for their proposal submission. Failure to utilize the revised Price Model will deem the Offerors submission noncompliant and will receive no further evaluation or eligibility for award. . . .

b. Delete the following attachments in their entirety:

i. Attachment 0005 - Price Model - Option Period - Five Years, Attachment 0005 has been deleted in its entirety as a result of the revisions made to Attachment 0004.

(omission added).

M.4 DISCUSSIONS

a. After receipt of proposals, the Government will conduct an evaluation. During the conduct of this acquisition, the Acquisition Source Selection Interactive Support Tool (ASSIST) will be used by the Government to support the proposal evaluation and source selection process. A separate tool, the ASSIST2Industry, will be used in conjunction with ASSIST to facilitate exchanges with Offerors after receipt of proposals pursuant to FAR 15.306.

(capitalization in original; emphasis, alterations and footnotes added). The Solicitation continued:

M.5 EVALUATION FACTORS

The following evaluation factors and subfactors will be used to evaluate each proposal. Awards will be made to the Offerors whose proposals are most advantageous to the Government based upon an integrated assessment of the evaluation factors and subfactors described below.

FACTOR 1: Technical Factor is divided into the following:

PART A - Equipment List (Acceptable/Non-Acceptable as evaluated at Step 2)

PART B - Technical Narrative (Overall Adjectival Rating)

    SUBFACTOR 1 - Compliant IT Equipment (Adjectival Rating)

        KEY POINT #1 - Compliant Solutions

        KEY POINT #2 - Catalog Management

        KEY POINT #3 - Technical Migration Management

    SUBFACTOR 2 - Quality Programs (Adjectival Rating)

        KEY POINT #1 - Quality Qualifications

        KEY POINT #2 - Quality Methodology

        KEY POINT #3 - Supply Chain Risk Management (SCRM)

        KEY POINT #4 - Contract Management

Factor 2: Price (No Rating Assigned)

Factor 3: Past Performance (Relevancy/Confidence Rating)

Factor 4: Small Business Participation (Adjectival Rating; applies only to Other than Small Business).

## M.6 RELATIVE IMPORTANCE

Factor 1: Technical is the most important factor. An overall Technical Part B factor rating will be assigned to each Offeror. Within Part B Technical Narrative, Subfactor 1 - Compliant IT Equipment is more important than Subfactor 2 - Quality Programs. Within Subfactor 1, all key points are of equal importance. Within Subfactor 2, all key points are of equal importance. Factor 1 – Technical Part B is significantly more important that Price, Past Performance and Small Business Participation.

The past performance factor is more important than Small Business Participation. All non-priced factors combined are significantly more important than Price. Although Price is not the most important factor, the closer the ratings in the non-price factors, the more significant price becomes. The Government will perform a trade-off analysis of the non-priced factors with price to select the best value proposals that provide the best value to the government.

## M.7 EVALUATION RATINGS

M.7.1 Ratings for Technical Evaluation Part A

Table 1 Technical Acceptable/Non-acceptable Ratings (Part A)

| Adjectival Rating | Description |
| --- | --- |
| Acceptable | The Government determining that all items evaluated in the statistical sample meet or exceed the Governments minimum requirements as identified in Column C of Attachment 0002. |
| Non-Acceptable | The Government determining through statistical sampling that the Offerors Equipment List does not meet the minimum requirements identified in Column C of Attachment 0002. |

M.7.2 Ratings for Technical Evaluation Part B

Table 2 Combined Technical/Risk Ratings (Part B)

| Adjectival Rating | Description |
| --- | --- |
| Outstanding | Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low. |
| Good | Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate. |
| Acceptable | Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high. |
| Unacceptable | Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable. |

In accordance with the Army Source Selection Supplement (28 November 2017), Section 3.1, the Army methodology for evaluating Technical Approach and Related Risk is the Combined Technical/Risk Rating, (see Table 1 above). This methodology considers risk, in conjunction with the significant strengths, strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies in determining technical ratings.

M.7.3 Relevancy Ratings for Past Performance Evaluation

Table 3 Past Performance Relevancy Ratings

| Rating | Definition |
| --- | --- |
| Very Relevant | Present/Past Performance effort that has a value of at least $2,000,000.00 with delivery of items that correspond to four (4) or more of the ITES-4H catalogs. |
| Relevant | Present/Past Performance effort that has a value of at least $1,000,000.00 with delivery of items that correspond to three (3) or more of the ITES-4H catalogs. |
| Somewhat Relevant | Present/Past Performance effort that has a value of at least $250,000.00 with delivery of items that correspond to two (2) or more of the ITES-4H catalogs. |
| Not Relevant | Present/Past Performance effort that has a value of $249,999.99 or less with delivery of items that correspond to one (1) or less of the ITES-4H catalogs. |

M.7.4 Confidence Ratings for Past Performance Evaluation

Table 4 Past Performance Confidence

| Adjectival Rating | Definition |
| --- | --- |
| Substantial Confidence | Based on the Offerors recent/relevant performance record, the Government has a high expectation that the Offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the Offerors recent/relevant performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort. |
| Limited Confidence | Based on the Offerors recent/relevant performance record, the Government has a low expectation that the Offeror will successfully perform the required effort. |

| | |
|---|---|
| No Confidence | Based on the Offerors recent/relevant performance record, the Government has no expectation that the Offeror will be able to successfully perform the required effort. |
| Unknown (Neutral) Confidence | No recent/relevant performance record is available, or the Offerors performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The Offeror may not be evaluated favorably or unfavorably on the factor of past performance. |

M.7.5 Adjectival Ratings for Small Business Participation Evaluation

Table 5 Small Business Participation Ratings

| Rating | Description |
|---|---|
| Outstanding | Proposal indicates an exceptional approach and understanding of the small business objectives. |
| Good | Proposal indicates a thorough approach and understanding of the small business objectives. |
| Acceptable | Proposal indicates an adequate approach and understanding of the small business objectives. |
| Marginal | Proposal has not demonstrated an adequate approach and understanding of the small business objectives. |
| Unacceptable | Proposal does not meet small business objectives. |

(capitalization and emphasis in original).

In the instructions to offerors, the Solicitation stated:

INSTRUCTIONS TO OFFERORS

L.1 OVERVIEW

The Army is conducting the ITES-4H competition in order to enter into contracts to acquire the information technology required to meet the Armys [sic] information technology mission.

The U.S. Army Computer Hardware, Enterprise Software and Solutions (CHESS) in coordination with the Army Contracting Command Rock Island (ACC-RI), requires contracts to support the Armys [sic] requirements both Continental United States (CONUS) and Outside the Continental United States (OCONUS), including remote OCONUS, covering a full range of Information Technology (IT) equipment for client, server, storage, and network environments; for related incidental services and software; for maintenance/warranty of legacy IT equipment; and for warranty variations as part of an Information Technology Enterprise Solutions 4 Hardware (ITES-4H) solution. The equipment and services shall be commercial in accordance with the definition of commercial items in Federal Acquisition Regulation (FAR) 2.101.

L.2 PROPOSAL SUBMISSION REQUIREMENTS

a. Each Offeror shall submit only one comprehensive and complete proposal, which consists of all required information with associated attachments each in their appropriate file formats, that addresses all Government requirements outlined in the solicitation. Submission of a proposal shall be on an all or none basis. Partial proposals are not acceptable and shall not be evaluated. If the Government has not received the Offerors proposal by the due date and time, the proposal will be considered incomplete and will not be further considered for award.

(capitalization in original; alterations added). The Solicitation continued:

L.3 STRICT COMPLIANCE REQUIREMENT
All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

(capitalization in original).

Regarding the format of the offerors' proposals, the Solicitation explained:

L.4 PROPOSAL FORMAT

This section specifies the format each Offeror shall use in preparing its proposal. The intent is not to restrict the manner in which proposals are prepared, but rather to ensure a certain degree of uniformity in proposal format for evaluation purposes. The proposal shall be prepared in a clear, legible, practical manner. Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted.

. . .

L.4.1.2 Each Offeror shall submit ONLY one proposal and that proposal shall address all of the requirements of the Request for Proposals (RFP). To be considered for this requirement, the Offeror must submit a complete response to this RFP using the instructions provided in Section L. STRICT COMPLIANCE REQUIREMENT: If the Offeror's proposal fails to meet the terms and conditions of the RFP or takes exception to any of the terms and conditions of the RFP, it will render the Offeror's proposal unacceptable and will not be further considered for award.

L.4.1.2 (a) Each Offeror shall submit the most current versions of Attachments 0002, 0004, 0006, 0007 and 0013 required for this RFP. The Government will verify that the Offerors submission contains the most current RFP Attachments 0002, 0004, 0006, 0007 and 0013 that were provided by email with this Amendment.

L.4.1.2 (b) STRICT COMPLIANCE REQUIREMENT: Failure to provide the most current versions of the RFP Attachments 0002, 0004, 0006, 0007 and 0013 shall render the Offerors proposal non-compliant and will not be further considered for award. To be considered for award the Offeror must submit a response to this solicitation in full to include the most recent attachments provided.

L.4.1.3 A proposal is presumed to represent the Offerors best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG)) will not be considered. Clarity and completeness are essential.

(capitalization in original; omission added).

Regarding the Technical Factor, the Solicitation provided:

L.5 SPECIFIC PROPOSAL INSTRUCTIONS

L.5.1 VOLUME I - Technical Factor. The volume shall be organized into the following sections:

L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award.

This portion of the proposal shall include a completed Equipment List spreadsheet (Attachment 0002) considering the following instructions:

a. The Offerors proposed configuration for each, and every System Description identified on each Catalog (Catalog I through Catalog VII); The Offeror shall complete the Equipment List at Attachment 0002 by providing, in the proposed configuration column, its proposed item to meet each requirement; and

b. An Offerors annotation with technical detail identifying that every Requirement related to each System Description in the proposed configuration is met or exceeded as to be confirmed by the Government. All proposed configuration cells must contain content for the Offerors proposal to receive consideration. STRICT COMPLIANCE REQUIREMENT: Cells that contain linked content are non-compliant. Additionally, modification of the Equipment List outside of indicated proposed configuration inputs are not permitted and will result in a proposal being determined non-compliant and not further evaluated; and

c. An identification of each Offerors proposed configuration product Description providing identification of (brand/model) within the Offerors proposed configuration for each and every System Description; and

d. Each Catalog Identification per each Description (brand/model) and every Platform addition, inclusive to aid in associating equipment list to price models.

e. The Offeror may also complete the Catalog Identification column to coordinate association between equipment list and price models. The burden of proof that the proposed item meets or exceeds the minimum requirements remains with the Offeror.

f. The minimum processor types are defined for Catalogs I and II. Offerors may propose a different base processor if the Offeror provides proof that the processor meets or exceeds the minimal architecture of the processor listed in the Equipment List.

g. Equipment List, electronic copy: Equipment List must remain in native MS Excel file format. Offerors proposed configuration information must be directly input in the proposed configuration field. Equipment List must not be password protected. Offeror proposed configuration input is only permitted in column D. STRICT COMPLIANCE REQUIREMENTS: Failure to provide the most current version of the RFP Attachment 0002 shall render the Offerors proposal non-compliant and will not be further considered for award. Unauthorized modifications to the Equipment List are not permitted and will render an Offerors proposal non-compliant and not further considered for evaluation. Linked inputs are not permissible and will render a proposal non-compliant.

h. The items in the Price Model that refer to the hardware and their detailed specifications are in the Equipment List (Attachment 0002). The pricing proposed in the Price Model (Attachment 0004) shall be for the same products and configurations proposed in the Equipment List (Attachment 0002). Any discrepancy between the product proposed in the Equipment List vs. the product proposed and priced out in the Price Model may result in an unfavorable finding in the Offerors proposal.

(capitalization in original). The Solicitation at L.5(c)-(d) provides:

c. Executed copies of all amendments. Each Offeror shall complete (fill-in and sign) the solicitation amendment sections (Standard Form 30 AMENDMENT OF SOLICTIATION/MODIFICATION OF CONTRACT, Contract Administration Data Representations, Clause fill-ins, Certification and Other Statements of Offerors) using the file provided with the solicitation amendment. An authorized official of the firm shall sign the SF 30s and all certifications requiring original signature. An Acrobat PDF file shall be created to capture the signatures for submission.

d. Should an amendment be issued against the solicitation; the Offeror shall acknowledge by signing one copy of the Standard Form (SF) 30 entitled Amendment of Solicitation/Modification of Contract and include it in the proposal submission. In Accordance With (IAW) FAR 52.215-1(b), acknowledgement of solicitation amendments issued after the proposal due date shall be submitted via email to usarmy.ria.acc.mbx.ites-4h-rfp@army.mil no later than date and time identified in the Amendment.

(capitalization in original).

As the defendant explained in its omnibus cross-motion for judgment on the Administrative Record for all of the above captioned bid protests:

> The Equipment List is a product catalog of various items the Government may purchase. The Equipment List contains seven catalogs and identifies the various "Product Descriptions" the Army requires, along with a System Description and the necessary "Minimum Requirement" for each system. The Army completed Columns A, B and C with its pre-configured inputs. The Army marked the top of Column D as "Proposed Configuration" and marked the top of Column E as "Catalog Identification."

(internal references omitted). Therefore, in order to comply with the strict compliance requirement for the Equipment List under the Technical Factor at Step 1, an offeror would have to complete each box for Column D and Column E.

Regarding Price, the Solicitation provided:

L.5.2 VOLUME II - Price Factor.

The volume shall be organized as follows:

(1) Electronic Copy. Price submission requirements: Files contained in the Volume II Price submission may not be password protected. Electronic links are not permissible. The Offeror shall not include pivot tables in Excel spreadsheets. The Offeror shall complete the Price Model in full. Offerors must ensure that Attachment 0004 is completed and submitted with the proposals. STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

(2) General Instructions. In accordance with FAR 15.402 and FAR 15.403-1, certified cost or pricing data is not required based on the fact that adequate competition is expected for this procurement. If after receipt of proposals the Contracting Officer determines that there is insufficient information available to determine price reasonableness, the Offeror may be required to submit other than certified cost or pricing data. Information other than certified cost or pricing data may be submitted in contractors chosen format to provide sufficient information in order to support price reasonableness. There are no page limitations for this volume. Proposal information included in this volume that is not directly related to Price will be

disregarded. Proposed dollar values shall be identified in US Dollars with only two decimal places. Any cells with more than two decimal places will be rounded up or down to the next whole cent.

L.5.2.1 Instructions for the Price Model

a. A price must be proposed for every item in each catalog identified in the Price Model. Proposed prices shall be for new items/equipment only.

b. DO NOT alter any part of the Price Model other than the cells shaded in yellow and orange.

c. Do not enter any formulas into the Price Model.

d. Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the Offeror ineligible for award. Further, all proposed prices and numbers shall be stated in U.S. Dollars, rounded, and displayed to two decimal places. It will be assumed that rows/columns containing zeros instead of prices are intentional and shall be considered as having no cost to the Government.

e. Pricing for catalog items, as discounted, shall not exceed the Offerors lowest available General Services Administration (GSA) Federal Supply Schedule price, other Government contract vehicle price, commercial catalog, or publicly published price list.

f. The Government anticipates receiving competitive proposals and using competition to determine price reasonableness. The Government reserves the right to request other than certified cost or pricing data to establish the reasonableness of the proposed contract and/or subcontract prices after receipt of proposals.

(capitalization in original).

Regarding Past Performance Factor, the Solicitation provided:

L.5.3 VOLUME III - Past Performance Factor. The Government will assess the degree of confidence it has that the Offeror will successfully complete the requirements in accordance with the contract terms based on the Offerors demonstrated record of recent and relevant past performance. Offerors shall provide a specific narrative explanation of each contract listed in Section II of the past performance questionnaire describing the contract requirements achieved and detailing how the effort is relevant to the requirements of this solicitation.

L.5.3.1 Past Performance Contract References: The Offeror shall submit with its initial proposal up to five contract references for itself. If the contract reference the Offeror is submitting is an ordering type contractual vehicle (e.g., an Indefinite Delivery "D" type contract, Blanket Purchase Agreement, Basic Ordering Agreement, etc.), PPQ [Past Performance Questionnaire] references are only acceptable after issuance of a delivery/task order where performance is ongoing or has occurred.

a. Contract references may be provided for any combination of CONUS and/or OCONUS locations.

b. The Government will only consider those references in which the Offeror is identified as the Prime or First-tier subcontractor.

L.5.3.2 Specific Proposal Instructions. This volume shall be organized into the following sections:

a. Contract Reference Information and ITES-4H PPQ POC List (Attachment 0013): The Government will not accept just the basic contract ordering number for ordering type contractual vehicles. Given this, an individual order (or orders) under the basic ordering contract vehicle must be submitted in lieu of just the basic ordering contract itself. Each submitted order shall be counted as one contract reference. For example, if an offeror has performance on an IDIQ type contract, the Offeror must provide the specific orders it desires the Government to evaluate. The Offeror must not provide just the basic IDIQ contract number. All contract reference(s) shall represent recent and relevant performance as a prime and/or first-tier subcontractor under Government Agency contracts (i.e., Department of Defense: Army, Navy, Air Force, Marine Corps, Defense Logistics Agency (DLA) etc.; Federal, Department of Homeland Security, Department of State, etc.). If submitting a reference as a first-tier subcontractor, Offeror is expected to provide the name of the Prime contractor under which it worked. If the Offeror has no Government Agency contracts, commercial references may be provided. The recency period is 25 October 2019 through 16 October 2023. STRICT COMPLIANCE REQUIREMENT: The Offeror must submit a completed ITES-4H PPQ POC List (Attachment 0013) of all the POCs who received a questionnaire with the submission of the proposal. Failure to provide a completed ITES-4H PPQ POC List will render the proposal non-compliant and will not be further considered for award. The past performance questionnaire (Attachment 0007) shall be used for each contract reference submitted. The completed PPQs are excluded from the page count for Past Performance.

b. Adverse Contract Performance: STRICT COMPLIANCE REQUIREMENT: In addition to the contract references, the Offeror shall identify any recent and relevant Government contract(s) it was awarded that

encountered any performance problems related to deliverables; services, security violations (i.e. data, physical, virtual, etc.), Environmental Protection Agency (EPA) violations, and every contract that was terminated (termination for default or termination for cause only), in whole or in part from 25 October 2019 through 16 October 2023. If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal. The number of contract references provided in response to this paragraph is unlimited. Submission of Adverse Contract Performance information shall not count as part of the page count for Past Performance.

For any contract falling under the Adverse Contract Performance description above, provide all the information listed as follows:

1. Contract number and Order number.
2. Define the performance problem and/or Type of Termination or Breach.
3. Describe the performance problem that caused the adverse action, termination, and/or breach.
4. Describe the corrective actions taken to resolve issues; and provide date(s) of issue/resolution.
5. Provide a copy of any Letter of Concern, cure notice, or show cause letters received.
6. Identify reasons for any Terminations for Default or Terminations for Cause.
7. Describe in detail any performance problems that include internal/external customer complaints and/or Contract Deficiency Reports (CDRs), EPA violations.
8. Provide points of contact who can confirm the success of the corrective measures to include email address and a valid telephone number.

The Government is under no obligation to search for additional past performance references for any Offeror as the Government intends to evaluate an Offerors past performance based on the information submitted as part of an Offerors proposal. However, the Government reserves the right to use data provided in the Offeror's proposal and data obtained from other sources. To ensure inclusion of all references in the evaluation process, the Offeror is encouraged to provide the Government with the most current data on each reference.

(capitalization in original; alteration added).

Regarding the Small Business Participation Factor, the Solicitation provided:

L.5.4 VOLUME IV - Small Business Participation Factor. THIS REQUIREMENT APPLIES TO OTHER THAN SMALL BUSINESS OFFERORS ONLY. IAW 13 CFR 125.3(g), Small Business Offerors will be given the maximum score, credit, or rating without having to submit any

information in connection with this factor. An Offeror is considered a Small Business if it can certify Small Business status under North American Industry Classification System (NAICS) 334111. STRICT COMPLIANCE REQUIREMENT: Failure to submit Attachment 0006 will render the Offeror's proposal non-compliant.

The Offeror shall demonstrate small business participation by detailing its proposed approach to meet the requirements under this factor by addressing the following two areas in its Small Business Participation proposal:

a. Proposed Small Business Participation Commitment Document in performance of the potential contract (applies only to Other Than Small Businesses). The Offeror shall complete the Small Business Participation Commitment Document at Attachment 0006 to show maximum practicable opportunities to Small Businesses to compete on this requirement in accordance with FAR 52.219-8, Utilization of Small Business concerns.

b. Commitment to Small Business:

i. Payment Procedures The Offeror shall include a written statement of its established procedures to ensure timely payments to small business subcontractors in accordance with FAR 52.219-8, Utilization of Small Business Concerns, (for those contracts under which it was required within the period of 25 October 2019 through 16 October 2023). If not required in any recent contracts, the Offeror shall so state.

ii. Compliance with Small Business Subcontracting Plan - Offerors must be in compliance with terms and conditions of FAR 52.219-9, Small Business Subcontracting Plan (if required on recent contracts). The Offeror shall provide three Individual Subcontracting Reports for recent contracts (where performance occurred within the period of 25 October 2019 through 16 October 2023) that included a subcontracting plan. Offerors submitting Commercial Subcontracting Plans shall provide three Summary Subcontract Reports (SSRs) and the associated Commercial Subcontracting Plan for each SSR. Caution: SSRs based on Individual Subcontracting Plans will not be accepted. If Small Business Subcontracting Plans were not required in any recent contracts, the Offeror shall so state. If the Offeror has less than three recent contracts, the Offeror shall provide the most recent Individual Subcontracting Report (or SSR for Commercial Subcontracting Plans) for each contract it has, and state that the Offeror does not have three recent contracts.

(capitalization in original).

The Solicitation was originally issued by the Army on August 25, 2021. Prior to receiving the responses to the Solicitation, the Army issued 26 amendments to the Solicitation, mostly in responses to questions and requests for clarifications from potential offerors to the Solicitation. It appears that the Army received 96 offerors when the Solicitation closed on October 25, 2022. In response to an agency level protest and a subsequent protest at the United States Government Accountability Office (GAO), the Army took partial corrective action, and issued two additional amendments, Amendment 27, and Amendment 28, with revised proposals due by January 23, 2023. The Army subsequently issued Amendments 29, 30, and 31, addressing further questions and ultimately making proposals due by October 16, 2023.

In October 2023, the Branch Chief Shanna Henao and the Procuring Contracting Officer Carrie Lansing issued a Memorandum for Record for the Solicitation. The October 2023 Memorandum for Record provided in full:

MEMORANDUM FOR RECORD                                    11 Oct 2023

SUBJECT: Determination to Amend Solicitation W52P1J-20-R-0082 for the ITES-4H requirement in support of Program Executive Office-Enterprise Information Systems (PEO-EIS).

BLUF[6]: Determination to amend the above-mentioned solicitation in an effort to update and revise the Tech evaluation process, past performance process, as well as adding additional members to the technical team in order to streamline the acquisition process and re-solicit for new proposals to evaluate in a more effective and efficient manor with the goal of an award in 1st quarter FY25, calendar year 2024 instead of an award in 1st quarter FY26, calendar year 2025.

Background and Justification: The above-mentioned solicitation was issued on 25 AUG 2021 and closed on 25 OCT 2022. An agency-level protest was received by the closing date of the solicitation. The Army took partial corrective action in response to the protest and denied the remaining grounds. Subsequently, the protester filed a protest at the Government Accountability Office (GAO), which was ultimately dismissed. Due to the need to take partial corrective action in response to the agency-level protest, two amendments were issued (Amendments 0027 and 0028) that allowed offerors to submit revised proposals. Thus, evaluations for ITES-4H began on 15 FEB 2023.

From FEB 2023 to APR 2023 both the Army Contracting Command-Rock Island (ACC-RI) and the PEOCHESS team worked together several times a week over the three-month period to go over the past performance evaluations, the technical evaluations as well as the small business and price evaluations. While progress was being made, it was not at the rate per

---

[6] "BLUF" is an acronym for "Bottom Line Up Front."

the anticipated milestones and therefore the award date was moving further to the right. It was determined that the technical team did not have the staff necessary to keep up with 89 technical proposals and complete the 2.5 evaluations necessary per week to make the scheduled award. Part of the issue taking a significant amount of time regarded the extensive number of items technical evaluators had to review as part of the Equipment List along with reading through a lengthy 25 page narrative for Sub-factors 1 and 2. Combined, this technical evaluation approach was significantly slowing the Technical team, especially due to some poor proposal quality issues from offerors. The Technical team also experienced several issues in terms of proposal quality. The past performance team also encountered issues with offerors providing a base IDIQ contract number without identifying any specific delivery or task orders for the Army to evaluate. Due to these difficulties, both the Past Performance and Technical evaluation teams were behind schedule.

After a meeting with senior Army leaders in April 2023, it was determined that the team, both PEO and ACC-RI, needed to come up with several Courses of Action (COAs)/opportunities in order to streamline the process of evaluating the large amount of interested offerors to make an award much more quickly and efficiently than the current method. From APR 2023 – JUL 2023 ACC-RI assigned a new PCO and lead specialist to the team and PEO committed to assigning additional personnel to the technical team. It was determined that the RFP required an amendment to revise the evaluation criteria in order to streamline the evaluation process. Several amendments starting with Amendment 0029 have been issued. The following highlights the main areas that were revised in the amendments as well as the rationale for the change. Not every specific RFP change is discussed below, however, the key changes to the RFP are noted below:

(a) Added Strict Compliance Requirements: The solicitation that initially closed in October 2022 already contained some Strict Compliance requirements for this solicitation in the form of Attachment 0014. This amendment will increase the number of items with a strict compliance requirement in order to enable the Army to efficiently evaluate and deal with proposals that fail to provide the necessary information requested. In this regard, Strict Compliance Requirements are notably being added to the Equipment List to respond to situations where offerors leave blank cells in the Equipment List. Providing a complete Equipment List (along with a complete proposal) is essential to ensuring not only that the offeror complies with the terms of the solicitation, but failing to provide a complete proposal and Equipment List also significantly slows the evaluation process. Indeed, this issue (blank cells on the Equipment List) significantly slowed the Technical Evaluation Team during its evaluation. By adding strict compliance to the Equipment List, and other material RFP requirements, the Army can ensure it is spending its substantive evaluation time (*i.e.*,

reviewing Technical, Past Performance, Price, and Small Business) on only complete proposals, rather than wading through numerous proposals that are fundamentally incomplete. The RFP will clearly note what requirements are considered matters of strict compliance and also will clearly note that offerors deemed non-compliant will not be further evaluated or considered for award.

(b) Added a "Phased" or "Step" Approach: Prior to this amendment, the RFP contemplated the Technical, Past Performance, Price and Small Business Evaluations occurring following the initial compliance check. This amendment will add a "phased" or "Step" approach where offerors will undergo the Step 1 compliance check and then have the Equipment List Reviewed for Technical Acceptability. The Equipment List was already being evaluated on an Acceptable/Unacceptable basis; however, it was combined with the Subfactor 1 and Subfactor 2 evaluation. Now, the Equipment List will be reviewed at Step 2 and only offerors who receive an Acceptable will proceed to receive further consideration of Technical Sub-factors 1 and 2, along with Past Performance, Small Business, and Price. By using this additional Step 2 approach where offerors must provide an acceptable Equipment List prior to receiving further evaluation, the Army can ensure it is spending its substantive evaluation resources on proposals that are not only complete, but also provide an acceptable baseline Equipment List. Prior to this amendment, even if the Technical Team determined an offeror had an unacceptable Equipment List, the team still had to complete a full Technical evaluation of Sub-factors 1 and 2 in case the SSA decided to include an unacceptable proposal as part of discussions. Additionally, unacceptable proposals would still receive past performance, price and small business evaluations. With this new approach, the Army can streamline its evaluation by ensuring evaluation resources are only spent on proposals with an acceptable equipment list, which should assist the Army in meeting its award date goals.

(c) Added a Statistical Sampling Evaluation Methodology to Step 2: The Equipment List is a large document comprising of seven product catalogs offerors must complete with over 900 cells of data for review. Previously, the Army was going line by line validating each product proposed by every offeror, which was taking significant time, especially with 89 proposals to evaluate. Now, this amendment will introduce a statistical sampling evaluation method to more efficiently evaluate the Equipment List. In this regard, it was determined that the Army will sample 35% of the data, which the technical team believes will provide a sufficient sample size to determine an offeror Technically Acceptable. All offerors will be evaluated for the same sample of products from the various catalogs. The sampling will be as follows:

Catalog 1: first 50 cells due to limited number of cells in the catalog;
Catalog 2: The sample will begin at row 299 and evaluate 50 odd numbers, which provides a more diverse product sampling;
Catalog 3: first 50 cells to allow for maximum diversity in the catalog;
Catalog 4: first 50 cells due to limited number of cells in the catalog;
Catalog 5: There are only 44 cells; as such, all 44 will be evaluated.
Catalog 6: 50 cells beginning at row 8; all even numbers will be evaluated;
Catalog 7: There are only 41 cells; as such, all 41 will be evaluated.

(d) Reduced Technical Page Count: Offerors were provided with 25 pages to demonstrate an approach for Technical sub-factors 1 and 2. Upon review by the Technical Team, it was determined that 25 pages was greatly in excess of what an offeror needs in order to submit a proposal that fully addresses the sub-factor 1 and 2 requirements. Specifically, the Technical evaluators noted that many offerors included a lot of banal commentary throughout the 25 page narrative that served more as promotional material rather than illustrated the merits of an offerors Technical approach. In order to streamline the evaluation process and encourage offerors to succinctly present the merits of their proposal, the page count for Technical Part B (sub-factors 1 and 2) was reduced to eight pages as part of Amendment 0029. However, following extensive consideration of offeror feedback following the issuance of Amendment 0029, it was determined that fourteen pages would both meet the requests of offerors to increase the page count from the previously identified page count of 8 pages in Amendment 0029, while also satisfy the Army's desire to reduce the page count as compared to what offerors provided at the initial closing date of the solicitation (25 October 2022). Fourteen pages is a reasonable number as it effectively provides offerors two pages for each Key Point. Additionally, fourteen pages still allows an offeror to provide the merits of its approach to meeting the Government's requirements, but will encourage offerors to "skip the fluff" and include succinct statements noting how an offeror will provide a solution in response to the RFP's requirements.

(e) Added a Key Point to Sub-factor 2: Key Point 4 is added to Sub-factor 2 in order to provide the Government will a description of how the offeror support and comply with the Statement of Work and the offeror's processes to support contract management. This is added in order to ensure a successful offeror can manage a complex undertaking such as ITES-4H.

(f) Revised Past Performance: The past performance factor also was changed in several key respects. First, if an offeror is submitting an ordering type vehicle contract reference (e.g., IDIQ), the offeror is required to provide the specific Delivery Order (DO) or Task Order (TO) it desires the Army to evaluate. When the Army initially received proposals in October 2022, numerous offerors simply provided the Army with the base IDIQ contract number as a contract reference rather than provide a specific delivery or

task order. Because performance on an IDIQ type contract occurs at the DO or TO level, the Army revised the terms of the RFP to ensure the Army receives specific DO's or TO's where the offeror actually performed. This will also ensure the Army knows exactly which references the offeror desires the Army to evaluate. It will also help the Army ensure an efficient evaluation process by not requiring the Army to guess or review potentially thousands of DO's or TO's issued off of an IDIQ type contract.

Second, the Army revised the relevancy metrics as part of the Amendment process. In this regard, the RFP now sets out specific dollar values and number of catalogs an offeror must meet to receive a particular relevancy rating. Offerors are expected to maintain an active role through extensive participation over the life of the ITES-4H contract. ITES-4H is valued at $10B over the 10-year period. CHESS expects total sales across all awardees to equal approximately $1B per year. The relevancy dollar figures were determined based on ITES-3H historical data points. CHESS looked at the lowest total sales by a single vendor during a single year over the life of the contract and structured the ratings based on that number. Specifically, CHESS determined that the lowest sales by a single vendor during a single year over the life of the contract was $1 million. Because $1 million was the lowest sales by a single vendor, the Army deems this value to equate to a "Relevant" contract reference. Using the lowest total sales of around $1,000,000.00 for a single year of performance allows room for consideration of small business that could compete. Sales above $2,000,000.00 would constitute as very relevant due to the historical data from ITES-3H showing most vendors consistently sold above this number and positively complied with all contract requirements. In addition, CHESS determined anything under the Simplified Acquisition Threshold would be the cutoff for relevant orders from a dollar value perspective. Considering that the total contract value for ITES-4H is $10 billion, the Army's dollar value metrics for relevancy are very reasonable and are on the lower end of the expected amount an awardee would receive as part of this contract effort. The Army has specifically considered the lower threshold numbers in order to promote competition for this effort. Further, the Army has set up the past performance criteria to allow an offeror to meet the dollar value requirements through combining up to five contract references. Overall, the Government has set these dollar figure parameters because it is vital an offeror can manage multiple contracts of higher value during a given period of time. If an offeror is unable to complete multiple orders at a time due to the magnitude of cost that could pose high risk to ITES-4H.

The relevancy definitions also provide a specific number of catalogs an offeror must meet to align with a certain relevancy rating. Similar to the dollar values, the Army has provided great leniency to offerors to meet the requirements. ITES-4H has a total of seven catalogs. Here, to receive a "Very Relevant" rating, an offeror would only need to provide contract

references meeting 4 catalogs (along with the associated dollar value) to receive the highest rating. The Army believes its needs can adequately be met through the aligned catalog numbers and also believes that because the RFP allows offerors to provide up to five references, the Army's catalog relevancy requirements are more than reasonable and do not unduly restrict competition.

I have also considered these amendments in light of the Federal Acquisition Regulation (FAR) requirements at FAR 15.206. Specifically, I do not deem these amendments to meet the requirements of FAR 15.206(e), which would necessitate cancelling the solicitation. In this regard, the requirements for ITES-4H have not changed. The Statement of Work remains the same and the solicitation continues to require offerors provide products that meet the Government's requirements. What is changing is portions of the evaluation criteria and how the Government intends to re-structure the evaluation process to ensure the Army can award ITES-4H requirement in a timely and efficient manner to meet the Army's needs. Because the fundamental ITES-4H requirement remains unchanged in terms of the Army's needs, I do not deem these amendments so substantial that additional sources would have likely submitted offers. Indeed, the changes in these amendments do not so significantly alter the purpose or the nature of the contract. I also note that the RFP was released in August 2021 and did not close until October 2022—over a year for prospective offerors to decide whether to submit a proposal. Ultimately, the Army received 96 proposals in October—a significant amount of industry interest. After conducting the initial compliance checks, 89 proposals remain, which again is a large number offerors. This large number of offerors gives me confidence that the field of competition for ITES-4H would not change based on this amendment. Further, offerors have spent considerable time, effort and money preparing proposals, thus, it is not in the interest of either the Government or offerors to completely cancel the RFP. Based on these considerations, I do not believe the ITES-4H solicitation requires cancellation. Instead, several amendments starting with Amendment 0029 were issued and offerors will be allowed the opportunity to submit revised proposals.

Additionally, the 7 offerors initially deemed non-compliant and removed from the competition will not be re-instated. FAR 15.206(c) notes that "Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition." Because the 7 were already eliminated, the FAR does not require their reinstatement. Further, and importantly, the basis for which the offerors were deemed non-compliant would not change as a result of this amendment because the amendment is not relaxing any of the terms for which the 7 offerors were removed.

(capitalization in original; footnote, alteration, and emphasis added).

Most relevant to the above captioned bid protests was the addition of the "Added Strict Compliance Requirements," which, as described above stated:

(a) Added Strict Compliance Requirements: The solicitation that initially closed in October 2022 already contained some Strict Compliance requirements for this solicitation in the form of Attachment 0014. This amendment will increase the number of items with a strict compliance requirement in order to enable the Army to efficiently evaluate and deal with proposals that fail to provide the necessary information requested. In this regard, Strict Compliance Requirements are notably being added to the Equipment List to respond to situations where offerors leave blank cells in the Equipment List. Providing a complete Equipment List (along with a complete proposal) is essential to ensuring not only that the offeror complies with the terms of the solicitation, but failing to provide a complete proposal and Equipment List also significantly slows the evaluation process. Indeed, this issue (blank cells on the Equipment List) significantly slowed the Technical Evaluation Team during its evaluation. By adding strict compliance to the Equipment List, and other material RFP requirements, the Army can ensure it is spending its substantive evaluation time (*i.e.*, reviewing Technical, Past Performance, Price, and Small Business) on only complete proposals, rather than wading through numerous proposals that are fundamentally incomplete. The RFP will clearly note what requirements are considered matters of strict compliance and also will clearly note that offerors deemed non-compliant will not be further evaluated or considered for award.

(capitalization in original).

The Administrative Record for the above captioned protests reflects that in response to the Solicitation, the Army received 83 proposals, including from the seven protestors.[7]

---

[7] Tab 120 of the Administrative Record, titled "Proposal Tracking Sheet," reflects that, of the 87 proposals the Army expected to receive, 52 proposals were compliant with the strict compliance requirement of Step 1 and moved to Step 2, 28 proposals were non-compliant with the strict compliance requirement of Step 1, 3 proposals were submitted late, and 4 offerors did not submit a proposal. As reflected above, the October 2023 Memorandum for Record states that "the RFP was released in August 2021 and did not close until October 2022—over a year for prospective offerors to decide whether to submit a proposal. Ultimately, the Army received 96 proposals in October," although the October 2023 Memorandum for Record did not indicate a specific year when the 96 proposals were received. The October 2023 Memorandum for Record continues: "After conducting the initial compliance checks, 89 proposals remain, which again is a large number offerors." The Administrative Record does not address the discrepancy between the remaining "89 proposals" in the October 2023 Memorandum for Record and the 83

As indicated above, all seven protestors who filed the above captioned bid protests were eliminated during Step 1 of the Army's ongoing evaluations.

Protestors' Strict Compliance Evaluations

*GovWave*

The Army reviewed GovWave's proposal and found GovWave's proposal Past Performance proposal non-compliant under Step 1. The January 12, 2024 Memorandum for Record for GovWave's evaluation provided:

Proposal submitted by GovWave, LLC. Dated 16 October 2023

The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by GovWave, LLC. Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements

---

proposals the Army ultimately received. Amendment 0029 was issued on August 16, 2023, made significant changes to the evaluation scheme, and changed the proposal due date to October 2, 2023. Amendment 0030 was issued on September 14, 2023, answered questions from offerors, and changed the proposal due date to October 16, 2023. Amendment 0031 was issued on September 28, 2023, made changes to the Solicitation such that "revised proposals are REQUIRED," and maintained the October 16, 2023 due date for proposals. (capitalization in original). Because the contracting officer could not know, when she electronically signed the October 2023 Memorandum for Record, that the Army would receive 96 proposals on October 16, 2023, the 96 proposals referenced by the Memorandum for Record may be referencing the number of proposals the Army received in October 2022, which are not germane to the above captioned bid protests.

The defendant added to the confusion by stating in its omnibus cross-motion for judgment on the Administrative Record: "The Army received eighty-seven proposals on October 16, 2023 in response to the updated RFP, including proposals from GovWave, Futron, ETSI, GAI, DHT, UNICOM and ACC." As summarized above, the Army received 83 proposals in response to the Solicitation, and moreover, given that 3 proposals were received late, it is not clear that the 3 proposals were submitted on October 16, 2023. At a hearing, the court asked the defendant to address the number of proposals actually submitted to the Army, but the defendant was unable offer clarity at the hearing.

encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) will not be considered. **Clarity and completeness are essential**.

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

**a. Volume 3 – Past Performance / Adverse Performance.** The Offeror's Proposal did not acknowledge or include a statement regarding any adverse past performance. The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

L.5.3.2 (b) Specific Proposal Instructions. Adverse Contract Performance: STRICT COMPLIANCE REQUIREMENT: In addition to the contract references, the Offeror shall identify any recent and relevant Government contract(s) it was awarded that encountered any performance problems related to deliverables; services, security violations (i.e. data, physical, virtual, etc.), Environmental Protection Agency (EPA) violations, and every contract that was terminated (termination for default or termination for cause only), in whole or in part from 25 October 2019 through 16 October 2023. If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal. The number of contract references provided in response to this paragraph is unlimited. Submission of Adverse Contract Performance information shall not count as part of the page count for Past Performance.

FINDING 1 – No Statement Acknowledging Adverse Performance: It is critical to the evaluation process that an Offeror provide a statement regarding whether any adverse past performance has occurred or not occurred. Acknowledgement of this requirement is important so that the USG [United States Government] may gather information about an Offeror's past performance in an efficient manner that allows for the evaluation of a proposal to reflect the Offeror's past performance record. When an Offeror's proposal is silent about whether it has any adverse past performance, that silence effectively creates ambiguity and does not equate to a clear statement that the Offeror has none. If Offeror has no history of adverse contract performance, offeror must provide a statement as such.

3. Based upon the above findings and in accordance with the terms of the RFP, Offeror CI [GovWave[8]] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; alterations and footnote added).

---

[8] The Army's evaluation system created a labelling code for each offer in response to the Solicitation. The following codes were used for the protestors in the above captioned bid protests:

CI – GovWave
CG - Futron
AL - Government Acquisitions
DT -DH Technologies
AM - Enterprise Technology Solutions
AU - Unicom
CM - Advanced Computer Concepts

As reflected on the Army's "Proposal Compliance Checklist" for GovWave, for the column, "*Meets terms and conditions of RFP*?" the Army indicated: "NO," with the explanation: "Overall, this proposal is NON-COMPLIANT. Did not acknowledge requirement to identify/discuss any potential adverse contract performacnce [sic]." (capitalization and emphasis in original; alteration added). For Volume 3, the Proposal Compliance Checklist reflected that Volume 3 was submitted and for the column "*Adverse Contract Performance*," the Army indicated "NO," with the explanation: "Not Mentioned in Volume 3, renders proposal non-compliant." (capitalization and emphasis in original). For the column "**Volume 3 Meets Requirements**," the Army indicated "NO." (capitalization and emphasis in original).

*Futron*

The Army reviewed Futron's proposal and found its Equipment List non-compliant under Step 1. The February 15, 2024 Memorandum for Record for Futron's evaluation provided:

Proposal submitted by <u>Futron, Inc.</u>, dated 16 October 2023

1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by <u>Futron, Inc.</u> Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high- quality proposal. Strict Compliance requirements encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP [Request for Proposal]. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 1 – Equipment List (Part A).** Offeror's Equipment List (Attachment 0002) contained a blank cell. Please see table below for the specific cell that is material to the evaluation process and was found blank:

| Equipment List Compliance Check | |
|---|---|
| **Tab** | **Blank Cell in Column D – Proposed Configuration** |
| [redacted] | [redacted] |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offeror's proposal non-compliant and will not be further considered for award.

FINDING 1 – Blank Cell in Column D – Proposed Configuration: It is critical to the evaluation process that all fillable cells in Column D of the Equipment List are complete, as required by the solicitation. Completeness ensures that the Offeror's proposed configuration for each System Description identified on each Catalog (Catalog I through Catalog VII) identifies clear technical detail. Blank cells present a risk of ambiguity and misinterpretation to the USG, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify which product/item an Offeror is proposing. Offerors are required to provide a proposed configuration for every System Description; thus, a complete Equipment List is important to the Government's evaluation. Here, the Government cannot determine if the offeror meets the requirement associated with [redacted] regarding "[redacted]" because the Offeror has provided a blank cell.

3. Based upon the above findings and in accordance with the terms of the RFP, Offeror CG [Futron] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; first alteration in original).

As reflected on the Army's "Proposal Compliance Checklist" for Futron, for the column, "*Meets terms and conditions of RFP*?" the Army indicated "NO," with the explanation: "Overall, this proposal is NON-COMPLIANT." (capitalization and emphasis in original). The Proposal Compliance Checklist reflected that Volume 1 was submitted and the Equipment List at Attachment 0002 was submitted as an Excel file. For the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "NO," with the explanation:

1 Blank in required Proposal Configuration fill-ins, 508 Blanks in catalog ID. PLEASE NOTE: The blanks in the Catalog ID (Column E) are waived from the non-compliance IAW L.5.1.1(e) "The Offeror **may** also complete the Catalog Identification column to coordinate association between equipment list and price models." (emphasis added.)

(capitalization and emphasis in original). For the column "***Volume 1 Meets Requirements***," the Army indicated "NO." (capitalization and emphasis in original).

*Government Acquisitions*

The Army reviewed Government Acquisitions' proposal and found its Price proposal non-compliant under Step 1. The January 11, 2024 Memorandum for Record for Government Acquisitions' evaluation provided:

Proposal submitted by <u>Government Acquisitions, Inc.</u> (GAI), dated 16 October 2023

1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by <u>Government Acquisitions, Inc.</u> (GAI) Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to

provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contains one blank cell on Tab Catalog III-O, Cell G6 *Fixed Discount for Warranty Variations*.

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as 'contractor fill-in' that are blank or unintelligible in Attachment 0004 will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror's intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalog identified in the Price Model of the solicitation will render the Offeror ineligible for award.

FINDING 1 – A cell that is color-coded for "contractor fill-in" is blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed in order to perform an accurate and complete evaluation. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the proposed price, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify if or what is the *Fixed Discount for Warranty Variation* for Tab Catalog III-O. This information is important to ensuring the Government knows the pricing associated with the Offeror's proposal.

> 3. Based upon the above findings and in accordance with the terms of the RFP, Offeror AL [Government Acquisitions] determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization, emphasis, and second alteration in original).

As reflected on the Army's "Proposal Compliance Checklist" for Government Acquisitions, for the column, "*Meets terms and conditions of RFP?*" the Army indicated: "No." (capitalization and emphasis in original). The Proposal Compliance Checklist reflected that Volume 2 was submitted and Attachment 0004 was submitted as an Excel file. For the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "No," with the explanation: "Blank cells identified."(emphasis in original). For the column "**Volume 2 Meets Requirements**," the Army indicated "No." (capitalization and emphasis in original).

*DH Technologies*

The Army reviewed DH Technologies' proposal and found its Price proposal non-compliant under Step 1. The February 12, 2024 Memorandum for Record for DH Technologies' evaluation provided:

> Proposal submitted by <u>DH Technologies, LLC</u>. Dated 16 October 2023

> 1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by <u>DH Technologies, LLC</u>. Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict compliance requirements encourage consistency and accuracy of information presented. Further, ensuring the Offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

> a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further

evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that the above referenced proposal is non-compliant:

a. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contained material blank cells. Please see table below for specific cells that were found blank:

| Price Model Compliance Check | |
| --- | --- |
| Tab | Column D – Proposed Configuration |
| Catalog I-O | D29, D30 |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will

render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror's intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the Offeror ineligible for award.

FINDING 1 – Two cells that are color-coded for Contractor Fill-in are blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed for a particular product in order to perform an accurate and complete evaluation. Additionally, it is particularly critical to the evaluation process that all fillable cells in Column D – Proposed Configuration of the Price Model are complete to ensure that the Price Model can be cross walked with Column D of the Equipment List. This ensures that the Offeror consistently proposed its items on both solicitation attachments; the Catalog ID does not provide enough information. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the product and price an offeror is proposing, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify the product associated with a particular price.

A Note Regarding Finding 1: The Army does note that the Offeror has placed information regarding the Catalog Identification in Column E for the associated blank cells. However, the information contained in Column E that is associated with D29 and D30 is insufficient to find this offeror compliant for the following reasons:

1) As noted above, it is important to the evaluation of proposals that Offerors ensure consistency between the Equipment List and Price Matrix. This ensures that not only can the Government adequately evaluate and assess the price for the products an offeror is proposing, but also makes certain that the offeror does not list one item on the Equipment List and list an entirely different and potentially unacceptable item on the Price Matrix. The Equipment List and the Price Matrix must be consistent, especially in regards to column D, to ultimately ensure the Government is receiving products that meet the Government's minimum requirements at a fair and reasonable price. By only providing the catalog identification number, the

<u>Offeror does not clearly note what product it is proposing at the associated price.</u>

2) To the extent the offeror asserts that the Army, for the purposes of the compliance check, should cross-reference the Offeror's Equipment List to the Price Matrix, such an assertion would be contrary to the terms of the RFP. The RFP provides at L.4.1 that "Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted." Thus, based on the clear language of L.4.1, the burden was on the offeror to ensure volumes are self-contained and contain all necessary information for the Government to evaluate.

3) It is also noted that It is an offeror's responsibility to submit a well-written proposal, with adequately detailed information which clearly demonstrates compliance with the solicitation requirements and allows a meaningful review by the Army. It is not the Army's responsibility to scour through various proposal documents to try and make an offeror compliant. Rather, as the RFP notes, it is the offeror's responsibility to comply with the clear solicitation requirements and place all information in the correct volume in order to allow the Government to conduct an efficient and effective evaluation.

4) Fundamentally, without a clear description of the product proposed in cells D29 and D30, the Army cannot know what product is being proposed at the price noted in the Price Matrix, which materially inhibits the evaluation.

3. Based upon the above findings and in accordance with the terms of the RFP, Offeror DT [DH Technologies] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; second alteration in original).

As reflected on the Army's "Proposal Compliance Checklist" for DH Technologies, for the column, "*Meets terms and conditions of RFP*?" the Army indicated "No," with the explanation: "Overall, this proposal is NON-COMPLIANT." (capitalization and emphasis in original). For Volume 1, the Proposal Compliance Checklist reflected that Volume 1 was submitted and the Equipment List at Attachment 0002 was submitted as an Excel file. The Army indicated for the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited),*" "Yes," with the explanation: "Catalog ID has blanks, L.5.1.1(e) provided that: 'The Offeror ***may*** also complete the Catalog Identification column to coordinate association between equipment list and price

models.' (emphasis added.)  Non-compliance for this issue will be waived." (emphasis in original). For the column "***Volume 1 Meets Requirements***," the Army indicated "Yes." (emphasis in original). As reflected on the Proposal Compliance Checklist for Volume 2, the Proposal Compliance Checklist reflected that Volume 2 was submitted and for the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited),*" the Army indicated "NO," with the explanation:

> 1. Catalog I-O, Cells D29, D30 are blank.
> 2. Catalog Identification (Cell B6) on the top of some Tabs is blank. These blank cells are immaterial as it is clear what catalog the offeror is proposing to because each Tab is already labeled by the Government as to the respective catalogs.

(capitalization and emphasis in original). For the column "**Volume 2 Meets Requirements**," the Army indicated "NO." (capitalization and emphasis in original).

*Enterprise Technology Solutions*

The Army reviewed Enterprise Technology Solutions' proposal and found its Price proposal non-compliant under Step 1. The January 29, 2024 Memorandum for Record for Enterprise Technology Solutions' evaluation provided:

> Proposal submitted by <u>Enterprise Technology Solutions, Inc.</u> (ETSI), dated 16 October 2023
>
> 1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by <u>Enterprise Technology Solutions, Inc. (ETSI)</u> Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:
>
> a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE

REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contained multiple blank cells. Please see table below for specific cells that are material to the evaluation process and were found blank with no additional explanations on the excel sheet:

| Price Model Compliance Check | | | |
|---|---|---|---|
| Tab | Column D<br>Proposed Configuration | Column E<br>Catalog Item Number | Column H<br>Catalog Unit Price |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror's intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the Offeror ineligible for award.

  FINDING 1 – Multiple cells that are color-coded for contractor-fill in are blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed in order to perform an accurate and complete evaluation. Additionally, it is particularly critical to the evaluation process that all fillable cells in Column D – Proposed Configuration of the Price Model are complete to ensure that the Price Model can be cross walked with Column D of the Equipment List. This ensures that the offeror consistently proposed its items on both solicitation attachments. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the proposed price, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify the proposed price for a particular product.

3. Based upon the above findings and in accordance with the terms of the RFP, Offeror AM [Enterprise Technology Solutions] is determined to be

non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization, emphasis, and second alteration in original).

As reflected on the Army's "Proposal Compliance Checklist" for Enterprise Technology Solutions, for the column, "*Meets terms and conditions of RFP?*" the Army indicated: "No." (capitalization and emphasis in original). The Proposal Compliance Checklist reflected that Volume 2 was submitted and Attachment 0004 was submitted as an Excel file. For the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "No," with the explanation:

(1) Material Blank cells identified as Non-Compliant, which is described in the compliance MFR.

(2) PLEASE NOTE: the USG reviewed Blanks Cells in Column E of all Catalogs. Except those noted in the compliance MFR, the remaining blanks in Column E are immaterial because of the offeror's response in Column D. The Offeror has noted that the [redacted], thus the offeror has provided a reason for not assigning a catalog number.  The compliance MFR notes cells where the offeror did not provide any rationale in Column D or E as to the blank cells.

(3) PLEASE NOTE: The Government noted that there is a blank Unit Price [redacted] in Catalog [redacted] and in Catalog [redacted]. Because the Offeror has noted that [redacted] the Government does not find the Offeror non-compliant for these cells. Effectively, the Offeror has provided a reason as to why some cells were left blank.  Thus, based on the particular circumstances of this Offeror's Price Model, the Government does not find the Offeror non-compliant for these blank cells.

(capitalization and emphasis in original). For the column "**Volume 2 Meets Requirements**," the Army indicated "No." (capitalization and emphasis in original).

*Unicom*

The Army reviewed Unicom's proposal and found its Equipment List non-compliant under Step 1. The February 15, 2024 Memorandum for Record for Unicom's evaluation provided:

Proposal submitted by <u>UNICOM Government, Inc</u>, [sic] dated 16 October 2023

1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by <u>UNICOM Government, Inc.</u> Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal

determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 1 – Equipment List (Part A).** Offeror's Equipment List (Attachment 0002) contained one blank cell in [redacted]. This cell is material to the evaluation process.

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offeror's proposal non-compliant and will not be further considered for award.

  FINDING 1 – Blank Cell in Column D – Proposed Configuration: It is critical to the evaluation process that all fillable cells in Column D of the Equipment List are complete, as required by the solicitation. Completeness ensures that the Offeror's proposed configuration for each System Description identified on each Catalog (Catalog I through Catalog VII) identifies clear technical detail. Blank cells present a risk of ambiguity and misinterpretation to the USG, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly know what product/item an Offeror is proposing. Offerors are required to provide a proposed configuration for every System Description; thus, a complete Equipment List is important to the Government's evaluation. Here, the Government cannot determine if the offeror meets the requirement associated with [redacted] because the offeror has provided a blank cell.

3. Based upon the above findings and in accordance with the terms of the RFP, Offeror AU [Unicom] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; alterations added).

As reflected on the Army's "Proposal Compliance Checklist" for Unicom, for the column, "*Meets terms and conditions of RFP*?" the Army indicated: "No." (capitalization and emphasis in original). The Proposal Compliance Checklist reflected that Volume 1

was submitted and the Equipment List at Attachment 0002 was submitted as an Excel file. For the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "No," with the explanation:

> 1. 1 blank cell in Catalog II configuration that is material: [redacted]
>
> 2. Note: Blank cells were also identified in the Catalog ID column. However, due to a solicitation ambiguity, these blank cells in Column E do not make the Offeror non-compliant. See MFR regarding the ambiguity for further details.

(emphasis in original). For the column "**Volume 1 Meets Requirements**," the Army indicated "No." (capitalization and emphasis in original). Similarly for Volume 2, the Proposal Compliance Checklist reflected that Volume 2 was submitted and for the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "No," with the explanation:

> Please note [redacted]. As it pertains to this Offeror's proposal, these cells are immaterial as the Offeror input a response in Column D noting its proposed technical approach, which explains why the cells are blank. Here, [redacted]. Because the Offeror has explained why the cells are blank, these cells are immaterial to the Step 1 evaluation.

(capitalization and emphasis in original). The Proposal Compliance Checklist asked if "**Volume 2 Meets Requirements**," and the Army indicated "No."

*Advanced Computer Concepts*

The Army reviewed Advanced Computer Concepts' proposal and found its Equipment List non-compliant under Step 1. The February 14, 2024 Memorandum for Record for Advanced Computer Concepts' evaluation provided:

> Proposal submitted by <u>Advanced Computer Concepts</u>, dated 16 October 2023
>
> 1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by <u>Advanced Computer Concepts</u> Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements

encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP [Request for Proposal]. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 1 – Equipment List (Part A).** Offeror's Equipment List (Attachment 0002) contained blank cells. Please see table below for the specific cell that is material to the evaluation process and was found blank:

| Equipment List Compliance Check | |
|---|---|
| Tab | Blank Cells in Column D – Proposed Configuration |
| [redacted] | [redacted] |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offeror's proposal non-compliant and will not be further considered for award.

  FINDING 1 – Blank Cells in Column D – Proposed Configuration: It is critical to the evaluation process that all fillable cells in Column D of the Equipment List are complete, as required by the solicitation. Completeness ensures that the Offeror's proposed configuration for each System Description identified on each Catalog (Catalog I through Catalog VII) identifies clear technical detail. Blank cells present a risk of ambiguity and misinterpretation to the USG, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify which product/item an Offeror is proposing. Offerors are required to provide a proposed configuration for every System Description; thus, a complete Equipment List is important to the Government's evaluation. Here, the Government cannot determine if the offeror meets the requirement associated with [redacted] regarding "[redacted]" because the offeror has provided a blank cell.

  3. Based upon the above findings and in accordance with the terms of the RFP, Offeror CM [Advanced Computer Concepts] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; first alteration in original).

As reflected on the Army's "Proposal Compliance Checklist" for Advanced Computer Concepts, for the column, "*Meets terms and conditions of RFP?*" the Army indicated: "No," with the explanation: "Overall, this proposal is NON-COMPLIANT. Blanks in Equipment List." (capitalization and emphasis in original). The Proposal Compliance Checklist reflected that Volume 1 was submitted and the Equipment List at Attachment 0002 was submitted as an Excel file. For the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "No," with the explanation:

1. 1 blank cell in [redacted] configuration that is material: [redacted].

2. Note: Blank cells were also identified in the Catalog ID column. However, due to a solicitation ambiguity, these blank cells in Column E do not make the Offeror non-compliant. See MFR regarding the ambiguity for further details.

(capitalization and emphasis in original). For the column "**Volume 1 Meets Requirements**," the Army indicated "NO." (capitalization and emphasis in original).

Additionally, for price, the Proposal Compliance Checklist reflected that Volume 2 was submitted and Attachment 0004 was submitted as an Excel file. For the column "All contractor filled cells are completed? (blank/unintelligible fills are prohibited)," the Army indicated "No," with the explanation:

Please note [redacted]. As it pertains to this Offeror's proposal, these cells are immaterial as the Offeror input a response in Column D noting its proposed technical approach, which explains why the cells are blank. Here, [redacted]. Because the Offeror has explained why the cells are blank, these cells are immaterial to the Step 1 evaluation.

Although noting that there were "33 Total Blank cells in Price Model," for the column "**Volume 2 Meets Requirements**," the Army indicated "YES." (capitalization and emphasis in original).

As described above, in response to being eliminated by the Army under Step 1 of the evaluation process, each of the seven protestors filed a pre-award bid protest in the United States Court of Federal Claims, the above captioned bid protests, alleging the Army arbitrarily and capriciously eliminated them from further evaluation of their proposals for possible award of the procurement.

Protestors' Complaints

*GovWave*

As stated above, the Army reviewed GovWave's proposal and found GovWave's Past Performance proposal non-compliant under Step 1. In its amended complaint, GovWave argues that the Army eliminated GovWave's proposal

because, after its initial review of GovWave's proposal, the Agency is unsure whether GovWave has any adverse past performance. The Army made this decision even though Solicitation No. W52P1J20R0082 required offerors with adverse past performance to identify such contracts in their proposal and provide various details and documents about their adverse past performance, and GovWave's proposal includes none of this information because it does not have any adverse past performance to address. The Army also made this decision despite several statements in

GovWave's proposal that, like the absence of any identified contracts or further details about adverse past performance, confirm it does not have adverse past performance. For example, GovWave's proposal states that [redacted].

(internal references and footnote omitted). GovWave continues:

The Army believes it is justified in removing GovWave from the competition (and the opportunity to provide ITES hardware for the next ten years) before conducting a full evaluation of its proposal because the Army claims the Solicitation contained a so-called "strict compliance requirement" mandating that GovWave use specific language to state that it does not have any adverse past performance. Yet, the Solicitation did not include "magic language" that offerors had to use if they do not have adverse past performance and, moreover, the Solicitation did not identify this instruction as a strict compliance requirement. The operative strict compliance requirement in the Solicitation only applied to the identification of recent and relevant contracts that encountered performance problems, which, again, GovWave does not have. There are other flaws in the Agency's decision, insofar as it indicates the Agency used an unstated evaluation criterion and that it abused its discretion in not seeking clarification of the perceived ambiguity or waiving an obvious and minor informality in GovWave's proposal. Indeed, this matter could be easily and quickly resolved through clarification in a one-sentence email or a brief phone call through which GovWave would confirm what it believes is already clear from its proposal: namely, that it does not have any recent and relevant contracts that encountered performance problems. Such a clarification would not require a revision to GovWave's proposal, would not delay the procurement any longer than it takes the Agency to ask, "please confirm you have no adverse past performance," and would ensure the Agency has the benefit of GovWave's strong proposal in the competition for the Solicitation.

GovWave's amended complaint has five counts: In Count One, GovWave alleges that "[t]he Agency's interpretation of the strict compliance requirement for adverse contract performance is contrary to the Solicitation and constitutes use of an unstated evaluation criterion." (alteration added). In Count Two, GovWave alleges "[t]he Agency's finding that GovWave's proposal does not comply with the instructions for adverse contract performance is arbitrary and capricious." (alteration added). In Count Three, GovWave contends "[i]f the Agency had any doubt about whether GovWave had adverse Past Performance, it should have sought clarification of GovWave's proposal." (alteration added). In Count Four, GovWave alleges, "[i]n the alternative, the Agency's decision to exclude GovWave's proposal for an obvious informality or minor irregularity is arbitrary, capricious, and an abuse of discretion." (alteration added). In Count Five, GovWave argues "[a]lternatively, the Solicitation contained a latent ambiguity." (alteration added). In Count Six, GovWave argues that "[t]he Agency engaged in disparate treatment and unequally evaluated GovWave's proposal to its prejudice." (alteration added). GovWave asks this court to declare "the Agency's evaluation of GovWave's proposal arbitrary,

capricious, and contrary to law," order the Army to "rescind its elimination of GovWave's exclusion from the competition and reinstate GovWave into Step 2 of the evaluation process," or, alternatively, "require the Agency to clarify its requirements in an amended Solicitation, resolicit revised proposals, and evaluate proposals in accordance with the law."

*Futron*

As reflected above, the Army reviewed Futron's proposal and found its Equipment List non-compliant under Step 1. Futron's complaint has a single count and alleges that "[t]he Army abused its discretion by failing to allow Futron to correct the omission through clarification," arguing that "the agency "excluded Futron from competition because Futron left one cell blank in its equipment list. Excluding Futron instead of seeking clarification was improper. First, the error is minor and can easily be corrected. All information pertaining to the [redacted] is featured in the cells above and below the blank," and, furthermore, that "the Army was on notice of the error." (alteration added). Futron further alleges that "[t]he Solicitation requirement also does not serve a substantive purpose or deprive the Army of any substantive information." (alteration added). Futron asks the court to determine "that the Army's decision to eliminate Futron from consideration was arbitrary, capricious and irrational," and "[r]equire the Army to evaluate Futron's proposal." (alteration added).

*Government Acquisitions*

As indicated above, the Army determined Government Acquisitions' Price proposal was non-compliant under Step 1. Government Acquisitions' amended complaint begins by alleging

> GAI's [Government Acquisitions'] summary exclusion from evaluation under the Army Contracting Command Solicitation W52P1J-20-R-0082 for Information Technology Enterprise Solutions 4 Hardware was in error. The Agency's exclusion of GAI was arbitrary, capricious, an abuse of discretion, and was otherwise contrary to law for the following reasons: the Agency's interpretation of Strict Compliance is arbitrary, capricious, and otherwise not in accordance with law; the Agency's finding that GAI's proposal does not comply with the instructions for cell completion is arbitrary, capricious and otherwise not in accordance with law; the Agency abused its discretion by not waiving the blank cell as a minor informality or irregularity; the Agency's failure to seek clarification was arbitrary, capricious, and was otherwise not in accordance with law; the Solicitation was latently ambiguous; the Agency failed to comply with stated evaluation criteria and applied unstated evaluation criteria to the evaluation of offers; and the Agency disparately evaluated proposals.

(internal references omitted; alteration added). Government Acquisitions' amended complaint noted that for the pricing information, the

data had to be entered manually. The use of formulae to populate the spreadsheet was not permitted, and the spreadsheet was password protected. Offerors could not use common programs both internal and external to Excel to prepare or review the Amendment 31 spreadsheet. Offerors were given 18 calendar days to complete the 1,352 cells in the pricing spreadsheet. In the course of manually moving the data from the original spreadsheets Amendment 31 spreadsheet, GAI left Cell G6, *Fixed Discount for Warranty Variations,* on Tab Catalog III-O blank. It was GAI's understanding that the government would not assign a 0 to a blank cell. Normally when a column is summed in an Excel spreadsheet, it only sums the numbers occurring after the blank space. For example, if there are 10 rows in a column of numbers and the 6th row is a blank, the system will only sum the last 4 rows. When this happens, the user is alerted that there must be a blank cell somewhere because the total number will be off. Apparently, contrary to what the solicitation stated regarding blank cells, the government had an algorithm embedded in the spreadsheet that assigned a zero value to the blank cell, or its formula construction led to that result. Had the spreadsheet provided by the Army not assigned a 0 value to the blank cell, the whole column would not have been included in the total and GAI would have been alerted that the total was dramatically different than expected and would have gone looking for a blank cell. GAI's Total Contract Line Price was only [redacted] higher than presented by GAI's initial submission, so that did not raise any red flags for GAI.

(internal references omitted; emphasis in original). Government Acquisitions' amended complaint has seven counts, in Count One, Government Acquisitions alleges that "[t]he Agency's interpretation of the strict compliance requirement regarding blank cells is arbitrary, capricious, and otherwise not in accordance with law." (alteration added). In Count Two, Government Acquisitions argues "[t]he Agency's finding that GAI's proposal does not comply with the instructions for cell completion is arbitrary and capricious." (alteration added). In Count Three, Government Acquisitions alleges that "[t]he Agency abused its discretion by not waiving the blank cell G6 as a minor informality or irregularity." (alteration added). In Count Four, Government Acquisitions claims that "[i]f the Agency had any doubt about GAI's discount percentage it should have sought clarification of GAI's proposal." (alteration added). In Count Five, Government Acquisitions alleges that "[t]he Solicitation was latently ambiguous." (alteration added). In Count Six, Government Acquisitions alleges that "[t]he Agency's failure to comply with the stated evaluation criteria was arbitrary and capricious." (alteration added). In Count Seven, Government Acquisitions argues that "[t]he Agency evaluated offers unequally." (alteration added). Government Acquisitions asks the court to order "the Agency to rescind its elimination of GAI's exclusion from the competition and reinstate GAI into Step 2 of the evaluation process," or "[a]lternatively, require the Agency to clarify its requirements in an amended Solicitation, resolicit revised proposals, and evaluate proposals in accordance with the law." (alteration added).

*DH Technologies*

As referenced above, the Army reviewed DH Technologies' proposal and found its Price proposal non-compliant under Step 1. Prior to filing a complaint, and then an amended complaint in this court, DH Technologies filed a bid protest at the GAO "that was dismissed by the GAO as a result of other protests being filed at the Court." DH Technologies' amended complaint in this court has five counts. In Count One, DH Technologies alleges that "[t]he very information that the Agency rejected DH Tech's proposal for being missing was actually found in other parts of its proposal in the same volume," and "[w]hile the Solicitation did contain a prohibition on cross-referencing the five separate volumes as each volume self-contained," "there was no prohibition in the Solicitation on the Agency cross-referencing within a particular volume. Since the alleged missing information was in the proposal, albeit in another place than where the Agency found it to be missing, it was still in the same volume proposal." (alterations added; internal references omitted). In Count Two of the amended complaint, DH Technologies alleges the "Army improperly rejected DH Tech's proposal for failure to meet a minor and immaterial defect." In Count Three, DH Technologies alleges that "[t]he Agency should have waived the requirement." (alteration added). In Count Four, DH Technologies' amended complaint argues that the "Agency evaluated offerors unequally." In Count Five, DH Technologies alleges that the "Agency engaged unequal clarifications/discussions." DH Technologies requests the court find the Army's actions were "irrationally based [sic], arbitrary, capricious, and contrary to applicable statutes and regulations," and "require the Agency to properly evaluate Plaintiff's proposal." (alteration added).

*Enterprise Technology Solutions*

As referenced above, the Army reviewed Enterprise Technology Solutions' proposal and found its Price proposal non-compliant under Step 1. Enterprise Technology Solutions' amended complaint argues that

> [t]he Army deviated from its own Solicitation criteria in its evaluation of ETSI's [Enterprise Technology Solutions'] proposal—but followed such criteria for other proposals that moved on to step two of the evaluation; and thus, it unequally evaluated offerors. The Army engaged in unfair and unequal clarifications with offerors. It failed to provide an administrative record sufficiently justifying its evaluation decisions. And the Army was latently ambiguous as to the utilization of the price model spreadsheet for this Solicitation. Were proposals properly evaluated, ETSI would have advanced in this competition, with a substantial chance of award.

(alterations added; internal references omitted). Enterprise Technology Solutions' amended complaint argues that

> [t]he Administrative Record produced by the Army for this case shows multiple offerors deemed compliant and allowed to move on to step two that had blank fields in their price model—blank fields identical to the blank fields

in ETSI's price model that the Army specifically relied on to deem ETSI non-compliant. The Administrative Record shows multiple offerors deemed compliant and allowed to move on to step two that filled out their price models in the same and/or similar fashion as ETSI. The Administrative Record shows multiple offerors deemed compliant and allowed to move on to step two that included non-numerical explanations (i.e., "N/A") in fields of their price models the same as and/or similar to ETSI's non-numerical explanations in those same fields of ETSI's price model, upon which Army specifically relied to deem ETSI non-compliant. The Administrative Record even shows at least one offeror excluded from the competition at step one purportedly based on blank fields in another proposal attachment—but which had some of the same blank fields and similar non-numerical explanations in certain fields of its price model as ETSI's price model was excluded for—and which: (i) received a notification from the Army of non-compliance and exclusion from competition for blank fields in another proposal attachment; (ii) apparently, subsequently sent the Army a response or responses to (or otherwise communicated with the Army responding to) the Army's notification of its noncompliance and exclusion from competition; (iii) received a second notification letter from the Army *amending* the Army's position on its compliance as a result of the offeror's communicated responses; and (iv) was then allowed back in the competition and promoted to step two of the competition.

(emphasis in original; alteration added). In Count One of five counts in Enterprise Technology Solutions' amended complaint, the protestor alleges that "[t]he Army's evaluation of ETSI deviated from the Solicitation." (alteration added). In Count Two, Enterprise Technology Solutions' amended complaint alleges "[t]he Army engaged in unequal evaluation of offerors." (alteration added). In Count Three, Enterprise Technology Solutions alleges that "[t]he Army engaged in unequal clarifications with offerors." (alteration added). In Count Four of the amended complaint, Enterprise Technology Solutions alleges that "[t]he Army inadequately documented its evaluation." (alteration added). In Count Five, Enterprise Technology Solutions alleges that "[t]he debrief shows a latent ambiguity/contra proferentem." (alteration added). Enterprise Technology Solutions seeks an order from this court declaring "that the Army's evaluation of ETSI's proposal and resulting elimination of ETSI from competition were arbitrary and capricious," and instructing the "Army to conduct a re-evaluation of certain or all proposals, in line with its equal evaluation requirements, consistent with the reasonable interpretation ETSI (and potentially others) applied," or, "[a]lternatively, require the Army to officially clarify its requirements related to the price model attachment in the Solicitation in an amended Solicitation, ensure the input the Army is requiring for each field is not limited by the spreadsheet, and allow for relevant revisions to all proposals," and subsequently require the Army to re-evaluate all the proposals. (alteration added).

*Unicom*

As described above, the Army reviewed Unicom's proposal and found its Equipment List non-compliant under Step 1. Unicom's complaint in this court alleges

> [c]ontrary to the express terms of the Solicitation, the Agency impermissibly broadened its Step 1 evaluation and disqualified UGI's [Unicom's] proposal based on an alleged "material" omission in UGI's proposal. Specifically, the Agency eliminated UGI's proposal based on a Solicitation term that was not a "Strict Compliance Requirement" and UGI's inadvertent and immaterial omission of information from one cell of a fifty-four (54) page, seven (7) tab Excel spreadsheet that UGI should have been permitted to correct.

(alterations added). Unicom's complaint continues:

> The Agency contends that exclusion of UGI from the competitive range was proper because UGI failed to comply with a "Strict Compliance Requirement" of the Solicitation, compliance with which was to be evaluated at Step 1 of a three-step proposal evaluation process. The Agency's position is unsupported by the terms of the Solicitation. Completion of the missing cell was not a Strict Compliance Requirement under the Solicitation and, therefore, was not subject to the Step 1 evaluation. Moreover, the omission of information from a single spreadsheet cell was an obvious, immaterial, and clerical error. The relevant information was reflected elsewhere in UGI's proposal.

(internal references omitted). Unicom's complaint has four counts. Count One alleges "[t]he Agency failed to properly perform its 'Step 1' evaluation in accordance with the terms of the Solicitation and applied unstated evaluation criteria." (alteration added). Count Two alleges "[t]he Agency's finding that UGI's proposal does not comply with the Solicitation instructions and exclusion of UGI's proposal from the Step 2 evaluation is arbitrary and capricious." (alteration added). Unicom's complaint at Count Three alleges "[i]f the Agency had any doubt about whether UGI's proposed Performance Notebook (GSS High End Laptop) product included [redacted], the Agency should have permitted UGI to correct or clarify an obvious and immaterial clerical error in its proposal." (alteration added). Count Four alleges "[i]n the alternative, the Agency's decision to exclude UGI's proposal for an obvious informality or minor irregularity is arbitrary, capricious, and an abuse of discretion." (alteration added). Unicom seeks a court order that "the Agency's evaluation of UGI's Proposal was arbitrary, capricious, and contrary to law," and "requiring the Agency to rescind its elimination of UGI's exclusion from the competitive range and reinstate UGI into Step 2 of the Solicitation evaluation process," requiring "the Agency to permit UGI to clarify and confirm that its proposed Performance Notebook (GSS High End Laptop) [redacted]," and requiring "the Agency to advance UGI's Proposal to Step 2 of the evaluation process."

*Advanced Computer Concepts*

As indicated above, the Army reviewed Advanced Computer Concepts' proposal and found its Equipment List non-compliant under Step 1. Prior to filing a complaint in this court, Advanced Computer Concepts filed a bid protest at the GAO. The GAO subsequently "dismissed the protest because the 'matter involved is currently pending before a court of competent jurisdiction.'" Advanced Computer Concepts' complaint in this court alleges that Advanced Computer Concepts'

> proposed Equipment List contained one minor typographical error—among over a thousand cells that needed to be completed in the Equipment List, ACC [Advanced Computer Concepts] inadvertently a [sic] word from one single cell—[redacted]. In [redacted], ACC was to confirm that the [sic] its [redacted] met the requirement to include a [redacted]. Despite the single blank cell (which the Agency expected to be completed using the word, "meets"), ACC's proposal made an unequivocal commitment to provide a solution that met all of the RFP's requirements—including the requirement for a [redacted]. Based upon the contents of ACC's proposal, there could have been no doubt in the evaluators' minds that ACC's solution was fully compliant with all of the RFP requirements. However, rather than waiving this minor typographical error or conducting a clarification to allow ACC to add the word, "meets" to [redacted] of its Equipment List, the Army improperly elevated form over substance, concluding that this single missing word—a word that had no material impact on ACC's proposal— justified ACC's elimination from the procurement. The Army had no rational basis to eliminate ACC's proposal, rather than waiving or clarifying the immaterial missing word. The Army's decision to eliminate ACC entirely failed to consider an important aspect of the issue: that ACC's proposal made clear—even without the missing word—that its performance laptop met the requirement to include [redacted]. Indeed, because ACC's Equipment List affirmatively stated that its solution included [redacted] and that it would provide a computer using Windows 10 or higher, ACC's solution, by definition, included a [redacted]. It would have been impossible to offer ACC's solution *without* a [redacted]. As a result, there should have been no doubt in the evaluators' minds that ACC's solution met the requirement for a [redacted].

(emphasis in original; alterations added; internal reference omitted). Advanced Computer Concepts' complaint has three counts. In Count One of Advanced Computer Concepts' complaint, Advanced Computer Concepts alleges that "[t]he Army's elimination of ACC's proposal based on its blank [redacted] was arbitrary and capricious." In Count Two, Advanced Computer Concepts alleges that "[t]he Army acted in an arbitrary and capricious manner by failing to waive the minor informality in ACC's proposal." (alteration added). In Count Three, Advanced Computer Concepts alleges "[t]he Army acted in an arbitrary and capricious manner by failing to engage in clarifications with ACC regarding [redacted]." (alteration added). Computer Concepts requests the court to "enjoin the Army

from making award under the Solicitation until the flawed described above are remedied," and Advanced Computer Concepts additionally requests the court order "the Army to include ACC in the competition and reinstate ACC into Step 2 of the evaluation process."

In response to the pre-award bid protests, the court held a series of hearings to address the various bid protests and determine how to proceed in all seven bid protests. After discussions with the parties, the court instructed the defendant to file the Administrative Record. Subsequently, the parties briefed cross-motions for judgment on the Administrative Record and the court held oral argument in all seven bid protests.

## DISCUSSION

Cross-Motions for Judgment on the Administrative Record

Regarding the parties' arguments in the cross-motions for judgment on the Administrative Record, as indicated by the United States Court of Appeals for the Federal Circuit:

> Cross-motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims. "In deciding these motions, the [Claims Court] considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record.'"

XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (alteration in original) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006)));see also DigiFlight, Inc. v. United States, 165 Fed. Cl. 588, 598 (2023); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005)); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); AAR Mfg., Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356-57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CeleraPro, LLC v. United States, 168 Fed. Cl. 408, 425 (2023); CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353-54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)),

amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1343 (Fed. Cir. 2021); Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); DigiFlight, Inc. v. United States, 165 Fed. Cl. at 597. In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (alteration added) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); see also Mitchco Int'l, Inc. v. United States, 26 F.4th 1373, 1377 (Fed. Cir. 2022); Harmonia Holdings Grp. v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Palantir USG, Inc. v. United States, 904 F.3d at 990; AgustaWestland North Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir.) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350-51 (citing Advanced

Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))), reh'g and reh'g en banc denied (Fed. Cir. 2013). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D) (2018);[9] see also REV, LLC v. United States, 91 F.4th 1156, 1163 (Fed. Cir. 2024); Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th 994, 997 (Fed. Cir. 2021); Veterans Cont. Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Per Aarsleff A/S v. United States, 829 F.3d at 1309; Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282,

---

[9] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>      (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>      (B) contrary to constitutional right, power, privilege, or immunity;
>      (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>      (D) without observance of procedure required by law;
>      (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>      (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

1285-86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (first alteration added) (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Cont., Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Off. Design Grp. v. United States, 951 F.3d 1366, 1371 (Fed. Cir. 2020); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests basis, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (alteration added) (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285-86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Connected Glob. Sols., LLC v. United States, 162 Fed. Cl. 720, 732 (2022).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (alteration added) (quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342

(Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ." (alteration added)). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d at 990; Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33). "'"If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6-7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1315 (Fed. Cir. 2021) ("Review in bid protests under the arbitrary-and-capricious standard is 'highly deferential.' Under it, we must 'sustain an agency action evincing rational reasoning and consideration of relevant factors.'" (internal citations omitted)); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard, the Federal Circuit stated "'the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'" (quoting Tex. Crushed Stone Co. v. United States, 35 F.3d 1535, 1540 (Fed. Cir. 1994))); In re Sang Su Lee,

277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. at 382; Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014) (alteration added); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations.").

Furthermore, according to the United States Court of Appeals for the Federal Circuit:

Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa

62

Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324,
1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly,
procurement decisions are subject to a "highly deferential rational basis
review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed.
Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Agile Def., Inc. v. United States,
959 F.3d 1379, 1385 (Fed. Cir. 2020) ("As we have repeatedly recognized, '[c]ontracting
officers are entitled to exercise discretion upon a broad range of issues confronting them
in the procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v.
United States, 238 F.3d at 1332 (alteration, internal quotation marks, and citation omitted
in original))); AgustaWestland N. Am., Inc. v. United States, 880 F.3d at 1332 ("Where,
as here, a bid protester challenges the procurement official's decision as lacking a rational
basis, we must determine whether 'the contracting agency provided a coherent and
reasonable explanation of its exercise of discretion,' recognizing that 'contracting officers
are entitled to exercise discretion upon a broad range of issues confronting them in the
procurement process.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United
States, 238 F.3d at 1332-33 (internal quotation marks and citation omitted))); Weeks
Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement
decisions 'invoke [ ] "highly deferential" rational basis review.' Under that standard, we
sustain an agency action 'evincing rational reasoning and consideration of relevant
factors.'" (alteration in original) (quoting CHE Consulting, Inc. v. United States, 552 F.3d
at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

"Contracting officers 'are entitled to exercise discretion upon a broad range of
issues confronting them in the procurement process.'" PAI Corp. v. United States, 614
F.3d at 1351 (quoting Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d at 1332); see also Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th at
997; DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1310–11 (Fed. Cir. 2021).
"Accordingly, procurement decisions are subject to a 'highly deferential rational basis
review.'" PAI Corp. v. United States, 614 F.3d at 1351 (quoting CHE Consulting, Inc. v.
United States, 552 F.3d at 1354 (internal quotation marks omitted)).

When a contracting officer's discretion grows, so does the burden on the protestor.
As noted in D & S Consultants, Inc. v. United States:

The protestor's burden becomes more difficult the greater the degree of
discretion vested in the contracting officer. DynCorp Int'l v. United States,
76 Fed. Cl. 528, 537 (2007). Negotiated procurements afford the contracting
officer a "breadth of discretion"; "best-value" awards afford the contracting
officer additional discretion. Id. Therefore, in a negotiated, best-value
procurement, the "protestor's burden is especially heavy." Id.

D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 33 (2011), aff'd, 484 F. App'x
558 (Fed. Cir. 2012); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at
1330 (noting that contracting officers have great discretion in negotiated procurements
but even greater discretion in best-value determinations than in procurements based on
cost alone); PHT Supply Corp. v. United States, 71 Fed. Cl. 1, 11 (2006) ("It is critical to

note that 'a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement.'" (citations omitted)). "It is well-established that contracting officers have a great deal of discretion in making contract award decisions, particularly when, as here, the contract is to be awarded to the bidder or bidders that will provide the agency with the best value." Banknote Corp. of Am. Inc. v. United States, 365 F.3d at 1355 (citing TRW, Inc. v. Unisys Corp., 98 F.3d 1325, 1327-28 (Fed. Cir. 1996); E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59); see also Cleveland Assets, LLC v. United States, 883 F.3d 1378, 1382 (Fed. Cir. 2018) ("The arbitrary and capricious standard of review is 'highly deferential,' and procurement officials 'have a great deal of discretion' in their decisions, particularly when, as here, 'the contract is to be awarded to the bidder or bidders that will provide the agency with the best value.'") (quoting Croman Corp. v. United States, 724 F.3d at 1363); see also Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958.

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Fall Lodging Realty, LLC v. United Sates, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995-96; Enhanced Veterans Sols., Inc. v. United States, 131 Fed. Cl. 565, 578 (2017); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Cont., Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (alteration and omission added) (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

A Bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. 550, 555 (2017); FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014), appeal dismissed (Fed. Cir. 2015); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (20113. To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions.

See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error." (alteration added)); see also Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th 994, 997 (Fed. Cir. 2021); Off. Design Grp. v. United States, 951 F.3d at 1371; Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial."); IT Enter. Sols. JV, LLC v. United States, 132 Fed. Cl. 158, 173 (2017) (citing Bannum v. United States, 404 F.3d at 1357-58).

In the above captioned bid protests, defendant argues that

[t]he seven protestors here all challenge their elimination from consideration for their failure to adhere to one of three Strict Compliance requirements. The solicitation expressly informed all offerors that they would be eliminated from consideration if they failed to adhere to all the Strict Compliance requirements, three of which are relevant here: (1) a statement on adverse past performance in Volume III, (2) a complete price model, or (3) a complete equipment list.

(alteration added).

As described above, GovWave was eliminated for failing to comply with the strict compliance requirement for adverse past performance; Government Acquisitions, DH Technologies, and Enterprise Technology Solutions were eliminated for failing to comply with the strict compliance requirement for price; and Futron, Unicom, and Advanced Computer Concepts were eliminated for failing to comply with the strict compliance requirement for the Equipment List. All seven offerors argue that it was arbitrary and capricious for the Army to eliminate their respective proposals on the basis of the strict compliance requirements.

Defendant responds that the strict compliance requirements under the Solicitation

were far from burdensome; most offerors managed just fine, and indeed, the Army was not looking at the substance of the requirements at this stage. Importantly, six of the plaintiffs do not dispute that they left out the information from their equipment list or price model, and the seventh admits that its proposal did not have a statement that it had no adverse past performance. Instead, they put forth myriad arguments about how, they claim, the Army was arbitrary and capricious in its evaluation of their proposals. However, the Army acted rationally, followed the terms of the solicitation, and documented is [sic] rationales when needed. Moreover, these arguments have no merit as they expressly disregard the plain language of the solicitation, the Federal Acquisition Regulation (FAR), and this Court's precedent.

(alteration added). The defendant argues:

The Step 1 plaintiffs incorrectly argue that the Army acted in an arbitrary and capricious manner when it eliminated them because they failed to adhere to the strict compliance requirements. None of the seven Step 1 plaintiffs followed the express, material strict compliance requirements outlined in the solicitation. The Army therefore acted reasonably when it eliminated them from further consideration.

Materiality

In order to determine if the Army acted in an arbitrary and capricious manner, the court must first interpret the Solicitation to determine if the strict compliance requirements were material terms of the Solicitation. The interpretation of a solicitation is a question of law. See Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 736 (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); see also Allicent Tech., LLC v. United States, 166 Fed. Cl. 77, 145 (2023), recons. denied, No. 22-1380C, 2023 WL 4287196 (Fed. Cl. June 30, 2023); Greenland Contractors I/S v. United States, 131 Fed. Cl. 216, 227 (2017) (citing CBY Design Builders v. United States, 105 Fed. Cl. 303, 327 (2012)). Regarding the interpretation of a solicitation, the United States Court of Appeals for the Federal Circuit has stated:

We begin with the plain language of the document. The solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation. If the provisions of the solicitation are clear and *unambiguous*, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them. Finally, we must consider the *solicitation as a whole*, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions.

See Per Aarsleff A/S v. United States, 829 F.3d at 1309 (emphasis in original) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); see also Crowley Gov't Servs., Inc. v. United States, 171 Fed. Cl. 453, 464 (2024) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353); AccelGov, LLC v. United States, 170 Fed. Cl. 508, 516 (2024); Allicent Tech., LLC v. United States, 166 Fed. Cl. at145; ARxIUM, Inc. v. United States, 136 Fed. Cl. 188, 198 (2018) (quoting Banknote Corp. of Am., Inc. v. United States, 365 F.3d at 1353) ("When interpreting a solicitation, the document must be considered as a whole and interpreted 'in a manner that harmonizes and gives reasonable meaning to all of its provisions.'"). Further, a "solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation," and "[i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." Banknote Corp. of Am. v. United States, 365 F.3d at 1353 (alteration added) (quoting Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed.Cir.2003)).

Regarding materiality, the United States Court of Appeals for the Federal Circuit has held "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Allied Tech.

Grp., Inc. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d at 448). The Federal Circuit more recently elaborated:

> A proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to a term or condition that is material. See E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996) ("[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations."). A "defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired." 48 C.F.R. § 14.405.

Oak Grove Techs., LLC v. United States, 116 F.4th 1364, 1379 (Fed. Cir. 2024) (alteration in original); ITellect, LLC v. United States, 173 Fed. Cl. 550, 562 (2024). A Judge of the United States Court of Federal Claims also explained:

> Any deviating proposal "should be considered unacceptable and a contract award based on such an unacceptable proposal [would] violate[ ] the procurement statute and regulations." Id. In other words, a proposal must adequately respond to material requirements in the solicitation. See Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037-38 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals.").
>
> A material solicitation requirement (1) is express in the solicitation, and (2) serves a "substantive purpose." Digiflight, Inc. v. United States, 150 Fed. Cl. 650, 657 (2020) (internal citations omitted), appeal dismissed, No. 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 506-07 (2019) (collecting cases). This Court has held that "[a] proposal's failure to satisfy a material . . . solicitation requirement is a material error." Digiflight, Inc., 150 Fed. Cl. at 657.

Thalin, LLC v. United States, 166 Fed. Cl. 246, 255–56 (2023) (alterations and omission in original); see also ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 508. As cited by the Judge in Thalin, in DigiFlight, another Judge of the United States Court of Federal Claims explained:

> A material solicitation requirement is one that (1) is express in the solicitation, and (2) serves a "substantive purpose." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 506 (2019) (citing Bus.

Integra, Inc. v. United States, 116 Fed. Cl. 328, 333 (2014)). This Court has further defined "substantive purpose" to mean something that is "important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." Id. at 506–07 (citing Bus. Integra, Inc., 116 Fed. Cl. at 333, ST Net, Inc. v. United States, 112 Fed. Cl. 99, 106–110 (2013), Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009), and Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012)). Moreover, to the extent that Federal Circuit case law has yet to recognize this explicitly, this Court holds that so-called "mandatory minimum requirements" are always – and by definition constitute – material solicitation requirements. That is so because a mandatory minimum requirement is one "that a proposal must meet . . . in order to be eligible for evaluation or, conversely, that failure to comply with . . . will lead to outright rejection of the proposal." ManTech Telecommunications & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 67 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002). A proposal's failure to satisfy a material, or mandatory minimum, solicitation requirement is a material error.

DigiFlight, Inc. v. United States, 150 Fed. Cl. 650, 657 (2020), appeal dismissed, 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021).

As noted by a Judge of the United States Court of Federal Claims: "It is undisputed that an agency 'may only accept an offer that conforms to the material terms of the solicitation.'" Elevated Techs., Inc. v. United States, 160 Fed. Cl. 257, 270 (2022) (quoting Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012)). The Judge in Elevated Technologies continued:

A response that fails to conform to the material terms of a solicitation "should be considered unacceptable" because "a contract award based on such a proposal violates the procurement statutes and regulations." Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)); ITT Fed. Servs. Corp. v. United States, 45 Fed. Cl. 174, 194 (1999) ("Generally, the case law provides that a contract award may not be upheld when the [agency] improperly departs from stated evaluation criteria in a solicitation.").

Elevated Techs., Inc. v. United States, 160 Fed. Cl. at 270 (alteration in original). Similarly, the Judge in Bionetics Corp. v. United States noted:

"[A] proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable[.]" E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996). Terms are material when they (1) are express in the solicitation and (2) serve a substantive purpose. ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 506

(2019). "A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." Id. at 506–07 (collecting cases). This Court has previously held that "so called 'mandatory minimum requirements' are always—and by definition constitute—material solicitation requirements." DigiFlight, Inc. v. United States, 150 Fed. Cl. 650, 657 (2020), appeal dismissed, No. 2021-1486, 2021 WL 6337494 (Fed. Cir. Sept. 22, 2021). "A proposal's failure to satisfy a material, or mandatory minimum, solicitation requirement is a material error." Id.

Bionetics Corp. v. United States, 159 Fed. Cl. at 842 (alterations in original).

As indicated above, the Solicitation at issue in the current protests, contained a number of strict compliance requirements, beginning with instructions to offerors, which stated:

L.3 STRICT COMPLIANCE REQUIREMENT

All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

(capitalization in original). This initial strict compliance requirement alerts any potential offeror to the upcoming strict compliance requirements, and that the failure to follow those requirements would render an offeror's proposal non-compliant. Next, the Solicitation in describing the format of the offerors' proposals, explained:

L.4.1.2 Each Offeror shall submit ONLY one proposal and that proposal shall address all of the requirements of the Request for Proposals (RFP). To be considered for this requirement, the Offeror must submit a complete response to this RFP using the instructions provided in Section L. STRICT COMPLIANCE REQUIREMENT: If the Offeror's proposal fails to meet the terms and conditions of the RFP or takes exception to any of the terms and conditions of the RFP, it will render the Offeror's proposal unacceptable and will not be further considered for award.

L.4.1.2 (a) Each Offeror shall submit the most current versions of Attachments 0002, 0004, 0006, 0007 and 0013 required for this RFP. The Government will verify that the Offerors submission contains the most current RFP Attachments 0002, 0004, 0006, 0007 and 0013 that were provided by email with this Amendment.

L.4.1.2 (b) STRICT COMPLIANCE REQUIREMENT: Failure to provide the most current versions of the RFP Attachments 0002, 0004, 0006, 0007 and 0013 shall render the Offerors proposal non-compliant and will not be further considered for award. To be considered for award the Offeror must submit a response to this solicitation in full to include the most recent attachments provided.

L.4.1.3 A proposal is presumed to represent the Offerors best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG)) will not be considered. Clarity and completeness are essential.

(capitalization in original). This portion of the Solicitation makes clear if an offeror does not comply with terms and conditions in the Solicitation, the offeror's proposal would be deemed unacceptable, and if an offer does not provide the most current versions of the attachments for the Equipment List, the pricing spreadsheet, or the past performance questionnaire, a proposal would be non-compliant and not considered for an award.

For Past Performance, the Solicitation provided:

L.5.3.2 Specific Proposal Instructions. This volume shall be organized into the following sections:

a. Contract Reference Information and ITES-4H PPQ POC List (Attachment 0013): The Government will not accept just the basic contract ordering number for ordering type contractual vehicles. Given this, an individual order (or orders) under the basic ordering contract vehicle must be submitted in lieu of just the basic ordering contract itself. Each submitted order shall be counted as one contract reference. For example, if an offeror has performance on an IDIQ type contract, the Offeror must provide the specific orders it desires the Government to evaluate. The Offeror must not provide just the basic IDIQ contract number. All contract reference(s) shall represent recent and relevant performance as a prime and/or first-tier subcontractor under Government Agency contracts (i.e., Department of Defense: Army, Navy, Air Force, Marine Corps, Defense Logistics Agency (DLA) etc.; Federal, Department of Homeland Security, Department of State, etc.). If submitting a reference as a first-tier subcontractor, Offeror is expected to provide the name of the Prime contractor under which it worked. If the Offeror has no Government Agency contracts, commercial references may be provided. The recency period is 25 October 2019 through 16

October 2023. STRICT COMPLIANCE REQUIREMENT: The Offeror must submit a completed ITES-4H PPQ POC List (Attachment 0013) of all the POCs who received a questionnaire with the submission of the proposal. Failure to provide a completed ITES-4H PPQ POC List will render the proposal non-compliant and will not be further considered for award. The past performance questionnaire (Attachment 0007) shall be used for each contract reference submitted. The completed PPQs are excluded from the page count for Past Performance.

b. Adverse Contract Performance: STRICT COMPLIANCE REQUIREMENT: In addition to the contract references, the Offeror shall identify any recent and relevant Government contract(s) it was awarded that encountered any performance problems related to deliverables; services, security violations (i.e. data, physical, virtual, etc.), Environmental Protection Agency (EPA) violations, and every contract that was terminated (termination for default or termination for cause only), in whole or in part from 25 October 2019 through 16 October 2023. If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal. The number of contract references provided in response to this paragraph is unlimited. Submission of Adverse Contract Performance information shall not count as part of the page count for Past Performance.

The Solicitation's strict compliance requirement for adverse contract past performance, which is specifically relevant to protestor GovWave as the only protestor to be eliminated for not meeting the strict compliance requirements for past performance, required the offeror to identify relevant contract performance for the four years preceding the Solicitation, and, if there were no contracts meeting that description, the offeror needed to indicate there were no such contracts in the Past Performance Volume of its proposal.

Regarding the Equipment List under the Technical Factor, the Solicitation provided:

L.5 SPECIFIC PROPOSAL INSTRUCTIONS

L.5.1 VOLUME I - Technical Factor. The volume shall be organized into the following sections:

L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award.

This portion of the proposal shall include a completed Equipment List spreadsheet (Attachment 0002) considering the following instructions:

71

a. The Offerors proposed configuration for each, and every System Description identified on each Catalog (Catalog I through Catalog VII); The Offeror shall complete the Equipment List at Attachment 0002 by providing, in the proposed configuration column, its proposed item to meet each requirement; and

b. An Offerors annotation with technical detail identifying that every Requirement related to each System Description in the proposed configuration is met or exceeded as to be confirmed by the Government. All proposed configuration cells must contain content for the Offerors proposal to receive consideration. STRICT COMPLIANCE REQUIREMENT: Cells that contain linked content are non-compliant. Additionally, modification of the Equipment List outside of indicated proposed configuration inputs are not permitted and will result in a proposal being determined non-compliant and not further evaluated; and

c. An identification of each Offerors proposed configuration product Description providing identification of (brand/model) within the Offerors proposed configuration for each and every System Description; and

d. Each Catalog Identification per each Description (brand/model) and every Platform addition, inclusive to aid in associating equipment list to price models.

e. The Offeror may also complete the Catalog Identification column to coordinate association between equipment list and price models. The burden of proof that the proposed item meets or exceeds the minimum requirements remains with the Offeror.

f. The minimum processor types are defined for Catalogs I and II. Offerors may propose a different base processor if the Offeror provides proof that the processor meets or exceeds the minimal architecture of the processor listed in the Equipment List.

g. Equipment List, electronic copy: Equipment List must remain in native MS Excel file format. Offerors proposed configuration information must be directly input in the proposed configuration field. Equipment List must not be password protected. Offeror proposed configuration input is only permitted in column D. STRICT COMPLIANCE REQUIREMENTS: Failure to provide the most current version of the RFP Attachment 0002 shall render the Offerors proposal non-compliant and will not be further considered for award. Unauthorized modifications to the Equipment List are not permitted and will render an Offerors proposal non-compliant and not further considered for evaluation. Linked inputs are not permissible and will render a proposal non-compliant.

h. The items in the Price Model that refer to the hardware and their detailed specifications are in the Equipment List (Attachment 0002). The pricing proposed in the Price Model (Attachment 0004) shall be for the same products and configurations proposed in the Equipment List (Attachment 0002). Any discrepancy between the product proposed in the Equipment List vs. the product proposed and priced out in the Price Model may result in an unfavorable finding in the Offerors proposal.

(capitalization in original).

The Solicitation's strict compliance requirement for the Equipment List, which is specifically relevant to protestors Futron, Unicom, and Advanced Computer Concepts, provides: "Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award." (capitalization in original). The Equipment List strict compliance requirement makes clear that every cell must be filled in or the offeror's Equipment List will be considered non-compliant.

Regarding Price, the Solicitation provided:

L.5.2 VOLUME II - Price Factor.

The volume shall be organized as follows:

(1) Electronic Copy. Price submission requirements: Files contained in the Volume II Price submission may not be password protected. Electronic links are not permissible. The Offeror shall not include pivot tables in Excel spreadsheets. The Offeror shall complete the Price Model in full. Offerors must ensure that Attachment 0004 is completed and submitted with the proposals. STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

(capitalization in original). The Solicitation's strict compliance requirement for price, which is specifically relevant to protestors Government Acquisitions, DH Technologies, and Enterprise Technology Solutions, demanded that offerors fill in the entire spreadsheet, such that every cell must be filled in or the offeror's price would be considered non-compliant. The Army under lined this requirement by explaining that if a proposed price

was zero, it must be entered as "0" and if left blank, the proposal would be deemed non-compliant.

Finally, the Solicitation identified the strict compliance requirement in the evaluation methodology, which explained:

> This is a competitive best value source selection in which competing Offerors will be evaluated against four evaluation factors: Technical, Price, Past Performance, and Small Business Participation. The contract award decisions will be determined based upon the evaluation of each Offeror's complete proposal against the evaluation criteria identified below. Selection of awardees will be accomplished as follows:
>
> Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as STRICT COMPLIANCE REQUIREMENTS in the Instructions to Offerors of this RFP shall render the Offerors proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

(capitalization in original). This strict compliance requirement reiterated to the offerors that the failure to follow the requirements would render an offeror's proposal non-compliant.

The Army indicated that the Step 1 strict compliance requirements explained that Step 1 was only the first stage in the evaluation process and that initially, at Step 1, proposals were only "reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied." Moreover, the Army explained that "[a]ny items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal," and "[o]nly Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process." (capitalization in original; alterations added). The Army also repeatedly identified the consequences for not complying with the strict compliance requirements, stating: "Failure to provide proposals in compliance with the instructions specified as STRICT COMPLIANCE REQUIREMENTS in the Instructions to Offerors of this RFP shall render the Offerors proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award." (capitalization in original). Specifically, the Army used the phrase "non-compliant" ten times in the above quoted strict compliance requirements and each time indicated that a non-compliant proposal would not be evaluated further and would not continue to be considered for award. The Army, therefore, clearly alerted potential offerors that the proposals would be first evaluated to meet the minimum standards and the failure to meet the minimum standards would result in the elimination of the proposal as non-compliant. As indicated above, the Federal Circuit has held that "[a] proposal's failure to conform to a term or condition of a solicitation renders the proposal unawardable only if the violation relates to

a term or condition that is material." Oak Grove Techs., LLC v. United States, 116 F.4th at 1379 (alteration added); see also Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1329; E.W. Bliss Co. v. United States, 77 F.3d at 448.

The Army's strict compliance requirement for the grounds that the seven above captioned protestors were eliminated were also specifically addressed in the Solicitation. For Past Performance, the Army spelled out that any negative past performance for the last four years needed to be identified, or the proposal would be eliminated for failure to comply with the strict compliance requirement. Further, if the potential offeror did not identify that there was no negative past performance for the last four years, the Army would eliminate the non-compliant proposal for failure to comply with the strict compliance requirement. The Solicitation also made plain that for Step 1, "ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award." The Solicitation also specifically provided for the price spreadsheet:

> All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

(capitalization in original).

The strict compliance requirements for Past Performance, which impacted protestor GovWave, for the Equipment List, which impacted protestors Futron, Unicom, and Advanced Computer Concepts, and for Price, which impacted protestors Government Acquisitions, DH Technologies, and Enterprise Technology Solutions, were material to the Solicitation because they were expressly and repeatedly identified in the Solicitation and served a substantive purpose for the evaluation of the procurement, as well as for the prospects for adequate performance if offerors were awarded a contract. The strict compliance requirements were important to ensure that offerors submitted complete proposals, including attention to detail and to demonstrate the ability to carefully meet government requirements, as well as to ensure consistency of information for evaluation. For example, as stated by the Army, "[b]lank cells present a risk of ambiguity and misinterpretation" to the government. (alteration added). See Thalin, LLC v. United States, 166 Fed. Cl. at 255; Digiflight, Inc. v. United States, 150 Fed. Cl. at 657. As noted in Thalin, "'[a] substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid.'" Thalin, LLC v. United States, 166 Fed. Cl. 246, 255–56 (quoting ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 506-07) (alteration added). An offeror's ability to demonstrate it could meet the announced technical requirements by carefully and completely filling out the Equipment List, the offeror's price proposal, and accurately reveal an offeror's past performance were all

considered in the Solicitation as important to the Army's process to evaluate the offerors' proposals and would have an impact on the review of the quality of an offeror's proposal. Therefore, the court finds that the strict compliance requirements for Past Performance, for the Equipment List, and for Price were material to the Solicitation and meet the definition of "mandatory minimum requirements" identified in DigiFlight, Inc. v. United States. As quoted above,

> so-called "mandatory minimum requirements" are always – and by definition constitute – material solicitation requirements. That is so because a mandatory minimum requirement is one "that a proposal must meet . . . in order to be eligible for evaluation or, conversely, that failure to comply with . . . will lead to outright rejection of the proposal." ManTech Telecommunications & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 67 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002). A proposal's failure to satisfy a material, or mandatory minimum, solicitation requirement is a material error.

DigiFlight, Inc. v. United States, 150 Fed. Cl. at 657 (omission in original); see also Bionetics Corp. v. United States, 159 Fed. Cl. at 842.

Furthermore, to the extent the protestors argue that the information required to meet the Strict Compliance requirements was contained elsewhere in their proposals and the Army should have considered the entirety of their proposals before being eliminated at the Step 1 evaluation process, the Proposal Format at L.4 of the Solicitation specifically stated:

L.4 PROPOSAL FORMAT

This section specifies the format each Offeror shall use in preparing its proposal. The intent is not to restrict the manner in which proposals are prepared, but rather to ensure a certain degree of uniformity in proposal format for evaluation purposes. The proposal shall be prepared in a clear, legible, practical manner. Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted.

(capitalization in original).

Each of the seven above listed protestors were eliminated for not complying with one of the material strict compliance requirements, and the failure to comply with the material requirements was found to be a material error. See Thalin, LLC v. United States, 166 Fed. Cl. at 255–56; Digiflight, Inc. v. United States, 150 Fed. Cl. at 657.

One protestor, GovWave, was eliminated for the failure to comply with the strict compliance requirement for Past Performance. GovWave, as described above, the Army explained: "The Offeror's Proposal did not acknowledge or include a statement regarding any adverse past performance," which did not meet the Adverse Contract Performance strict compliance Solicitation requirement of L.5.3.2(b). Additionally, the January 12, 2024 Memorandum for Record for GovWave's evaluation provided, in part:

> 2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:
>
> **a. Volume 3 – Past Performance / Adverse Performance.** The Offeror's Proposal did not acknowledge or include a statement regarding any adverse past performance. The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:
>
> L.5.3.2 (b) Specific Proposal Instructions. Adverse Contract Performance: STRICT COMPLIANCE REQUIREMENT: In addition to the contract references, the Offeror shall identify any recent and relevant Government contract(s) it was awarded that encountered any performance problems related to deliverables; services, security violations (i.e. data, physical, virtual, etc.), Environmental Protection Agency (EPA) violations, and every contract that was terminated (termination for default or termination for cause only), in whole or in part from 25 October 2019 through 16 October 2023. If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal. The number of contract references provided in response to this paragraph is unlimited. Submission of Adverse Contract Performance information shall not count as part of the page count for Past Performance.
>
> FINDING 1 – No Statement Acknowledging Adverse Performance: It is critical to the evaluation process that an Offeror provide a statement regarding whether any adverse past performance has occurred or not occurred. Acknowledgement of this requirement is important so that the USG may gather information about an Offeror's past performance in an efficient manner that allows for the evaluation of a proposal to reflect the Offeror's past performance record. When an Offeror's proposal is silent about whether it has any adverse past performance, that silence effectively creates ambiguity and does not equate to a clear statement that the Offeror has none. If Offeror has no history of adverse contract performance, offeror must provide a statement as such.

(capitalization and emphasis in original).

GovWave argues that "[t]he Agency's interpretation of the strict compliance requirement for adverse contract performance is contrary to the Solicitation and

constitutes use of an unstated evaluation criterion," and that "[t]he Agency's finding that GovWave's proposal does not comply with the instructions for adverse contract performance is arbitrary and capricious." (alterations added). GovWave argues that "there is nothing in the Solicitation that required GovWave's proposal to contain 'a statement regarding whether any adverse past performance has occurred or not occurred,'" and that all that was required for strict compliance for Past Performance was "a statement regarding whether any adverse past performance has occurred." The court disagrees, the Solicitation at L.5.3.2(b) called for

> Adverse Contract Performance: STRICT COMPLIANCE REQUIREMENT: In addition to the contract references, the Offeror shall identify any recent and relevant Government contract(s) it was awarded that encountered any performance problems related to deliverables; services, security violations (i.e. data, physical, virtual, etc.), Environmental Protection Agency (EPA) violations, and every contract that was terminated (termination for default or termination for cause only), in whole or in part from 25 October 2019 through 16 October 2023. If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal.

The Solicitation demanded that an offeror indicate if negative past performance took place, and also required an offeror to indicate the absence of any negative past performance. The Solicitation plainly calls for both, and both were required to meet the strict compliance requirement of the Solicitation. The Army's strict compliance evaluation did not, therefore, add an unstated evaluation criterion, and it was reasonable for the Army to demand GovWave indicate if any negative past performance had or had not taken place. GovWave also argues

> GovWave's proposal materially complied with that instruction through the following representations:
>
> • GovWave's proposal explained that [redacted].
>
> • GovWave's proposal additionally noted that [redacted].
>
> • GovWave's proposal further explained that it [redacted].
>
> • GovWave's proposal also highlighted that it [redacted].
>
> • GovWave's proposal further noted that its [redacted].

Those representations plainly demonstrate what was already clear given the lack of any identified adverse contract performance in GovWave's proposal, i.e., GovWave has no adverse contract performance. AR 2233. Therefore, GovWave materially complied with the Solicitation instruction to "state as such," particularly given this instruction was not preceded by the

> term "STRICT COMPLIANCE REQUIREMENT" and did not serve a substantive purpose given the strict compliance requirement to identify adverse contract performance if it existed.

(capitalization, emphasis, and alterations in original; internal references omitted). As the government correctly states, however,

> It was not enough for GovWave's proposal to "materially compl[y]" with the solicitation, as GovWave suggests here, where strict compliance was expressly required to pass or fail. Many of the statements in its proposal to which GovWave points were in Volume I addressing past contracts — and these are plainly insufficient to satisfy the Past Performance Strict Compliance Requirement. Strict Compliance requirement required a statement on past performance to be included in *Volume III*. And the language that GovWave points to in Volume III are not statements indicating no adverse past performance, but rather general statements about GovWave's successful past performance. Further, the Army warned offerors that "[t]he Government is under no obligation to search for additional past performance references for any Offeror as the Government intends to evaluate an Offerors past performance based on the information submitted as part of an Offerors proposal."

(emphasis and alterations in original; internal references omitted).

Three protestors were eliminated for the failure to comply with the strict compliance requirement for the Equipment List: Unicom, Advanced Computer Concepts, and Futron. Unicom alleges "[t]he Agency failed to properly perform its 'Step 1' evaluation in accordance with the terms of the Solicitation and applied unstated evaluation criteria," and that "[t]he Agency's finding that UGI's proposal does not comply with the Solicitation instructions and exclusion of UGI's proposal from the Step 2 evaluation is arbitrary and capricious." (alterations added). Advanced Computer Concepts alleges that "[t]he Army's elimination of ACC's proposal based on its blank [redacted] was arbitrary and capricious." (alteration added). Futron's sole count in its complaint alleges that "[t]he Army abused its discretion by failing to allow Futron to correct the omission through clarification." (alteration added). The issue of why clarifications were not offered to protestors is addressed below.

As referenced above, the strict compliance requirement for the Equipment List provides: "Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award." (capitalization in original). The Equipment List strict compliance requirement makes clear that every cell must be filled in or the offeror's Equipment List will be considered non-compliant.

The February 15, 2024 Memorandum for Record for Unicom's evaluation provided, in part:

> 2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:
>
> a. **Volume 1 – Equipment List (Part A).** Offeror's Equipment List (Attachment 0002) contained one blank cell in [redacted]. This cell is material to the evaluation process.
>
> The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:
>
> • L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offeror's proposal non-compliant and will not be further considered for award.
>
> FINDING 1 – Blank Cell in Column D – Proposed Configuration: It is critical to the evaluation process that all fillable cells in Column D of the Equipment List are complete, as required by the solicitation. Completeness ensures that the Offeror's proposed configuration for each System Description identified on each Catalog (Catalog I through Catalog VII) identifies clear technical detail. Blank cells present a risk of ambiguity and misinterpretation to the USG, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly know what product/item an Offeror is proposing. Offerors are required to provide a proposed configuration for every System Description; thus, a complete Equipment List is important to the Government's evaluation. Here, the Government cannot determine if the offeror meets the requirement associated with [redacted] because the offeror has provided a blank cell.

(capitalization and emphasis in original).

> Unicom states: [redacted]

(internal references omitted; emphasis added).

Despite not complying with the strict compliance requirement for the Equipment List, Unicom argues that the Army did not properly rely on the strict compliance requirement L.5.1.1 PART A, and claims:

> In its Step 1 evaluation of UGI's Proposal, the Agency ignored these Solicitation terms and improperly assessed whether other alleged "non-compliances" existed, as confirmed by the Agency's February 28, 2024

letter to UGI. In that correspondence, the Agency stated that the absence of information within [redacted] was "material to the evaluation process, **as is** the strict compliance review." In addition, the Agency's February 28 letter identified two Solicitation provisions that UGI allegedly failed to satisfy – "[p]lease see L.5.1.1 Part A and L.5.1.1(a) . . . ." However, as set forth below, only one of those provisions contains a "STRICT COMPLIANCE REQUIREMENT" and UGI's Proposal satisfied this requirement. The Agency has conceded that, as part of its Step 1 evaluation, the Agency evaluated compliance with both the identified Strict Compliance Requirements ***and*** other Solicitation terms that it considered "material to the evaluation process." The Agency, therefore, failed to perform its Step 1 "STRICT COMPLIANCE REQUIREMENT" evaluation in accordance with the "STRICT COMPLIANCE REQUIREMENTS" specified in the Solicitation.

(capitalization, emphasis, alteration, and omission in original; internal references omitted).

Unicom continues:

The absence of a "STRICT COMPLIANCE REQUIREMENT" mandate at Section L.5.1.1(a) confirms that UGI was not strictly required to include, "in the proposed configuration column [column D], its proposed item to meet each requirement." The Agency's consideration of Section L.5.1.1(a) as part of the Step 1 evaluation was improper. The other Section identified by the Agency – Section L.5.1.1 Part A – does contain a Strict Compliance Requirement. However, this Strict Compliance Requirement only requires information "as to the product the Offeror is proposing" and ***does not*** obligate UGI to complete every cell in the Equipment List.

(capitalization, emphasis, and alteration in original; internal reference omitted).[10]

---

[10] As reflected above, the Solicitation at L.5 provided:

L.5 SPECIFIC PROPOSAL INSTRUCTIONS

L.5.1 VOLUME I - Technical Factor. The volume shall be organized into the following sections:

L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award.

This portion of the proposal shall include a completed Equipment List spreadsheet (Attachment 0002) considering the following instructions:

a. The Offerors proposed configuration for each, and every System Description identified on each Catalog (Catalog I through Catalog VII); The Offeror shall complete the Equipment List at Attachment 0002 by providing, in the proposed configuration column, its proposed item to meet each requirement; and

b. An Offerors annotation with technical detail identifying that every Requirement related to each System Description in the proposed configuration is met or exceeded as to be confirmed by the Government. All proposed configuration cells must contain content for the Offerors proposal to receive consideration. STRICT COMPLIANCE REQUIREMENT: Cells that contain linked content are non-compliant. Additionally, modification of the Equipment List outside of indicated proposed configuration inputs are not permitted and will result in a proposal being determined non-compliant and not further evaluated; and

c. An identification of each Offerors proposed configuration product Description providing identification of (brand/model) within the Offerors proposed configuration for each and every System Description; and

d. Each Catalog Identification per each Description (brand/model) and every Platform addition, inclusive to aid in associating equipment list to price models.

e. The Offeror may also complete the Catalog Identification column to coordinate association between equipment list and price models. The burden of proof that the proposed item meets or exceeds the minimum requirements remains with the Offeror.

f. The minimum processor types are defined for Catalogs I and II. Offerors may propose a different base processor if the Offeror provides proof that the processor meets or exceeds the minimal architecture of the processor listed in the Equipment List.

g. Equipment List, electronic copy: Equipment List must remain in native MS Excel file format. Offerors proposed configuration information must be directly input in the proposed configuration field. Equipment List must not be password protected. Offeror proposed configuration input is only permitted in column D. STRICT COMPLIANCE REQUIREMENTS: Failure to provide the most current version of the RFP Attachment 0002 shall render the Offerors proposal non-compliant and will not be further considered for award. Unauthorized modifications to the Equipment List are not permitted and will render an Offerors proposal non-compliant and not further

The court notes that although Unicom points to the Army's February 28, 2024 letter to Unicom to suggest that the agency considered unstated criteria in the evaluation of Unicom's proposal at Step 1, the February 15, 2024 Memorandum for Record for Unicom's evaluation only relied on Section L.5.1.1 Part A, which Unicom conceded "does contain a Strict Compliance Requirement." In response to Unicom's argument, the defendant contends that in the February 28, 2024 letter "the Army never stated it was revising its prior finding or that relied upon RFP § L.5.1.1(a)." The court finds that the Army relied on Section L.5.1.1 Part A to determine that Unicom did not strictly comply with the Equipment List and did not add an unstated evaluation requirement on Unicom's proposal.

Regarding Unicom's argument that Section L.5.1.1 Part A did not require Unicom to "complete every cell in the Equipment List," the court disagrees. The language states: "Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offerors proposal non-compliant and will not be further considered for award," (capitalization in original), requires every cell be completed. Although Unicom suggests that the strict compliance is limited to the phrase "product the Offeror is proposing," and does not require each cell to be completed, the court finds the plain language of the Section L.5.1.1 Part A indicates each cell was required to be filled in or the proposal would be considered non-compliant.

Regarding Advanced Computer Concepts' argument that "[t]he Army's elimination of ACC's proposal based on its blank [redacted] was arbitrary and capricious," (alteration added), protestor Advanced Computer Concepts contends that

> [t]he Army's sole basis for excluding ACC's otherwise compliant and Acceptable proposal was that [redacted] of Catalog II in ACC's Equipment List was blank. However, as explained below, in eliminating ACC, the Army has failed to consider an important aspect of the problem—the fact that, despite the empty [redacted], ACC's proposal unambiguously indicated that its solution would include a [redacted].

---

> considered for evaluation. Linked inputs are not permissible and will render a proposal non-compliant.
>
> h. The items in the Price Model that refer to the hardware and their detailed specifications are in the Equipment List (Attachment 0002). The pricing proposed in the Price Model (Attachment 0004) shall be for the same products and configurations proposed in the Equipment List (Attachment 0002). Any discrepancy between the product proposed in the Equipment List vs. the product proposed and priced out in the Price Model may result in an unfavorable finding in the Offerors proposal.

(capitalization in original).

(alteration added). Advanced Computer Concepts also argues "[a]lthough ACC's [redacted] inadvertently failed to include the word 'meets,' ACC's commitment to provide a [redacted] is nevertheless apparent on the face of ACC's proposal due to ACC's proposed [redacted] its [redacted]." (alteration added).

The February 14, 2024 Memorandum for Record for Advanced Computer Concepts' evaluation provided, in part:

> 2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

> a. **Volume 1 – Equipment List (Part A).** Offeror's Equipment List (Attachment 0002) contained blank cells. Please see table below for the specific cell that is material to the evaluation process and was found blank:

| Equipment List Compliance Check | |
|---|---|
| Tab | Blank Cells in Column D – Proposed Configuration |
| [redacted] | [redacted] |

> The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

> - L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offeror's proposal non-compliant and will not be further considered for award.

> FINDING 1 – Blank Cells in Column D – Proposed Configuration: It is critical to the evaluation process that all fillable cells in Column D of the Equipment List are complete, as required by the solicitation. Completeness ensures that the Offeror's proposed configuration for each System Description identified on each Catalog (Catalog I through Catalog VII) identifies clear technical detail. Blank cells present a risk of ambiguity and misinterpretation to the USG, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify which product/item an Offeror is proposing. Offerors are required to provide a proposed configuration for every System Description; thus, a complete Equipment List is important to the Government's evaluation. Here, the Government cannot determine if the offeror meets the requirement associated with [redacted] regarding "[redacted]" because the offeror has provided a blank cell.

(capitalization and emphasis in original).

Although acknowledging that [redacted] was a blank cell, Advanced Computer Concepts argues:

> As an initial matter, it is essential to note that—as all individuals with an IT background would know—by simply offering the "[redacted]" with [redacted], ACC unambiguously demonstrated that its solution would include [redacted], as required by the RFP. Significantly, all commercial laptops and desktops that are Windows 10 and above have [redacted]. All such computers use a Unified Extensible Firmware Interface ("UEFI"), without which a computer would not be Windows 10 or 11 capable. The UEFI uses a basic input/output system framework that, **by default**, enforces [redacted] if ports exist on the computer. This is the case for laptops and desktops manufactured by [redacted], as well as all other commercially produced laptops and desktops on the market that are compatible with Windows 10 and above. Here, the RFP required, and ACC confirmed that it would provide, Windows 10 or above operating systems. See, e.g., AR Tab 91 at 15207, 15209 (indicating that, for the performance notebook requirement, ACC proposed the [redacted]. Given that ACC's solution is incapable of **not** offering a [redacted], ACC's proposal made clear that it satisfied the requirement of providing a [redacted].

> Moreover, ACC offered the [redacted]—one of the world's most widely used laptops by both business and government. It is inconceivable that the evaluators would have had any doubt that ACC's proposed solution offered [redacted]. Finally, ACC's proposal confirmed that even its [redacted] included [redacted], see AR Tab 91 at 15207, and thus it would be unreasonable and inconsistent with ACC's proposal to assume that its [redacted] did not also contain this basic feature. In short, there would have been no doubt in the evaluators' minds that ACC's solution complied with the requirement to provide at [redacted]. Rather than constituting a failure to comply with the specifications, ACC's proposal unambiguously demonstrates that the single blank cell was the result of a clerical or typographical error that cannot serve as the basis for ACC's elimination from this competition.

(emphasis in original).

Although Advanced Computer Concepts believes it should be obvious that their proposal would include [redacted], the Solicitation at L.4.1.3 was very clear that:

> A proposal is presumed to represent the Offerors best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its

proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG)) will not be considered. Clarity and completeness are essential.

The Army specifically indicated that if the proposal did not include the information, including leaving a cell blank, the Army would not consider it. Advanced Computer Concepts simply did not comply with the strict compliance requirement not to leave any cell blank. The Solicitation at L.4, the proposal format, also directly informed the offerors that the Army would not search the proposal for information included in a different part the proposal:

This section specifies the format each Offeror shall use in preparing its proposal. The intent is not to restrict the manner in which proposals are prepared, but rather to ensure a certain degree of uniformity in proposal format for evaluation purposes. The proposal shall be prepared in a clear, legible, practical manner. Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted.

As explained by a Judge of the United States Court of Federal Claims:

Both the law and the solicitation are clear that the onus is not on the agency to cobble together a compliant offer from an offeror's submission. See ST Net, Inc. v. United States, 112 Fed. Cl. 99, 110 (2013) ("Indeed, this court has held that an agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place."); Prescient, Inc. v. United States, 125 Fed. Cl. 475, 491 (2016) ("[I]t was not the responsibility of the agency to sift through [a] proposal and piece together a compliant offer. Rather, it is well established that all offerors . . . are expected to demonstrate their capabilities in their proposals." (quotations omitted) (alteration in original)); AR 102 ("Failure to provide a technical proposal in accordance with the solicitation instructions may render an Offeror's proposal incomplete and ineligible for award."). Rather, offerors are responsible for submitting complete and thorough proposals that address the solicitation's requirements and demonstrate their capacity to perform under the contract. Red River Holdings, 87 Fed. Cl. at 787.

Veterans Elec., LLC v. United States, 142 Fed. Cl. 566, 576–77 (2019); see also Price Gordon Servs. v. United States, 139 Fed. Cl. 27, 57 (2018).

In sum, by leaving [redacted] blank, Advanced Computer Concepts ran the risk of being eliminated for having a non-compliant proposal. The Army did not act arbitrarily or capriciously by eliminating Advanced Computer Concepts, but instead followed the instructions set out by the Solicitation for the strict compliance requirements for the Equipment List.

Three protestors were eliminated for the failure to comply with the strict compliance requirement for Price: Government Acquisitions, DH Technologies, and Enterprise Technology Solutions. Protestor Government Acquisitions argues that "[t]he Agency's interpretation of the strict compliance requirement regarding blank cells is arbitrary, capricious, and otherwise not in accordance with law," and "[t]he Agency's finding that GAI's proposal does not comply with the instructions for cell completion is arbitrary and capricious." (alterations added). Government Acquisitions also contends "[t]he Agency's failure to comply with the stated evaluation criteria was arbitrary and capricious." (alteration added). Government Acquisitions furthermore argues that "[t]he Agency's decision to exclude GAI's proposal because it left one single cell that called for a percentage during option years blank was arbitrary, capricious, and otherwise not in accordance with law." (alteration added).

The January 11, 2024 Memorandum for Record for Government Acquisitions' evaluation provided, in part:

b. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contains one blank cell on Tab Catalog III-O, Cell G6 *Fixed Discount for Warranty Variations*.

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as 'contractor fill-in' that are blank or unintelligible in Attachment 0004 will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalog identified in the Price Model of the solicitation will render the Offeror ineligible for award.

> FINDING 1 – A cell that is color-coded for "contractor fill-in" is blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed in order to perform an accurate and complete evaluation. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the proposed price, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify if or what is the *Fixed Discount for Warranty Variation* for Tab Catalog III-O. This information is important to ensuring the Government knows the pricing associated with the Offeror's proposal.

(capitalization, emphasis, and alteration in original).

As indicated above, Government Acquisitions argues that "[t]he Agency's decision to exclude GAI's proposal because it left one single cell that called for a percentage during option years blank was arbitrary, capricious, and otherwise not in accordance with law." (alteration added). Government Acquisitions contends

> Cell G6 simply was assigned a dollar value of zero, according to the Army embedded Excel algorithm. The Government knew what GAI's proposal was. GAI offered a fully compliant Total Contract Line Price (calculated according to the Government algorithm embedded in the spreadsheet) and there reasonably could have been no confusion about what GAI was offering. Second, the Agency has eliminated GAI due to a blank cell that does not call for a dollar value. The cell at issue called for a percentage. In accordance with the express terms of the Solicitation, all dollar value formatted cells are filled in with values. The Total Contract Line Price was calculated based on a zero percentage for the warranty discount period. It is immaterial to the proposal or its evaluation <u>how</u> GAI arrived at the Total Contract Line Price that was to be evaluated by the Agency.

(emphasis in original). Government Acquisitions explains:

> GAI's Total Contract Line Price was calculated based on a zero percentage for the warranty discount period, with the only effect being that it increased GAI's price by [redacted]%. It is immaterial to the proposal or its evaluation <u>how</u> GAI arrived at the Total Contract Line Price that was to be evaluated by the Agency. The Army's rationale that this one blank cell interfered with the ability of the Army to efficiently evaluate GAI's proposal is nonsensical.

(emphasis in original; internal reference omitted).

The court disagrees with Government Acquisitions. The strict compliance requirement for price clearly stated:

> STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

Notably, the defendant argues "GAI appears to argue that because the spreadsheet calculated a total price, despite the blank cell, that the GAI's proposal was compliant. Of course, GAI admits that the blank existed and that its price was off by [redacted] percent. That omission altered the price and is material." (internal reference omitted). Based on the language in the Solicitation, leaving a single cell blank in the pricing spreadsheet as Government Acquisitions did makes a proposal non-compliant. The court has determined the strict compliance requirement for price was material, and the failure to follow the material requirement made Government Acquisitions' price proposal non-compliant.

Protestor DH Technologies argues that "[t]he very information that the Agency rejected DH Tech's proposal for being missing was actually found in other parts of its proposal in the same volume," and "[w]hile the Solicitation did contain a prohibition on cross-referencing the five separate volumes as each volume [sic] self-contained, there was no prohibition in the Solicitation on the Agency cross-referencing within a particular volume." (alterations added). Therefore, DH Technologies contends, "[s]ince the alleged missing information was in the proposal, albeit in another place than where the Agency found it to be missing, it was still in the same volume proposal." (alteration added). DH also Technologies argues that

> [t]he Agency's explanation for its decision to eliminate DHT was that the blank Cells D29 and D30 prevented the Agency from cross walking with Column D of the Equipment List. This explanation is directly contradicted by DHT's proposal itself, which contains full pricing information for each item. Since the alleged missing information was in the proposal, albeit in another place than where the Agency found it to be missing, it was still in the proposal. Thus, the Agency was not prejudiced or damaged by DHT's failure to provide the information in all of the places where the Agency requested that DHT provide it. The fact that the information was in DHT's proposal meant that the Agency could still evaluate the proposal as required by the terms of the Solicitation.

(alteration added; internal reference omitted).

As described above, the February 12, 2024 Memorandum for Record for DH Technologies' evaluation provided:

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that the above referenced proposal is non-compliant:

a. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contained material blank cells. Please see table below for specific cells that were found blank:

| Price Model Compliance Check | |
|---|---|
| **Tab** | **Column D – Proposed Configuration** |
| Catalog I-O | D29, D30 |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror's intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the Offeror ineligible for award.

FINDING 1 – Two cells that are color-coded for Contractor Fill-in are blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed for a particular product in order to perform an accurate and complete evaluation. Additionally, it is particularly critical to the evaluation process that all fillable cells in Column D – Proposed Configuration of the Price Model are complete to ensure that the Price Model can be cross walked with Column D of the Equipment List. This ensures that the Offeror consistently proposed its items on both solicitation attachments; the Catalog ID does not provide enough information. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the product and price an offeror is proposing, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify the product associated with a particular price.

A Note Regarding Finding 1: The Army does note that the Offeror has placed information regarding the Catalog Identification in Column E for the associated blank cells. However, the information contained in Column E that is associated with D29 and D30 is insufficient to find this offeror compliant for the following reasons:

1) As noted above, it is important to the evaluation of proposals that Offerors ensure consistency between the Equipment List and Price Matrix. This ensures that not only can the Government adequately evaluate and assess the price for the products an offeror is proposing, but also makes certain that the offeror does not list one item on the Equipment List and list an entirely different and potentially unacceptable item on the Price Matrix. The Equipment List and the Price Matrix must be consistent, especially in regards to column D, to ultimately ensure the Government is receiving products that meet the Government's minimum requirements at a fair and reasonable price. By only providing the catalog identification number, the Offeror does not clearly note what product it is proposing at the associated price.

2) To the extent the offeror asserts that the Army, for the purposes of the compliance check, should cross-reference the Offeror's Equipment List to the Price Matrix, such an assertion would be contrary to the terms of the RFP. The RFP provides at L.4.1 that "Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted." Thus, based on the clear language of L.4.1, the burden was on the offeror to ensure volumes are self-contained and contain all necessary information for the Government to evaluate.

3) It is also noted that It is an offeror's responsibility to submit a well-written proposal, with adequately detailed information which clearly demonstrates compliance with the solicitation requirements and allows a meaningful review by the Army. It is not the Army's responsibility to scour through various proposal documents to try and make an offeror compliant. Rather, as the RFP notes, it is the offeror's responsibility to comply with the clear solicitation requirements and place all information in the correct volume in order to allow the Government to conduct an efficient and effective evaluation.

4) Fundamentally, without a clear description of the product proposed in cells D29 and D30, the Army cannot know what product is being proposed at the price noted in the Price Matrix, which materially inhibits the evaluation.

> 3. Based upon the above findings and in accordance with the terms of the RFP, Offeror DT [DH Technologies] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; alteration added).

Despite DH Technologies leaving D29 and D30 of Catalog I-O of its pricing model blank, DH Technologies suggests that "[s]ince alleged missing information was in the proposal, albeit in another place than where the Agency found it to be missing, it was still in the proposal." (alteration added). The February 12, 2024 Memorandum for Record for DH Technologies' evaluation explained "[t]o the extent the offeror asserts that the Army, for the purposes of the compliance check, should cross-reference the Offeror's Equipment List to the Price Matrix, such an assertion would be contrary to the terms of the RFP." (alteration added). The Solicitation at L.4.1 makes clear that "Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted." The Army made clear in the Solicitation it would not scour the proposals for the required information, and the Army was not obligated to do so. See Veterans Elec., LLC v. United States, 142 Fed. Cl. 566, 576–77; see also ST Net, Inc. v. United States, 112 Fed. Cl. at 110 ("Indeed, this court has held that an agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place.").

DH Technologies also argues the requirement to provide information was not material requirement," contending that "[w]hile it was a material requirement to provide the information that the Agency alleges is missing from DHT's proposal in its proposal, it was not a material requirement for DHT to provide the information in every location in its proposal that the Agency stated," and "the Agency eliminated DHT due to blank cells that do not call for a dollar value. The cells at issue called for proposed configurations. In accordance with the express terms of the Solicitation, all dollar value formatted cells are filled in with values. The Total Contract Line Price was calculated based on a zero percentage for the warranty discount period." The court disagrees. As determined above, the strict compliance requirement was a material term to the Solicitation. Furthermore, the Solicitation demanded of offerors:

> STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

(capitalization in original). The strict compliance requirement required each cell to be completed, and, contrary to DH Technologies' argument contemplated when a zero needed to be included in a proposal to avoid leaving a cell blank. As indicated above, the Army was not obligated to search DT Technologies' proposal to find information to make the proposal compliant with the Solicitation. See Veterans Elec., LLC v. United States, 142 Fed. Cl. 566, 576–77.

For protestor Enterprise Technology Solutions, the Army's January 29, 2024 Memorandum for Record for Enterprise Technology Solutions' evaluation provided, in part:

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contained multiple blank cells. Please see table below for specific cells that are material to the evaluation process and were found blank with no additional explanations on the excel sheet:

| Price Model Compliance Check | | | |
|---|---|---|---|
| Tab | Column D Proposed Configuration | Column E Catalog Item Number | Column H Catalog Unit Price |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror's intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the Offeror ineligible for award.

  FINDING 1 – Multiple cells that are color-coded for contractor-fill in are blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed in order to perform an accurate and complete evaluation. Additionally, it is particularly critical to the evaluation process that all fillable cells in Column D – Proposed Configuration of the Price Model are complete to ensure that the Price Model can be cross walked with Column D of the Equipment List. This ensures that the offeror consistently proposed its items on both solicitation attachments. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the proposed price, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify the proposed price for a particular product.

  3. Based upon the above findings and in accordance with the terms of the RFP, Offeror AM [Enterprise Technology Solutions] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; first alteration in original).

The Army found 42 cells blank in Enterprise Technology Solutions' proposal and determined that Enterprise Technology Solutions' proposal was non-compliant with the strict compliance requirements for Price.

Regarding the strict compliance requirements for Price, defendant argues "ETSI failed to comply with this strict compliance requirement. ETSI left dozens of cells blank, and the Government found 42 of those blank cells non-compliant, as those specific cells were "material to the evaluation process and were found blank with no additional explanations on the excel sheet." (emphasis in original). Although Enterprise Technology Solutions argues "ETSI did not violate the strict compliance terms of the Solicitation," Enterprise Technology Solutions, as described above, focuses its arguments on what it believes was a flawed evaluation by the Army. In its motion for judgment on the Administrative Record, Enterprise Technology Solutions argues:

The Army's decision to exclude ETSI from award consideration was flawed in multiple ways. First, the Army deviated from the terms of the Solicitation in its evaluation of ETSI's proposal. Second, the Army engaged in unequal evaluation of offerors by inconsistently waiving and/or deviating from the

Solicitation terms for some offerors. Third, the Army engaged in unequal clarifications with offerors. Fourth, the Army inadequately documented its evaluation. Fifth, the Solicitation had a latent ambiguity. These all represent violations of regulations or statutes, as well as legal precedent set by this Court.

Despite protestor's arguments, addressed below, the blank cells were strict compliance fill in requirements, and the strict compliance requirements were material terms to the Solicitation. By not fully completing the price spreadsheet, the Enterprise Technology Solutions' proposal was properly removed from further evaluation.

Unequal Treatment

The three protestors eliminated for not complying with the strict compliance requirements for price, Government Acquisitions, DH Technologies, and Enterprise Technology Solutions also argue the agency evaluated the non-compliant offerors unequally. In Office Design Group v. United States, 951 F.3d 1366 (Fed. Cir. 2020), the United States Court of Appeals for the Federal Circuit explained:

The Federal Acquisition Regulation requires an agency to treat offerors fairly and impartially. 48 C.F.R. § 1.602–2(b) ("Contracting officers shall . . . ensure that contractors receive impartial, fair, and equitable treatment."). This obligation necessarily encompasses an agency's obligation to fairly and impartially evaluate all proposals. Equal evaluation of proposals, however, does not translate into identical evaluations. An agency is under no obligation to assign dissimilar proposals the same evaluation rating. 48 C.F.R. § 1.102–2(c)(3) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same." (emphasis added)).

Upon review, it appears that this court has not yet articulated a standard for evaluating disparate evaluation claims. The Claims Court, however, has done so, having adjudicated numerous disparate evaluation claims. To prevail at the Claims Court, a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were "substantively indistinguishable" or nearly identical from those contained in other proposals. See Enhanced Veterans Solutions, Inc. v. United States, 131 Fed. Cl. 565, 588 (2017); see also Red River Comput. Co. v. United States, 120 Fed. Cl. 227, 238 (2015); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 272 (2012); Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 585 (2010); Hamilton Sundstrand Power Sys. v. United States, 75 Fed. Cl. 512, 516 (2007). A protestor may also prevail by showing that the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines. See Sci. Applications Int'l Corp., 108 Fed. Cl. at 272 (citing BayFirst Sols., LLC v. United States, 102 Fed. Cl. 677 (2012)).

We see no reason to depart from the Claims Court's "substantively indistinguishable" standard. If a protestor meets this threshold, a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters. See, e.g., COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1384 (Fed. Cir. 2012). If a protestor does not, then the court should dismiss the claim. To allow otherwise would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings. This is not the court's role.

Off. Design Grp. v. United States, 951 F.3d at 1372–73 (emphasis and omission in original; footnote omitted). A Judge of the United States Court of Federal Claims has explained that "it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote Corp. of Am. v. United States, 56 Fed. Cl. at 383 (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000) (citing cases)); see also Samsara Inc. v. United States, 166 Fed. Cl. 457, 472 (2023); Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 585 (2010) ("[U]nequal treatment claims are the 'quintessential example of conduct which lacks a rational basis.'" (alteration added; emphasis in original) (quoting Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 273 (2004))). "Equal treatment, however, does not require that all proposals be treated the same." Chenega Mgmt., LLC v. United States, 96 Fed. Cl. at 585 (citing FAR 1.102–2(c)(3); FAR 1.102–2(c)(3) (2024) ("All contractors and prospective contractors shall be treated fairly and impartially but need not be treated the same.")). Instead, "'an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently.'" Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220, 234 (1997) (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996)).

In its motion for judgment on the Administrative Record, Government Acquisitions argues:

In contrast to the rote process employed for GAI's proposal, the Agency qualitatively reviewed other proposals with blank cells and added unstated criteria that modified the Strict Compliance requirement in several instances to retain offerors who submitted proposals with blank cells, while not applying those same unstated criteria to GAI. Some of the blanks were determined to be "not material." The Agency waived the Strict Compliance requirement if they determined that the offeror had explained the blank cell(s). The Agency waived the Strict Compliance requirement is [sic] the "technical advisor agreed" that the blank cell would have no impact on the evaluation. One offer was found compliant with 654 blank cells. **None** of these qualifiers were in the Solicitation and were randomly applied by the Agency.

(emphasis in original; alteration added; internal references omitted). Government Acquisitions also argues "offerors were required to submit one proposal. However, some offerors submitted multiple versions of attachments including the Price Model Attachment 0004. Rather than excluding these offerors, the Agency merely chose which version to retain in the competition. The Agency either had mandatory provisions or it did not." (internal references omitted). Government Acquisitions argues that

> offerors were required to acknowledge amendments. Some offerors that failed to do so nevertheless were retained in the competition, because the Agency performed a basic holistic review of those offers and decided that the lack of acknowledgment was not disqualifying based on the proposal as a whole. Again, there were either mandatory requirements or there were not. The Army's approach of cherry picking what, when, and how to enforce its mandatory requirements is textbook fundamental unfairness.

(internal references omitted). Defendant correctly points out

> GAI once again cites to RFP § L.2 and argues that this section required offerors to submit one proposal. While it is true that RFP § L.2 states that offerors should submit one proposal, this is not a strict compliance requirement and is not preceded with a strict compliance requirement legend. Similarly, GAI cites to RFP § L.2(d) and argues that it mandatory that offerors acknowledge solicitation amendments, but, once again, this provision is not a strict compliance requirement.

(internal references omitted).

Regarding [redacted], an offer whose proposal was found to be compliant despite containing 654 blank cells as highlighted by Government Acquisitions, the defendant explains:

> This is a reference to offeror [redacted], which had multiple blank cells in the Catalog Identification column (Column E) of the equipment list. However, this issue is a red herring as the Army waived blank cells in Column E of the Equipment List for all offerors — as the record expressly explains. On February 6, 2024, the Army issued a memorandum for record (February 6th MFR) with respect to the Catalog Identification column. The February 6th MFR explained that after commencing the Step 1 compliance review, the agency noticed that several offerors had left blank cells in the Catalog Identification section (Equipment List Column E) and upon further review of the RFP, the Government identified a conflict in the terms of the RFP with respect to this column. Specifically, RFP Section L.5.1.1(e) states that an "Offeror may also complete the Catalog Identification column to coordinate association between equipment list and price models." Accordingly, the agency determined that an ambiguity existed between

Section L.5.1.1(e) with its permissive language and Section L.5.1. Part A "which requires the Offeror to fill in all cells marked for Contractor Fill-In, which would include Column E." (emphasis in original) [sic]. Because of this ambiguity, the agency "determine[d] that no Offeror will be removed as part of Step 1 for failing to complete a cell in Column E of Attachment 0002 - Equipment List." As such, the blank cells for the Catalog Identification are irrelevant as all offerors were treated the same.

(emphasis in original; footnote and internal references omitted; alteration added). Defendant continued: "In making this exception, the agency specifically explained that this determination "does not affect any other strict compliance provision."

Regarding the blank cell for the "technical advisor," defendant notes that the issue is present for two offerors, [redacted] and [redacted]. The defendant argues

[t]hese offerors left blanks in the proposed configuration column, and the Army explained that "[t]he reason an offeror's failure to fill in the "proposed configuration" column for these blank cells was waived is because the Government does not require a price for the proposed configuration. Therefore, these offerors are dissimilar to GAI.

(first alteration add; footnote and internal references omitted).

DH Technologies argues "the Agency waived the strict requirement to acknowledge amendments." The government responds that "[t]hese offerors had missing signatures on prior contract amendments but, because their proposals contained the correct versions of the attachments from the most recent amendments, they were deemed to have accepted the amendments and proper attachments, which were included with their signed proposals." (alteration added).

DH Technologies also argues "[t]he Agency waived the strict requirement to submit only one proposal." (alteration added). As discussed above, Government Acquisitions also raised this issue, although DH Technologies cites to different offerors: [redacted] and [redacted]. Defendant's answer is consistent with its response to Government Acquisitions: "[T]hese offerors attached two copies of their price model before the submission deadline, and the Army checked which one constituted their submission and only reviewed one. Both issues are minor, nonsubstantive issues. Neither impacted the substance of the offerors [sic] proposal, unlike DHT which did not provide substantive information." (alterations added; internal reference omitted).

Enterprise Technology Solutions cites to the proposals of [redacted], [redacted], [redacted], and [redacted]. As defendant correctly indicates, although [redacted] and [redacted] left blanks for certain products in Column E (Catalog Item Number),

in reviewing ETSI's proposal, the Government found blanks in Column E immaterial where ETSI provided an explanation for the blank in Column D (Proposed Configuration) by noting that the [redacted]. The Government

followed that same approach for [redacted], and [redacted]. Thus, the Government treated [redacted], and [redacted] the same as it treated ETSI.

(internal references omitted). Similarly, the government explains

Second, ETSI cites offeror [redacted] and offeror [redacted], which left blanks for certain products in Column H (Catalog Unit Price). For these products, [redacted] listed "[redacted]" in Column D (Proposed Configuration) and "Included" in Column E (Catalog Item Number). Similarly, [redacted] listed "[redacted]" in Column D (Proposed Configuration) and "[redacted]" in Column E (Catalog Item Number). Therefore, the Government found these blanks immaterial, as the offeror had provided an explanation for the blanks. In every instance in which ETSI used a similar phrase, the Government also found ETSI's Column H blanks immaterial. See, e.g., Tab 121 at AR 30544 (blank cell [redacted] in Catalog [redacted] and in Catalog [redacted] was found immaterial because ETSI [redacted]). Thus, the Government treated [redacted] and [redacted] the same as it treated ETSI.

(internal references omitted).

As described above, the United States Court of Appeals for the Federal Circuit in Office Design Group held:

We see no reason to depart from the Claims Court's "substantively indistinguishable" standard. If a protestor meets this threshold, a reviewing court can then comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters. See, e.g., COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1384 (Fed. Cir. 2012). If a protestor does not, then the court should dismiss the claim. To allow otherwise would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings. This is not the court's role.

Off. Design Grp. v. United States, 951 F.3d at 1373. Protestors Government Acquisitions, DH Technologies, and Enterprise Technology Solutions have not demonstrated that the Army treated their proposals differently than similarly situated offerors. For blank cells which the Army determined were immaterial, the Army treated the offerors, including protestors the same. For the offerors cited by DH Technologies that included blank cells in the price proposals and included an explanation in the prior column which were found to meet the strict compliance requirements, the Army treated DH Technologies differently, but because DH Technologies did not include an explanation in an adjoining cell, but simply did not include the required information. DH Technologies' proposal was not "substantively indistinguishable" from the other offerors which included an explanation in the prior column, and, therefore, it was not arbitrary for the Army to treat DH Technologies differently. See id.

Regarding the protestors arguments that the Army treated other offerors differently, either by allowing offerors to submit multiple proposals, which was not permitted under the Solicitation or other offerors which failed to acknowledge amendments as required by the Solicitation, none of the protesters were eliminated for submitting multiple proposals or failing to acknowledge amendments. Therefore, the protestors were not treated unequally on those grounds. See Off. Design Grp. v. United States, 951 F.3d at 1373. Furthermore, on the merits of those issues, neither requirement was a strict compliance requirement. The Solicitation instruction at L.2 states:

L.2 PROPOSAL SUBMISSION REQUIREMENTS

a. Each Offeror shall submit only one comprehensive and complete proposal, which consists of all required information with associated attachments each in their appropriate file formats, that addresses all Government requirements outlined in the solicitation. Submission of a proposal shall be on an all or none basis. Partial proposals are not acceptable and shall not be evaluated. If the Government has not received the Offerors proposal by the due date and time, the proposal will be considered incomplete and will not be further considered for award.

(capitalization in original). The Solicitation instruction at L.2 does not include a strict compliance requirement, and, therefore, would not alone render a proposal non-compliant under the Step 1 evaluation. Regarding acknowledging amendments, the Solicitation instruction at L.5(c)-(d) states:

c. Executed copies of all amendments. Each Offeror shall complete (fill-in and sign) the solicitation amendment sections (Standard Form 30 AMENDMENT OF SOLICTIATION/MODIFICATION OF CONTRACT, Contract Administration Data Representations, Clause fill-ins, Certification and Other Statements of Offerors) using the file provided with the solicitation amendment. An authorized official of the firm shall sign the SF 30s and all certifications requiring original signature. An Acrobat PDF file shall be created to capture the signatures for submission.

d. Should an amendment be issued against the solicitation; the Offeror shall acknowledge by signing one copy of the Standard Form (SF) 30 entitled Amendment of Solicitation/Modification of Contract and include it in the proposal submission. In Accordance With (IAW) FAR 52.215-1(b), acknowledgement of solicitation amendments issued after the proposal due date shall be submitted via email to usarmy.ria.acc.mbx.ites-4h-rfp@army.mil no later than date and time identified in the Amendment.

(capitalization in original). The Solicitation at L.5(c)-(d) also does not contain a strict compliance requirement.[11] Therefore, for the reasons described above, the protestors found non-compliant for the strict compliance requirement for price, Government Acquisitions, DH Technologies, and Enterprise Technology Solutions, have not demonstrated that the Army evaluated their proposals unequally.

Clarifications

All seven of the protestors have a count in their respective complaints that alleges the Army should have engaged in clarifications.[12] For example, GovWave argues that "[c]larification would have been quick and easy," and Futron argues "[e]xcluding Futron instead of seeking clarification was improper. First, the error is minor and can easily be corrected." (alterations added). Advanced Computer Concepts argues that ""the Army abused its discretion in failing to conduct clarifications with ACC to resolve the missing word in [redacted]," and Government Acquisitions similarly claims that "the agency abused its discretion by not engaging in clarifications." Protestor Unicom argues that "[t]he omission of information from [redacted] was an obvious and immaterial error for which the Agency should have sought clarification, and which could have easily been corrected by the addition of the word 'Meets.'" (alteration added).

Defendant argues that "[t]he Step 1 plaintiffs were treated reasonably and correctly pursuant to the terms of the RFP" and "the Army rationally elected not to engage in clarifications." (alteration added). Defendant further argues that "the offerors were on notice and adequately warned that they were required to adhere to the strict compliance requirements," and that "[t]his decision was consistent with the structure of the solicitation's steps and the strict compliance requirements." (alteration added). Defendant also contends:

> The agency anticipated receiving a large number of proposals, which ultimately occurred. The need to conduct an efficient procurement and not engage in clarifications with over eighty offerors is reasonable and justifiable. Instead, the agency structured the RFP with strict compliance requirements to ensure that essential, material information would be provided by offerors and to ensure a complete proposal was provided before substantive evaluations occurred.

Defendant argues that in the above captioned bid protests

---

[11] Defendant also suggests that "these offerors had missing signatures on prior contract amendments but because their proposals contained the correct versions of the attachments from the most recent amendments, they were deemed to have accepted the amendments and proper attachments, which were included with their signed proposals."

[12] DH Technologies and Enterprise Technology Solutions suggest the issue with clarifications was the Army's decision to hold allegedly unequal clarifications.

the Step 1 plaintiffs did not heed the solicitation's myriad warnings by failing to provide a complete proposal. As such, they were found non-complaint [sic] for missing information. Regardless, the Step 1 plaintiffs are asserting that the Army should have engaged in clarifications to allow the plaintiffs to revise their proposals and provide the missing information that is absent from their proposals. This is not the purpose of clarifications and runs counter to the Step 1 strict compliance requirements structure of the RFP.

The United States Court of Appeals for the Federal Circuit has held that

> requests for clarifications are "limited exchanges," designed to "clarify certain aspects of proposals" or "resolve minor or clerical errors" in the offerors' proposals. FAR 15.306(a)(1)–(2). "Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal."

Dell Fed. Sys., L.P. v. United States, 906 F.3d at 998 (quoting JWK Int'l Corp. v. United States, 52 Fed. Cl. 650, 661 (2002)). The FAR at 15.306 explains that "[c]larifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated," and clarifications provide offerors with an "opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR § 15.306(a)(1)-(2) (alteration added).

As explained by a United States Court of Federal Claims Judge in Bionetics Corp. v. United States:

> "It is therefore always reasonable for a [Contracting Officer] not to request clarifications of a proposal that is materially deficient." Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 216 (2019). Price terms are nearly always material to a contract, but especially so in a lowest price technically acceptable procurement. See Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012) ("A solicitation term is 'material' if failure to comply with it would have a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured") (emphasis added); Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009) (holding that a substantive provision of the RFP has "more than a negligible impact on the price, quantity, quality, or delivery of the subject of the bid") (emphasis added); ST Net, Inc. v. United States, 112 Fed. Cl. 99, 109–110 (2013) (prices are binding on the offeror, therefore not minor or clerical in nature).

Bionetics Corp. v. United States, 159 Fed. Cl. 834, 843 (2022) (emphasis and alteration in original). "Flowing from the permissive wording of" FAR § 15.306, a contracting officer's

"decision to seek (or not to seek) clarification from an offeror is within his discretion." Criterion Sys., Inc. v. United States, 140 Fed. Cl. 29, 37 (2018); see also Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. at 629 (stating that a contracting officer has discretion when determining whether to seek clarifications); Bionetics Corp. v. United States, 159 Fed. Cl. 834, 843 (2022); Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 216 (2019). A Judge of the United States Court of Federal Claims also has stated:

> While this court has found an abuse of discretion in bid protests governed by FAR Part 15 where the government failed to inquire into copying errors that affected the procuring authority's evaluation of past performance, see BCPeabody, 112 Fed. Cl. at 513, an omission of pricing information has not been found to be a minor or clerical error in these types of procurements, see ST Net[, Inc. v. United States], 112 Fed. Cl. [99,] at 111 [(2013)].

Bus. Integra, Inc. v. United States, 116 Fed. Cl. at 335 (alterations added); see also ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. 493, 512 (2019) ("This court has determined in several previous cases that proposals with missing mandatory price information contain material errors, even when the price information has a minimal impact [sic] the total price, so long as the needed prices will be considered in the evaluation process and binding on the offeror." (alteration added). The Judge in ManTech held that a material error included in an offeror's proposal "could not be corrected through a clarification." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 508.

Despite the protestors' arguments in the above captioned protests that each of the protestors should have been allowed to engage in clarifications with the Army, the Solicitation did not provide an opportunity for clarifications during the Step 1 evaluations. Moreover, as determined above, the requirements to comply with the strict compliance requirements for past performance, for the Equipment List, and for price were all material requirements under the Solicitation. The protestors, additionally, were all on notice that the failure to comply with the strict compliance requirements would make their proposals non-compliant and the non-compliant proposals would not be considered for award. As described above, the Evaluation Methodology explained:

> Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as STRICT COMPLIANCE REQUIREMENTS in the Instructions to Offerors of this RFP shall render the Offerors proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

(capitalization in original). The failure to comply with the strict compliance requirements meant that the proposals did not comply with the material terms in the Solicitation. The Army did not permit anticipate or require clarifications to resolve a material requirement of the Solicitation. See Dell Fed. Sys., L.P. v. United States, 906 F.3d at 998; Bionetics

Corp. v. United States, 159 Fed. Cl. at 843. Contrary to the protestors' arguments, it was not arbitrary or capricious not to proceed with or permit clarifications for the seven protestors. See Mission1st Grp., Inc. v. United States, 144 Fed. Cl. at 216 ("It is therefore always reasonable for a CO [Contracting Officer] not to request clarifications of a proposal that is materially deficient." (alteration added)). Notably, however, the agency would have acted in an arbitrary or capricious manner if it had permitted the offerors to submit clarifications only in cases including some of the protestors in the above captioned protests. See Dell Fed. Sys., L.P. v. United States, 906 F.3d at 998 ("Clarifications are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal."). The clarifications that protestors sought were not "minor or clerical errors," but were material terms to the Solicitation.

Furthermore, under FAR § 15.306, absent a requirement in a solicitation, the decision to seek clarifications is within the agency's discretion. See Criterion Sys., Inc. v. United States, 140 Fed. Cl. at 37 ("Flowing from the permissive wording of the regulation, the CO's decision to seek (or not to seek) clarification from an offeror is within his discretion."); see also Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. at 629. No such requirement was present in the Solicitation. An agency may have a duty to inquire for a clerical error, see Griffy's Landscape Maint. LLC v. United States, 46 Fed. Cl. 257, 259 (2000), however, as determined by this court, none of the issues with the protestor's proposals were minor or clerical, but were related to material terms of the Solicitation. The Army was not required to engage in clarifications and declined to do so.

The government also cites to the case of ST Net, Inc. v. United States, 112 Fed. Cl. 99, to support its argument that clarifications were not required of the protestors eliminated at Step 1. The ST Net case offers an analysis for an agency's approach to a solicitation that shares some similarities to Army's approach to this Solicitation. In ST Net, the Department of Homeland Security (DHS) issued a solicitation which noted "[a]lthough the government reserved the right to 'waive informalities and minor irregularities,' the solicitation repeatedly warned offerors that failure to conform to the solicitation's instructions jeopardized their chances of receiving an award." Id. at 104 (alteration added; internal reference omitted). The solicitation at issue in ST Net also included an instruction to offerors which stated, in part

> Proposals that fail to provide all required information in the format requested may be found unacceptable and may be rejected without further consideration if the Contracting Officer determines that a significant revision or addendum to the Offeror's proposal would be required to permit further evaluation, and especially if the incompleteness of the proposal or errant formatting of the proposal appears to be due from a lack of diligence or competence of the Offeror.

Id. (emphasis in original). The Judge in ST Net stated that "[b]y the time bidding closed in March 2012, DHS had received over 240 proposals from more than 140 bidders across the five small business categories," and "[w]ithin each small business category, multiple

proposals were removed from best value consideration because their pricing matrices did not conform to the solicitation's instructions," and DHS "removed an additional 39 companies from best value consideration because their pricing matrices failed to include brand/model and/or price information for each line item. These proposals were deemed to be 'fundamentally flawed' and were eliminated from consideration." Id. at 104–05 (internal references omitted; alterations added). One offeror eliminated was protestor ST Net, Inc. (ST Net) for failure to fill out two lines on the price matrix. After elimination, ST Net filed a post-award bid protest, and argued that it was arbitrary for DHS to exclude ST Net's proposal. The Judge in ST Net offered comments and a decision that can be instructive in the protests currently under review, as follows:

> The plaintiff first contends that, because of the obvious and "minor" nature of the omissions or mistakes in ST Net's pricing proposal, coupled with what ST Net believes was the ability to address those mistakes "without prejudice to any offeror and to the government's benefit," DHS had an affirmative duty to communicate with ST Net and provide an opportunity to revise its bid prior to disqualification. In support of this proposition, the plaintiff relies chiefly on FAR 1.602–2(b) (contracting officers have a duty to act fairly with offerors) and 15.306(a)(2) (permitting clarifications to address minor or clerical errors prior to establishment of a competitive range or award without creation of a competitive range). ST Net also cites several cases in which courts have found that the government has a duty to notify bidders of potential mistakes when the agency knows or should know about the error.

> In response, the government characterizes the plaintiff's argument as an attack on DHS's decision to reject all incomplete proposals, which the government contends is not reviewable. (quoting E.W. Bliss, 77 F.3d at 449). The government further notes that the cases on which ST Net relies are inapposite because all of them involve a contracting officer's duty to seek clarification of conforming bids.

> The court finds for the reasons that follow that DHS did not have an affirmative duty to provide ST Net with an opportunity to correct or revise its bid through clarifications prior to disqualification and that DHS's decision not to seek any clarifications was not arbitrary, capricious or an abuse of discretion. As discussed above, it is undisputed that ST Net failed to fill in the price and brand/model information for two line items. Instead, ST Net listed the brand/model name for both items as * * *," which ST Net acknowledges was an error. ST Net included a price and discount rate for both items at * * *, which was also an error. ST Net concedes that if DHS had provided an opportunity for the plaintiff to remedy its proposal, ST Net's total evaluated price would have been increased by over * * *, from * * * to * * *.

> The court cannot say, based on this record, that ST Net's errors were minor or clerical such that DHS's failure to seek a clarification can be

characterized as arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. Importantly, the price, brand/model information, and discount rates were not simply estimating tools, but were actually binding on the offerors—at least until "certain specifications or proposed items (brand and model) [became] obsolete." By its own estimate, ST Net's errors would have amounted to a roughly 7% increase in ST Net's total evaluated price. Moreover, ST Net's contention that the government might have ascertained the missing brand information from elsewhere in ST Net's proposal is severely undermined by the plaintiff's concession that multiple bidders offered different brand items for the line items at issue in this case. Pl.'s Mot. 16 (estimating that "approximately * * *% of the offerors whose price matrices the Government provided in the Administrative Record * * * offered the same item for Line Items * * *. [sic] Indeed, this court has held that an agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place. See IBM Corp. v. United States, 101 Fed. Cl. 746, 758–59 (2011). In light of the undisputed facts, the court rejects ST Net's contention that ST Net's omissions were simply minor or clerical, or that it was improper for DHS to abstain from requesting that ST Net address these errors through clarifications.

The court has examined the cases on which the plaintiff relies and finds that none address the issue in the case at bar: Whether an agency, when conducting a negotiated procurement under FAR Part 15 that expressly contemplates making an award(s) without discussions or creation of a competitive range, is under an affirmative duty to allow an offeror to cure a material omission in its proposal. Indeed, most of the plaintiff's cited cases rely on a "duty to inquire" found in FAR Part 14, which applies to sealed bidding, rather than negotiated procurements. See Hunt Constr. Co. v. United States, 281 F.3d 1369, 1374–75 (Fed. Cir. 2002) (discussing duty to verify bids under FAR Part 14); Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000) (recognizing duty to examine under FAR Part 14); Ruggiero v. United States, 190 Ct. Cl. 327, 329, 334–39, 420 F.2d 709 (1970) (contracting officer erred by accepting bids that he should have known were mistaken prior to acceptance).

In addition, the plaintiff's reliance on Griffy's Landscape Maint. LLC v. United States, 46 Fed. Cl. 257, 259–60 (2000) (duty to seek clarification for clerical errors applies in both sealed and negotiated procurements), which did involve a FAR Part 15 procurement, is misplaced. Unlike the instant case, in which the plaintiff omitted material terms in the form of price and brand/model name, the plaintiff in Griffy's made only a clerical error by neglecting to include the point of contact information for the company's insurer. Id. Even putting aside the subsequent criticism of its holding, see, e.g., C.W. Over & Sons, Inc. v. United States, 54 Fed. Cl. 514, 521 n.10 ("Since the contract at hand was the result of a negotiated procurement

process, its administration is governed only by the provisions in part 15."), Griffy's simply does not stand for the proposition that in the absence of discussions, a contracting officer is under an affirmative duty to provide a bidder in a negotiated procurement with notice and an opportunity to correct material omissions in their proposals.

To hold that DHS could not disqualify ST Net without first allowing ST Net to correct its mistake and revise its proposal would significantly limit the discretion afforded to contracting officers in negotiated procurements under Section 15.306, which provides that "[c]larifications . . . may occur when award without discussions is contemplated." 48 C.F.R. § 15.306 (emphasis added). This court has repeatedly recognized the permissive nature of this regulation in the context of negotiated procurements. See, e.g., Mil–Mar Century Corp. v. United States,111 Fed. Cl. 508, 534–35 (2013) (agency has discretion to engage in clarifications with just one offeror); Chenega Mgmt., LLC v. United States, 96 Fed. Cl. 556, 586 (2010) (ease with which proposal could have been corrected did not render agency's decision to forgo clarifications unreasonable); cf. Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1327–29 (Fed. Cir. 2011) (declining to construe similar solicitation language as limiting contracting officer's discretion to forgo discussions when an offeror(s) failed to comply with solicitation's requirements). Although the plaintiff is correct that, in other contexts, an agency may abuse its discretion when it "unreasonably withholds from undertaking a discretionary act," Appeals of Jim Smith Contracting Co., ENGBCA No. 5883, 94–2 BCA ¶ 26,879 (1994), at *19, aff'd sub nom. Jim Smith Contracting Co., v. West, 61 F.3d 918 (Fed. Cir. 1995), it is also well-settled that "the mere non-exercise of discretion is not per se unreasonable." Id.

In sum, DHS's decision to find ST Net's proposal "fundamentally flawed" without first seeking a clarification from ST Net and allowing it to correct and revise its proposal was lawful and reasonable. ST Net understood from the express terms of the solicitation that it would be bound by its proposal. The solicitation repeatedly informed offerors of the importance of providing complete and correct information in their proposals. Offerors were told that DHS would be evaluating them on "completeness," and that clarity and completeness in preparing their proposals was of the "utmost importance." Given the clear importance DHS placed on offerors carefully and properly providing the required information, the court cannot say that DHS was obligated under FAR 1.602–2(b) and 15.306(a) to seek clarifications where information was missing or wrong, or that DHS's decision to forgo clarifications was arbitrary, capricious or an abuse of discretion.

ST Net, Inc. v. United States, 112 Fed. Cl. at 109–11 (footnotes omitted; alterations and omission in original).

The <u>ST Net</u> decision provides a through and helpful analysis, as well as a good comparison to the seven above captioned bid protests, as all seven offerors in the protests before this court failed to include Solicitation required information, just as in <u>ST Net</u>, regarding which the <u>ST Net</u> Judge noted "it is undisputed that ST Net failed to fill in the price and brand/model information for two line items. Instead, ST Net listed the brand/model name for both items as * * *," which ST Net acknowledges was an error. ST Net included a price and discount rate for both items at * * *, which was also an error." <u>ST Net, Inc. v. United States</u>, 112 Fed. Cl. at 109 (omissions in original). Significantly, the agency in <u>ST Net</u> was attempting to evaluate a large number of proposals, over 240 proposals from more than 140 bidders, and "removed an additional 39 companies from best value consideration because their pricing matrices failed to include brand/model and/or price information for each line item. These proposals were deemed to be 'fundamentally flawed' and were eliminated from consideration." <u>Id.</u> at 105 (footnote and internal references omitted). The Judge in <u>ST Net</u> found it significant that "the price, brand/model information, and discount rates were not simply estimating tools, but were actually binding on the offerors—at least until 'certain specifications or proposed items (brand and model) [became] obsolete.' By its own estimate, ST Net's errors would have amounted to a roughly 7% increase in ST Net's total evaluated price." <u>Id.</u> at 109 (alteration in original; internal reference omitted). Each offeror, except for GovWave, either did not include pricing information or did not include the precise information on the Equipment List which would have allowed the agency to determine if the strict compliance requirements were met.

The Judge in <u>ST Net</u> also addressed protestors' contentions that the information could have been determined from other parts of the proposal, concluding,

> ST Net's contention that the government might have ascertained the missing brand information from elsewhere in ST Net's proposal is severely undermined by the plaintiff's concession that multiple bidders offered different brand items for the line items at issue in this case. Pl.'s Mot. 16 (estimating that "approximately * * *% of the offerors whose price matrices the Government provided in the Administrative Record * * * offered the same item for Line Items * * *. [sic] Indeed, this court has held that an agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place.

<u>ST Net, Inc. v. United States</u>, 112 Fed. Cl. at 110 (footnote omitted; alteration added; omissions in original). Therefore, the Judge in <u>ST Net</u> concluded: "In light of the undisputed facts, the court rejects ST Net's contention that ST Net's omissions were simply minor or clerical, or that it was improper for DHS to abstain from requesting that ST Net address these errors through clarifications. <u>Id.</u> Similarly, in the protests currently before this court, the Army should not be held responsible in the bid protests currently before this court for not trying to determine if the information was included elsewhere in the proposal, especially in light of the language in the Solicitation at L.4:

L.4 PROPOSAL FORMAT

This section specifies the format each Offeror shall use in preparing its proposal. The intent is not to restrict the manner in which proposals are prepared, but rather to ensure a certain degree of uniformity in proposal format for evaluation purposes. The proposal shall be prepared in a clear, legible, practical manner. Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted.

(capitalization in original).

Just as the protestor in ST Net cited to Griffy's Landscape Maintenance LLC v. United States, 46 Fed. Cl. 257, some of the protestors in the above captioned bid protests, specifically GovWave, Futron, Unicom, and Advanced Computer Concepts, cite to Griffy's Landscape as well. In Griffy's Landscape Maintenance LLC v. United States, a United States Court of Federal Claims Judge explained that protestor, Griffy's Landscape Maintenance, LLC (Griffy's Landscape), brought a post-award bid protest "challenging the award to Easy Tree Services of a best-value solicitation for tree trimming and right of way maintenance services at Ft. Campbell, Kentucky. The central issue of this protest is whether Griffy's missing insurance point of contact information raised a duty of inquiry by the Army." Id. at 257. The Judge in Griffy's Landscape noted:

The Army issued its solicitation in late May 1999, and six proposals were received by the July closing date. The Army determined that Easy Tree offered the best value to the Army and awarded it a contract on September 20, 1999. The Army evaluated past performance and price, with past performance receiving a maximum of 100 points and viewed as slightly more important. One of the past performance subfactors was the experience modification factor (EMF). EMF refers to a rating assigned by a bidder's general liability insurance carrier based upon the bidder's safety record. The number of EMF points awarded is a product of the bidder's insurance rating, calculated by a mathematical formula. The maximum is 20 points. In the absence of a contact name and phone number for Griffy's insurance representative, there was no rating and, consequently, no EMF points. Griffy asserts that it submitted the contact information, a disputed fact. For the purposes of these cross motions, we assume simply that the required information was missing. We make no assumptions as to why.

Id. at 258.

The Judge in Griffy's Landscape determined:

While we decline to assume that Griffy actually submitted the missing information, thus laying responsibility for its later absence squarely on the Army, we do not think the situation is much changed. When Griffy's proposal

was evaluated, and the information was seen to be missing, there really were only two explanations. Either Griffy did not have any insurance contact and the omission was deliberate—possible, but highly improbable that a contractor without insurance would submit a proposal; or the omission was inadvertent. And if it was inadvertent, it was because of a clerical error either by Griffy or by the Army. In either event, the Army had a duty to inquire further. Moreover, Griffy had regularly contracted through the Ft. Campbell contracting office and was presently performing another contract there. The missing information may have been readily available from the Army's own contract files. And a brief phone call would have remedied the error, irrespective of responsibility.

Id. at 258–59. The Judge in Griffy's Landscape continued:

[T]he absence of the point of contact information in and of itself clearly indicates a clerical mistake. We see from Easy Tree's proposal and Griffy's "lost material" that we are talking about a single sheet of paper containing the name of an insurance representative and a telephone number. The government's obligation as respects an apparent clerical error is clear—it has a duty to inquire.

Id. at 259 (alteration added). The Judge in Griffy's Landscape noted that Griffy's Landscape had performed multiple contracts with the Army, and given its previous relationship, also should have alerted the agency to inquire about the missing contact information, and explained:

Our conclusion is reinforced by the Army's past contract history with Griffy. This should have alerted the Army that the missing name and number was quite probably due to oversight or clerical error. Griffy had performed at least two previous landscaping and mowing services contracts for the Army at Ft. Campbell. One of the contracts was performed in 1998. The other contract began in 1998 and was still in effect when this contract was solicited and awarded. For all we know, there might have been Griffy trucks regularly parked outside the window of the Ft. Campbell contracting office. Moreover, it is evident from the administrative record that persons in the Ft. Campbell contracting office who evaluated the bids on this solicitation were also involved in half of the prior contracts Griffy had in the past. Of the 13 past and present contract's [sic] which Griffy referenced in its bid proposal, the contracting officer for this solicitation, Roy Murray, was the contact person for four; and Joseph Whitfield, one of Griffy's evaluators for this solicitation, was contact person for two others. It is, of course, possible that Griffy no longer had insurance, or that its rating changed since its previous contracts, but this past history supports our belief that there was duty to inquire.

Id. at 260 (alteration added). The Judge in Griffy's Landscape concluded: "The government's obligation is clear and simple. If it suspects a clerical error, it must ask. We therefore find that the Army's failure to inquire under these circumstances is arbitrary and capricious and a violation of 5 U.S.C. § 706." Griffy's Landscape Maint. LLC v. United States, 46 Fed. Cl. at 261.

Protestors argue, that like the protestor in Griffy's Landscape, each of the pieces of information missing from the protestors' proposals was at most "a clerical error." As determined above, however, the clarifications that protestors sought were not "minor or clerical errors," but material terms to the Solicitation. Further, the information missing in the protestors' proposals in the above-captioned bid protests, is different than the "missing insurance point of contact information." Although the Army deemed it to be a part of the solicitation requirements for tree trimming and right of way maintenance services in Griffy's Landscape, the insurance contact information did not prevent the agency from evaluating the protestor's proposal in Griffy's Landscape. By contrast, the past performance information, the information on the Equipment List, as well as price information in the Solicitation currently under review were all crucial and necessary elements of the proposal and would have prevented the Army from properly evaluating the proposals had the above captioned protestors' proposals made it past the strict compliance requirements. Despite the protestations to the contrary, such as GovWave arguing the Army "could and should have resolved this matter in a one-sentence email or a brief phone call," the missing information was material and had "a non-negligible effect on the price, quantity, quality, or delivery of the supply or service being procured." Furniture by Thurston v. United States, 103 Fed. Cl. at 518; see also Bionetics Corp. v. United States, 159 Fed. Cl. 834, 843.

The protestors also all cite to the United States Court of Federal Claims decision of Aspire Therapy Services & Consultants, Inc. v. United States, 166 Fed. Cl. 366 (2023). In Aspire, a Judge of the United States Court of Federal Claims explained "DeCA [Defense Commissary Agency] issued Solicitation No. HQC00822R0023 on October 5, 2022, seeking proposals for the award of a negotiated firm-fixed price contract for loading, stocking, and custodial work at the Dover Air Force Base Commissary." Id. at 371 (alteration added). The Judge in Aspire noted:

Per the solicitation, DeCA intends to use three factors to evaluate proposals: Factor 1 – Performance Capability; Factor 2 – Past Performance; and Factor 3 – Price. The Performance Capability and Past Performance factors combined are deemed relatively equal in importance to the Price factor. To evaluate the Price factor, DeCA intends to use a price realism analysis, wherein proposals will be evaluated "to determine whether offered prices are realistic in relation to the work to be performed, reflect a clear understanding of the requirements, and are consistent with other portions of the offeror's proposal." The solicitation required offerors to submit their proposals in three volumes through the Procurement Integrated Enterprise Environment ("PIEE") system. Volume I required offerors to break down their proposed services and prices and submit a Cost Breakout spreadsheet via Microsoft Excel. Volume II required offerors to provide a Technical

Capability and Personnel Proposal via PDF and a Direct and Indirect Labor Summary via Microsoft Excel. Volume III required offerors to provide past performance information via PDF. The Volume I Cost Breakout spreadsheet and the Volume II Direct and Indirect Labor Summary spreadsheet both included formulas that automatically generated various computations. To allow offerors to complete the computations, "the necessary inputs [were] 'unprotected' and [could] be changed as needed to adequately reflect [an offeror's] proposal." The solicitation warned that "[t]he offeror is ultimately responsible for the accuracy of all calculations." The solicitation also informed offerors that they "may have to present the same information, in the same or different format, in more than one volume." As such, DeCA instructed offerors to "[e]nsure information and statements on similar topics (e.g., number of work hours and productivity rates) are consistent throughout the proposal." Twice more the solicitation instructed offerors to ensure data entries agreed across different parts of the offeror's proposal.

Id. at 371–72 (alterations in original; internal references omitted). Notably, "the solicitation warned offerors twice that '[p]roposals that fail to comply with the content or format requirements may be rejected without further evaluation.'" Id. at 372 (alteration in original). Protestor Aspire completed the volumes and submitted its proposal, but DeCA rejected Aspire's "without further consideration." Id. The agency in Aspire explained, regarding Aspire's proposal:

Your proposal failed to comply with the requirements of Section L, Provision 52.215-4509 Proposal Submission (Format and Content) (APR 2004) identified in the solicitation and is being rejected without further evaluation due to the hours proposed in the Volume I, Cost Breakout did not correlate with the hours in the Volume II, Direct Labor Summary.

Id. (internal references omitted). The Judge in Aspire indicated:

Critically, Aspire states that the inclusion of the number 51 in the cell C16 formula was a typo, and it should have entered 81—the correct number from the Direct and Indirect Labor Summary spreadsheet. As a result of this typo, the Material Handling Laborer hours were 30 hours less than intended, as were the total Direct Labor Hours in cell C26. Accordingly, the spreadsheet totaled the RSHA direct labor hours as 2,336 in the Volume I Cost Breakout spreadsheet in contrast with the 2,366 total in the Volume II Direct and Indirect Labor Summary spreadsheet.

Id. at 374 (internal references omitted). Aspire filed suit in the United States Court of Federal Claims and challenged the 30-hour difference between the two volumes as a minor clerical error, and argued that the agency abused its discretion by not seeking clarification from Aspire. See id. at 376.

The Judge in Aspire reasoned:

DeCA determined that the error in Aspire's spreadsheets "was not a minor clerical error pursuant to FAR 15.306." The administrative record is devoid of any explanation of the agency's underlying rationale, and more importantly, the evidence in the administrative record does not rationally support such conclusion. Rather, it is apparent from the record that the discrepancy in Aspire's labor hours was a minor clerical error that could be corrected through clarification. DeCA's decision to disqualify Aspire was thus arbitrary and capricious in that regard. First, from the face of Aspire's proposal alone, it should have been evident to DeCA that the discrepancy was likely typographical rather than deliberate. The mismatched labor hour numbers—2,336 and 2,366—are off by one digit and appear so similar that the error is easily overlooked by the naked eye, a strong indicator that Aspire had made a typographical error. Moreover, the typographical nature of Aspire's error can be confirmed with virtual certainty by reviewing the formulas in the native versions of Aspire's spreadsheets, which it submitted to DeCA with its proposal via the PIEE system. Cell D34 in Aspire's Direct and Indirect Labor Summary spreadsheet calculated the RSHA Direct Labor Subtotal by adding together all RSHA labor subcategories for a total of 2,366 hours. Aspire manually entered the numbers of hours for the first five subcategories, the sum of which totaled 2,285 hours. In the final subcategory—RSHA Coverage for Contract Work Schedule (cell D32)—Aspire used the formula "=2366-2285", which produced the number 81. By using such formula, Aspire guaranteed that the RSHA Direct Labor Subtotal in cell D34 would equal 2,366 hours, confirming 2,366 was the intended number.

Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 378 (internal reference omitted). The Judge in Aspire continued:

This sort of obvious typographical mistake is analogous to the types of mathematical errors in proposals that the Federal Circuit and this court have found to constitute minor or clerical errors rather than material ones. See Galen, 369 F.3d at 1333; DynCorp, 76 Fed. Cl. at 545; WaveLink, 154 Fed. Cl. at 270. Just as in WaveLink, Aspire made an obvious typo when inputting labor hours into its spreadsheets, and the correct information was "readily present elsewhere in the proposal." WaveLink, 154 Fed. Cl. at 270; see DynCorp, 76 Fed. Cl. at 545 (citing IPlus, Inc., B298020, B-598020.2, 2006 CPD ¶ 90 (holding that clarification is permissible "where the existence of the mistake and the amount intended by the offeror is clear from the face of the proposal")). That Aspire's error was obviously typographical supports the conclusion that the error was minor and clerical and thus subject to clarification. Second, the effect of Aspire's error on its proposed hours and price is minor, to say the least, and largely inconsequential to DeCA's evaluation. The typo led Aspire to underreport its RSHA labors hours in its Cost Breakout spreadsheet by a mere 30 hours. The Government argues

that DeCA intends to use proposed labor hours to evaluate proposals under the Performance Capability and Price factors. While the number of labor hours an offeror proposes will assist DeCA in determining whether the offeror understands the solicitation requirements and is able to fulfill them, it is difficult to see how an error totaling 30 hours—a 1.3 percent difference—could affect the agency's evaluation in a material way.

Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 379 (internal references omitted).

The Judge in Aspire disagreed with the government's argument that the differential between the two sections of the proposal was a material provision of the solicitation, stating:

Of course, the number and breakdown of an offeror's proposed labor hours will have a substantive impact on DeCA's evaluation. But the requirement that labor hours in different parts of a proposal exactly match does not further the substantive purpose of ensuring offerors propose sufficient labor hours if the reason for the discrepancy is purely and obviously clerical.

Id. at 380. The Judge in Aspire also concluded that "Aspire's error affected its price does not prevent clarification." Id. The Judge in Aspire noted that the government cited to ST Net, Inc. v. United States, 112 Fed. Cl. 99, but explained that

[i]n ST Net, the plaintiff completely failed to enter the price and brand/model information for two line items in its proposal, which the court concluded was a material error that could not be corrected through clarification. Id. at 109–10. Unlike Aspire's error, ST Net involved an omission of material information that resulted in a "fundamentally flawed" proposal. Id. at 111. As the Federal Circuit held in Dell Federal Systems, clarifications are inappropriate to "cure proposal deficiencies or material omissions." 906 F.3d at 998. Conversely, Aspire's mismatched labor hours resulted from a typo that created "an obvious mathematical error," and the correct labor hour figure was apparent in Aspire's proposal despite the error. Galen, 369 F.3d at 1333. Furthermore, the omission in ST Net led to a seven percent price increase, a much more significant variance that the 0.063 percent price difference resulting from Aspire's error. ST Net, 112 Fed. Cl. at 110.

Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 381. The Judge in Aspire concluded:

In sum, DeCA's determination that Aspire's error was not a minor clerical error lacks a rational basis. The administrative record shows that Aspire's error was both obvious and typographical, and it had an insignificant effect on the labor hours proposed in the Cost Breakdown worksheet and, as a

result, Aspire's proposed price. Accordingly, DeCA could have allowed Aspire to resolve the error through clarification.

Id.

Government Acquisitions argues that "[i]n Aspire Therapy Services, the agency stated an almost identical rationale for a solicitation requirement." (alteration added) (citing Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 380-81). Similarly, Futron argues that "[t]he Army provides the same reason for the strict compliance requirement as the one analyzed in Aspire Therapy Services, so it too should receive the same fate. It is not material." (alteration added). Unlike in Aspire, in which the Judge found that "[t]he administrative record is devoid of any explanation of the agency's underlying rationale," Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 378 (alteration added), the Army provided detailed descriptions of the protestors' failure to comply with the strict compliance requirements in the Solicitation under the Step 1 evaluations in the Memoranda for Record for each of the seven protestors, as quoted extensively above. Each of the Memoranda for Record documented when a strict requirement was not met preventing each protestor from advancing to the Step 2 evaluations.

Most significantly, the information in Aspire was incorrect and an obvious mistake, in the above captioned protests the information was missing from the relevant Volume of protestors' proposals. As indicated above, the Judge in Aspire found it significant that

> [t]he mismatched labor hour numbers—2,336 and 2,366—are off by one digit and appear so similar that the error is easily overlooked by the naked eye, a strong indicator that Aspire had made a typographical error. Moreover, the typographical nature of Aspire's error can be confirmed with virtual certainty by reviewing the formulas in the native versions of Aspire's spreadsheets, which it submitted to DeCA with its proposal via the PIEE system. Cell D34 in Aspire's Direct and Indirect Labor Summary spreadsheet calculated the RSHA Direct Labor Subtotal by adding together all RSHA labor subcategories for a total of 2,366 hours. Aspire manually entered the numbers of hours for the first five subcategories, the sum of which totaled 2,285 hours. AR Tab 4.b.1. In the final subcategory—RSHA Coverage for Contract Work Schedule (cell D32)—Aspire used the formula "=2366-2285", which produced the number 81. By using such formula, Aspire guaranteed that the RSHA Direct Labor Subtotal in cell D34 would equal 2,366 hours, confirming 2,366 was the intended number.

Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 378 (internal references omitted). In the above captioned protests, there is no way for the Army to know for certain what information the protestors intended. Although protestors have argued it was obvious from other parts of the proposal, unlike in Aspire, the information which led

to the elimination during Step 1 was missing from each offerors' proposal.[13] Moreover, the Judge in Aspire differentiated Aspire's proposal from the protestor in ST Net noting that ST Net protestor "completely failed to enter the price and brand/model information for two line items in its proposal, which the court concluded was a material error that could not be corrected through clarification." Aspire Therapy Servs. & Consultants, Inc. v. United States, 166 Fed. Cl. at 381. In the current protests under review, the protestors "completely failed" to provide the Army with requisite information necessary for the Army to advance the protestors past the strict compliance review. The missing information was material, and, therefore, clarifications were not warranted or appropriate. The Army correctly did not err when it did not allow for clarifications regarding the protestors' proposals.

As referenced above, two protestors also allege that the Army handled clarifications unequally, DH Technologies and Enterprise Technology Solutions. Both DH Technologies and Enterprise Technology Solutions point to the treatment of [redacted] DH Technologies argues:

> The Agency allowed at least one offeror, [redacted] to clarify blanks in the spreadsheet of its proposal. This is not just engaging in unequal clarifications since the Agency allowed at least one offeror's clarification of the blanks in the spreadsheet attachments of its proposal to amend the Agency's decision on that offeror's non-compliance with the strict compliance requirements of the Solicitation. As a result, the Agency even allowed that offeror back in the competition and promoted it to step two— not to mention, that same offeror also had blanks and non-numerical explanations in its price model, for which it was not penalized for at all. This is unequal and unfair clarifications with offerors, and even worse, unequal, and unfair clarifications with offerors that had a significant effect on the competition and prejudiced DHT, who could have easily clarified any blanks in the spreadsheet attachments of its proposal if given the fair and equal chance to do so.

---

[13] As described above, the Solicitation's proposal format in the Solicitation currently under review at L.4 provided:

> This section specifies the format each Offeror shall use in preparing its proposal. The intent is not to restrict the manner in which proposals are prepared, but rather to ensure a certain degree of uniformity in proposal format for evaluation purposes. The proposal shall be prepared in a clear, legible, practical manner. Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted.

(capitalization in original).

Enterprise Technology Solutions argues:

> [redacted]'s Equipment List (Attachment 0002), per the Army's own statements, was noncompliant for having "blank cells." In turn, [redacted] provided essentially the same argument related to its Equipment List that ETSI made for its Price Model, that any entry in the cell would be improper. This explanation from [redacted] was accepted by the Army, which then found [redacted]'s proposal compliant. When ETSI asserted basically the same reason as to why its cells were "blank," however, the Agency rejected this position. While [redacted]'s non-compliance was related to the Equipment List, and ETSI's was related to its Price Model, the strict compliance requirements for both attachments are identical.

Enterprise Technology Solutions also argues regarding [redacted], "the Army arbitrarily and unequally allowed at least one offeror to simply 'fill in the blanks' of its Catalog bringing its proposal <u>back into the competition</u>—all the while telling ETSI (and potentially other offerors) that any such explanation was not allowed." (emphasis in original). Enterprise Technology Solutions also contends that

> qualifying the Army's exchange with [redacted] and acceptance of its post-evaluation explanations of "blank cells" as anything other than discussions is just allowing the Army to have its cake and eat it too. Specifically, the Army cannot rely on the "clarification" qualification to assert discretion to treat offerors unequally—and simultaneously assert that some offerors' "blank cells" were so "material" to the evaluation that they required disqualification of those offerors.

Defendant acknowledges that the Army initially found [redacted] proposal non-compliant for failure to fully complete the Equipment List. The Army's documentation for [redacted]'s non-compliance was similar to the documentation for the seven protestors in the above captioned bid protests:

> Proposal submitted by [redacted], dated 16 October 2023

> 1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by [redacted] Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements encourage consistency and accuracy of information presented. Further,

ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 1 – Equipment List.** Offeror's Equipment List (Attachment 0002) contained blank cells. Please see table below for specific

| Equipment List Compliance Check | |
|---|---|
| **Tab** | **Blank Cells in Column D – Proposed Configuration** |
| [redacted] | [redacted] |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.1.1 PART A - Equipment List. STRICT COMPLIANCE REQUIREMENT: ANY cells marked for Contractor Fill-In on the Equipment List that are left blank or are unintelligible as to the product the Offeror is proposing shall render the Offeror's proposal non-compliant and will not be further considered for award.

FINDING 1 – Blank Cells in Column D – Proposed Configuration: It is critical to the evaluation process that all fillable cells in Column D of the Equipment List are complete, as required by the solicitation. Completeness ensures that the Offeror's proposed configuration for each System Description identified on each Catalog (Catalog I through Catalog VII) identifies clear technical detail. Blank cells present a risk of ambiguity and misinterpretation to the USG, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly know what product/item an Offeror is proposing.

Note Regarding Finding 1: The Army notes that the Offeror's proposal has a conflict and ambiguity between volumes. In Volume 1, the Offeror has made no notation regarding why the cells noted above regarding the warranty are blank. This causes the offeror to be non-compliant with the terms of the solicitation as stated above. The Offeror did make a notation in its Price Model about the [redacted]. The Offeror's proposal is problematic for several reasons:

- L.4 provides that "Five separate volumes shall be submitted. These volumes shall be self-contained and shall not be cross-referenced. The Government will not assume the duty to search for data or information to cure problems discovered in any proposal submitted." As L.4 makes clear, the Government will not assume the duty to cure problems discovered in any proposal submission.

- During the substantive evaluations, offerors evaluating Volume 1 will not be reviewing the Price Model in Volume II. Thus, evaluators reviewing Volume 1 will not have any information from the Price Model and will not see any notations made in this document. Rather, the Volume 1 documents must stand on their own due to the separate evaluations being conducted by different teams.

- Fundamentally, the Offeror's proposal has failed to comply with the clear terms of the RFP by not filling out the cells in the Equipment List. This creates a conflict and ambiguity between the Offeror's proposal volumes in regards to the Offeror's actual intent. It is an offeror's responsibilty [sic] to provide a clearly written proposal that accurately conveys its intent. It is not the duty of the Government to reconcile conflicting portions of an offeror's proposal to determine what the offeror intended. Here, if the Offeror's intent was to provide the [redacted], the Offeror should have made a clear notation in that regard on the Equipment List. Thus, the Offeror's blank cells in Volume 1 are a material failure to comply with the instructions and evaluation criteria in the RFP.

  3. Based upon the above findings and in accordance with the terms of the RFP, Offeror AW [redacted] is determined to be non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; alterations added).

On February 7, 2024, [redacted] provided the following response to the contracting personnel:

  In response to the ITES (RFP) W52P1J-20-R-0082 Notification of Results of Compliance Check for Non-Compliant Offeror letter received on February, 6th 2024

  Ms. Lansing & Ms. Haffey,

  Would the Government revisit its decision to remove [redacted] from the competition for the following reasons?  [redacted]

  As per the [redacted] website for both of these parts: [redacted]

  The Government's thoughtful consideration of our response and the decision to retain [redacted] in this competition is appreciated. We will make ourselves available to provide any additional information or to answer any further questions if requested.

(capitalization and emphasis in original). After receipt of [redacted]'s response letter, the Army issued a memorandum on February 9, 2024, which provided in part:

  1. The purpose of this memorandum is to document the United States Government's (USG) decision to allow Offeror AW – [redacted] to be found

Compliant and remain within the competition to move forward to Step 2 of the evaluation process.

2. On 5 February, Offeror AW was notified (Ref. e) that it was found non-compliant for failing to fill-in four cells on the Equipment List. The Government sent Offeror AW a letter (Ref. e) outlining its apparent non-compliance as well as prepared an internal compliance worksheet (Ref. c) and an internal Non-Compliance MFR (Ref. d) documenting the findings.

3. On 6 February, Offeror AW submitted questions (Ref. f) to the Government regarding its non-compliance determination. The Government reviewed the questions along with Offeror AW's submission. Based on this review, the Government determined that Offeror AW will remain in the competition. Specifically, the Government recognized that for cells [redacted] of Catalog IV, the Offeror did place a notation in Column E explaining why those cells were blank. The Offeror noted that the cells were blank because for its particular technical solution the [redacted]. Because the Offeror has made this notation, the Government does not find the blank cells material to the Step 1 evaluation of this Offeror. In effect, the Offeror has provided an explanation for why the respective cells are left blank, namely that its proposed technical solution has [redacted]. Thus, these blank cells have no effect on the Government's evaluation in relation to Step 1.

Regarding the process for [redacted], the defendant argues:

Importantly, the agency did not engage in clarifications or allow [redacted] to revise its proposal. The Army originally found [redacted] (Offeror AW) non-compliant for failing to complete cells in the Equipment List. During the debriefing, [redacted] explained that its proposal in Column E (Catalog Identification) included an explanation that the [redacted].

(citation and footnote omitted).

Defendant argues that

this is an instance in which a blank cell was explained because the information for the cell was contained in overall pricing information for the product. Upon receipt of this information, the agency confirmed that the proposal included this explanation. The information allowing the Government to make this amended determination was already in [redacted]'s proposal. The Army did not allow [redacted] to revise or resubmit its proposal. Instead, the Army corrected an error on its own part when it initially failed to recognize that [redacted] left a note in Column E about the item being included, as other offerors had done. Thus, the information key to the Army's non-compliance determination was already in

> [redacted]'s proposal and the Army did not engage in clarifications to allow
> [redacted] to amend a material omission or otherwise revise its proposal.
> Instead, the Army corrected its error to allow this offeror to be treated the
> same as other offerors that provided an explanation that the pricing
> information was included in another portion of the product pricing
> information.

(citation omitted). Defendant notes that "DHT did not raise a similar issue in its debriefing questions." Specially, defendant argues

> If, as DHT claims, the agency mistakenly disregarded relevant information
> about the warranty in its review of DHT's proposal, DHT missed its
> opportunity to use the debriefing to alert the agency. This is not an example
> of what DHT called unequal clarifications, because DHT was provided with
> the same opportunity to debrief as every other offeror. What DHT
> communicated in that exchange is entirely within DHT's purview.

Regarding Enterprise Technology Solutions' argument for [redacted], defendant argues:

> Based on the debriefing, in which [redacted] explained that its proposal in
> Column E (Catalog Identification) included an explanation that the
> [redacted], the agency confirmed that the proposal included this explanation
> and amended its position. Importantly, the information allowing the
> Government to make this amended determination was already in
> [redacted]'s proposal; therefore, the Army did not allow [redacted] to revise
> or resubmit its proposal. Instead, the Army corrected an error on its own
> part when it initially failed to recognize that [redacted] left a note in Column
> E about the item being included. Thus, the information key to the Army's
> noncompliance determination was already in [redacted]'s proposal and the
> Army did not engage in clarifications to allow [redacted] to amend a material
> omission or otherwise revise its proposal. In contrast, ETSI could not point
> to a similar explanation in its proposal in its debriefing document because
> none existed.[14] ETSI cannot add this information after the fact to its
> proposal through either clarification or communications.

(footnotes and internal references omitted; alteration added). Defendant reiterates that

> the Army did not allow [redacted] to fill in anything. Nor did the Army make
> a similar mistake in evaluating ETSI's proposal. Where ETSI had provided
> the necessary information to resolve a blank cell issue, the Army deemed

---

[14] Defendant explains in a footnote: "All offerors eliminated in Step 1 were provided an opportunity to ask debriefing questions following notification that their proposals were found to be non-compliance with Step 1. This includes ETSI which submitted its own debriefing."

that blank cell immaterial. The Army found ETSI non-compliant for <u>material</u> blank cells. ETSI could not add <u>new</u> information after the fact to its proposal through either clarification or communications. <u>Dell Fed. Sys.</u>, 906 F.3d at 998 (Clarifications may not "be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal." (citations omitted)); FAR 15.306(b)(2). So, while it is true that both [redacted] and ETSI sent emails to the Army as part of the debriefing process, [redacted]'s email made the Army realize that [redacted] had included the necessary information <u>in its proposal</u>, but ETSI's email provided <u>new</u> information not contained in its proposal about its blanks to the Army. At Step 1, all offerors were evaluated based <u>only</u> on their proposals — not based any new information provided during the debriefing process. The Army did not engage in clarifications with [redacted], ETSI, or any other offeror.

The court agrees with defendant that the Army did not engage in clarifications with [redacted] and [redacted] did not provide any changes or clarifications to its proposal. Also, as reflected above, the information for DH Technologies and Enterprise Technology Solutions was not available for the Army to evaluate in the same section of their proposals, and, therefore, the Army did not engage in unequal clarifications with [redacted] or treat DH Technologies and Enterprise Technology Solutions differently in the evaluations of the proposals.

<u>Minor Irregularity</u>

Protestors GovWave, Government Acquisitions, DH Technologies, Unicom, and Advanced Computer Concepts all argue in the alterative that the missing information from their proposals constituted at most a minor irregularity and the Army should have waived the minor irregularities and allow each of their proposals to proceed to the Step 2 evaluation. GovWave argues that "[t]o the extent the Agency was looking for magic words in Volume III of GovWave's proposal, the omission of whatever precise wording the Agency sought from GovWave's proposal (or from Volume III of GovWave's proposal) was plainly an informality or minor irregularity that the Agency should have waived." (alteration added). Government Acquisitions contends: "At the very worst, GAI's omission of a discount percentage in the one cell for an option period is a minor informality or irregularity. There was no impediment to the full and efficient evaluation of GAI's revised proposal. By not waiving this minor irregularity, the Army abused its discretion." DH Technologies argues that "[u]nder these circumstances, the Agency should waive the blank cell as a minor irregularity under FAR 52.212-1(g)." (alteration added). Unicom similarly argues that "UGI's inadvertent omission of information from [redacted] was a minor informality that could be easily remedied by simply confirming that the [redacted]. Finally, Advanced Computer Concepts argues "that minor informalities and typographical errors such as the one here must be waived."

In response, defendant argues that the "omissions in the Step 1 plaintiffs' proposals were not clerical errors or minor informalities," and

these plaintiffs are not bringing true clerical errors such as transposed numbers or missing digitals from a telephone number. Rather they did not complete material cells in the price model (ETSI, GAI, & DHT), did not provide requested and required information about products on the equipment list they intend to sell the Army (Futron, UGI, & ACC), or they failed to address adverse past performance or affirmatively state they had none (GovWave). These are not obvious clerical errors and requiring clarifications in such circumstances would void an agency's broad discretion to engage in clarifications.

The Solicitation in the above-captioned protests incorporated FAR clause 52.212-1(g), which states that "[t]he Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received." See FAR § 52.212-1(g) (2023) (alteration added); see also Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1347 (Fed. Cir. 2021) ("Under FAR 52.212-1(g), the Government may waive "informalities and minor irregularities.'"); ITellect, LLC v. United States, 173 Fed. Cl. at 562. As indicated above, errors or omissions that are considered to be "material" are not subject to waiver under FAR clause 52.212-1(g). See ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 506 ("Because DOJ [the Department of Justice] only had the discretion to waive 'informalities and minor irregularities' [under FAR clause 52.212-1(g)], DOJ cannot waive errors that were rationally categorized as material.") (alterations added); see also Bus. Integra, Inc. v. United States, 116 Fed. Cl. 328, 337 (2014) ("Because Business Integra's error was material, the government was under no obligation to waive the error or allow Business Integra to correct the error."). Errors or omissions are considered to be material when the error or omission violates an express provision in the Solicitation that serves "a substantive purpose." See ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 506 (citations omitted); see also MSC Indus. Direct Co. v. United States, 140 Fed. Cl. at 643 ("Under FAR § 52.212-1(g) material elements are those necessary for a proposal to represent an offer to provide the exact thing called for in the request for proposals." (internal quotation marks and citation omitted)). A provision in the Solicitation "is considered to have a substantive purpose when it is important to the government's evaluation, is binding on the offeror, or has more than a negligible impact on the price, quantity, or quality of the bid." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 508 (citations omitted). Under FAR clause 52.212-1(g), "omissions in proposals are material omissions when the excluded information is 'important to the government's evaluation of the offer.'" MSC Indus. Direct Co. v. United States, 140 Fed. Cl. at 643 (quoting Bus. Integra, Inc. v. United States, 116 Fed. Cl. at 334). Moreover, even if an error or omission is subject to waiver under FAR clause 52.212-1(g), an agency is not required to waive the error or omission. See T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. at 558 ("The fact that an agency is permitted to waive the submission format requirement, of course, does not mean it is required to do so." (emphasis in original)). FAR 52.212-1(g) provides:

(g) Contract award (not applicable to Invitation for Bids). The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best

terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers receive.

48 C.F.R. § 52.212-1 (2024).

The Federal Circuit in <u>Safeguard Base Operations, LLC v. United States</u>, noted, "FAR 14.405 provides examples of what might constitute a minor informality or irregularity," and quoted FAR 14.405, in part:

> FAR 14.405 provides that:
>
> A minor informality or irregularity is one that is merely a matter of form and not of substance. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders. The defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired. . . . Examples of minor informalities or irregularities include failure of a bidder to—
>
> (a) Return the number of copies of signed bids required by the invitation;
>
> (b) Furnish required information concerning the number of its employees;
>
> (c) Sign its bid, . . .
>
> (d) Acknowledge receipt of an amendment to an invitation for bids, . . . ; and
>
> (e) Execute the representations with respect to Equal Opportunity and Affirmative Action Programs . . . .

<u>Safeguard Base Operations, LLC v. United States</u>, 989 F.3d at 1347 (quoting FAR 14.405) (omissions in original); <u>see</u> <u>also</u> <u>ITellect, LLC v. United States</u>, 173 Fed. Cl. at 562 (citing <u>Safeguard Base Operations, LLC v. United States</u>, 989 F.3d at 1347).

As quoted above, the Evaluation Methodology at M.3 of the Solicitation explained:

> Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as STRICT COMPLIANCE REQUIREMENTS in the Instructions to Offerors of this RFP shall render the Offerors proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

(capitalization in original). Also, the requirements in the Solicitation discussed above at issue in the seven current protestors' protests were material and necessary for inclusion in the offerors' proposals in order to meet the strict compliance requirements for the agency's evaluations. In Safeguard Base Operations, the Federal Circuit concluded that that "[t]he roughly $6 million increase in price [in protestor's proposal] was not negligible when contrasted with the total cost or scope of the services being acquired," and "they were omissions of substance, not form. They concerned material defects and variations from the exact requirements that would have been prejudicial to other bidders unless the same omissions were waived for them as well." Safeguard Base Operations, LLC v. United States, 989 F.3d at 1347-48 (alterations added). This court reaches the same conclusion, the omissions discussed above by the current protestors resulted in material defects in the offerors' proposals and for the Army to have waived the omissions would be prejudicial to the offerors who were eliminated for similar omissions during the Step 1 strict compliance check. Additionally, the past performance requirement, the Equipment List requirement, and the pricing requirements are different than the type of non-material, form requirements that the Federal Circuit discussed in Safeguard Base Operations, which are present in FAR 14.405. See Safeguard Base Operations, LLC v. United States, 989 F.3d at 1347.

Furthermore, even if the court were to have reached the conclusion that the requirements were not material and were minor omissions, it does not follow that protestors automatically should have had their errors overlooked or waived by the agency. As noted by a Judge of the United States Court of Federal Claims, even if an error or omission is subject to waiver under FAR clause 52.212-1(g), an agency is not required to waive the error or omission. See T Square Logistics Servs. Corp. v. United States, 134 Fed. Cl. at 558. Given the errors were ones of omission, the agency still would have had the discretion not to try to determine what information was missing or to follow up with each of the protestors who had failed to provide required information in the relevant Volume of their proposals. As determined above, the strict compliance requirements in the Solicitation were material, and, therefore, the Army properly determined that there was no obligation to, and that it would be in fact improper to, waive the irregularities in the protestors' proposals and allow the protestors in the above captioned protests to proceed to Step 2.

Latent Ambiguity

Protestors GovWave, Government Acquisitions, and Enterprise Technology Solutions argue that the Solicitation contained a latent ambiguity. GovWave argues that "the Court should hold that the Solicitation was latently ambiguous about which instructions were strict compliance requirements that could render a proposal ineligible for award and what offerors needed to state to satisfy the same." Both Government Acquisitions and Enterprise Technology Solutions argue that the Solicitation at L.5.2 is latently ambiguous. GovWave, Government Acquisitions, and Enterprise Technology Solutions also all argue that due to the latent ambiguity, and because the government drafted the Solicitation, the doctrine of contra proferentem, should apply and that each of

the protestors' reasonable interpretations should govern. For example, Government Acquisitions argues that the "ambiguity was latent and not patent, and the doctrine of contra proferentem applies."

> In response, defendant argues

> Neither the Step 1 plaintiffs, or any other offeror, protested the strict compliance requirements or the language of the current RFP prior to submitting proposals or being eliminated for non-compliance with Step 1. To the extent the Step 1 plaintiffs believe that the solicitation should not have included a strict compliance requirement and/or should have provided for the establishment of a competitive range, discussions, and/or clarifications at Step 1, they should have raised the challenge to the solicitation before the submission and evaluation of proposals**.** Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007).

In Blue & Gold, the United States Court of Appeals for the Federal Circuit addressed whether if an offeror had the opportunity to object to a patent error in the terms of a solicitation, but failed to do so, did the offeror waive the right to challenge that same error in a subsequent bid protest. See id. at 1313. The Federal Circuit noted that the protestor in Blue & Gold had failed to challenge the terms of the solicitation until after the agency had made a contract award. See id. at 1311. In considering if the protestor had waited too long to challenge the solicitation, the Federal Circuit noted that decisions of the Court of Federal Claims had concluded "that where there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003)) (omission in original); see also Trillion ERP Venture Tech LLC v. United States, 161 Fed. Cl. 531, 542 (2022). In Blue & Gold, the Federal Circuit held:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (alteration in original); see also M.R. Pittman Grp. v. United States, 68 F.4th 1275, 1283 (Fed. Cir. 2023) ("Blue & Gold requires that a party with the opportunity to object to the terms of a government solicitation containing a patent error must do so prior to the close of the bidding process or else it waives its ability to raise that objection in the Court of Federal Claims." (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313)); Mitchco Int'l, Inc. v. United States, 26 F.4th 1373, 1380 (Fed. Cir. 2022) (citing Harmonia Holdings Grp. v. United States, 20 F.4th 759, 766 (Fed. Cir. 2021) (citing Blue & Gold, Fleet, L.P. v. United States, 492 F.3d at 1303)); Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312 (Fed. Cir. 2016); Trace Sys. Inc. v. United States, 165 Fed. Cl. 44, 62 (2023); Eagle Techs., Inc. v. United States, 163 Fed. Cl. 692, 706 (2022), appeal dismissed, No. 2023-1473, 2023 WL 2820095 (Fed. Cir. Apr. 7, 2023); Land Shark Shredding, LLC v. United States, 142 Fed. Cl. 301, 311

(2019); MSC Indus. Direct Co. v. United States, 140 Fed. Cl. at 641; Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 181 (2016); CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 737–38 (2014)) ("The rule in Blue and Gold Fleet thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." (alteration added) (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000)))). The Federal Circuit in Blue & Gold reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that, "'the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original; alteration added).

The Federal Circuit also explained in Blue & Gold:

"It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).[15]

---

[15] The court notes that in 2023, the United States Court of Appeals for the Federal Circuit issued M.R. Pittman Group, LLC v. United States, 68 F.4th 1275 (Fed. Cir. 2023), which addressed waiver under Blue & Gold. The Federal Circuit in Pittman determined that

the Blue & Gold waiver rule—which seeks to reduce inefficiencies by requiring an objection to a solicitation be made prior to the close of bidding—is more akin to a nonjurisdictional claims-processing rule since it "seeks to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." Henderson v. Shinseki, 562 U.S. 428, 435, 131 S. Ct. 1197, 179 L. Ed. 2d 159 (2011).

M.R. Pittman Grp. v. United States, 68 F.4th at 1280. The Federal Circuit, therefore, concluded that "the waiver rule articulated in Blue & Gold is nonjurisdictional." M.R. Pittman Grp. v. United States, 68 F.4th at 1280. Defendant in the above captioned bid protests has not moved to dismiss any of protests for the lack of jurisdiction on the grounds that waiver under Blue & Gold applies. Rather in the above captioned protests, defendant cites to Blue & Gold to argue that the Solicitation did not contain a latent ambiguity.

Furthermore, as described above, a "solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation," and "[i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." Banknote Corp. of Am. v. United States, 365 F.3d at 1353 (alteration added); see also Per Aarsleff A/S v. United States, 829 F.3d at 1309; AccelGov, LLC v. United States, 170 Fed. Cl. at 516 (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1353).

The court in Blue & Gold Fleet found that "'[t]he doctrine of patent ambiguity is an exception to the general rule of contra proferentem, which courts use to construe ambiguities against the drafter.'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1342 (Fed. Cir. 2004)); see also HPI/GSA 3C, LLC v. United States, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("The general rule is contra proferentem, which requires ambiguities in a document to be resolved against the drafter."); Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997) ("More subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of contra proferentem."); Ekagra Partners, LLC v. United States, 163 Fed. Cl. 189, 208 (2022); T.W. Laquay Marine, LLC v. United States, 127 Fed. Cl. 748, 762 (2016) ("A latent ambiguity should be construed against the Government in accordance with the recognized contract interpretation principle of contra proferentum [sic]." (alteration added)).

According to the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision . . . . the provision should be construed less favorably to that party which selected the contractual language." United States v. Seckinger, 397 U.S. 203, 216, reh'g denied, 397 U.S. 1031 (1970) (omission added). This doctrine of contra proferentem "'pushes the drafters toward improving contractual forms and it saves contractors from hidden traps not of their own making.'" Fry Commc'ns, Inc. v. United States, 22 Cl. Ct. 497, 503 (1991) (quoting Sturm v. United States, 190 Ct. Cl. 691, 697, 421 F.2d 723, 727 (1970)). Similarly, according to the United States Court of Appeals for the Federal Circuit: "When a dispute arises as to the interpretation of a contract and the contractor's interpretation is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004) (citing United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed. Cir. 1987)); see also States Roofing Corp. v. Winter, 587 F.3d 1364, 1372 (Fed. Cir. 2009); Gardiner, Kamya & Assocs. v. Jackson, 467 F.3d 1348, 1352 (Fed. Cir. 2006); HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed. Cir. 2004).

The Federal Circuit in Blue & Gold Fleet further held that "[u]nder the doctrine, where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government." Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1381 (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996))); see also Premier Off. Complex of Parma, LLC v.

United States, 134 Fed. Cl. 83, 88 (2017) ("A patent ambiguity is one that is 'obvious, gross, [or] glaring.'" (alteration in original) (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671, 204 Ct. Cl. 696, 716 (1974))); West Bay Builders, Inc. v. United States, 85 Fed. Cl. 1, 15 (2008) ("A patent ambiguity is one that is obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start.") (alteration in original) (internal quotation marks omitted).

> GovWave argues:
>
> To the extent it finds the Agency did not unreasonably evaluate GovWave's proposal or abuse its discretion in not waiving or clarifying the obvious informality or minor irregularity in the same, the Court should hold that the Solicitation was latently ambiguous about which instructions were strict compliance requirements that could render a proposal ineligible for award and what offerors needed to state to satisfy the same.

Specifically, GovWave argues:

> Setting aside the instruction at issue in this protest, the Solicitation included eight instructions that were preceded by the term "STRICT COMPLIANCE REQUIREMENT" in the singular form, a colon, and then a one-sentence requirement, which would render an offeror's proposal non-compliant if not followed. Conversely, in the section of the Solicitation that included more than one strict compliance requirement following the colon, the Solicitation informed offerors by using the plural form, "STRICT COMPLIANCE REQUIREMENTS," and explicitly noting in each sentence following that which succeeded the colon that failure to comply would render the proposal noncompliant. (emphasis added).
>
> Section L.5.3.2.b., included the term "STRICT COMPLIANCE REQUIREMENT" in the singular, a colon, and a one-sentence requirement that follows. Consistent with the other strict compliance requirements in the Solicitation, GovWave reasonably interpreted the Solicitation to mean that the singular "STRICT COMPLIANCE REQUIREMENT" in Section L.5.3.2.b. was to "identify any recent and relevant Government contract(s) it was awarded that encountered any performance problems." That interpretation is unquestionably reasonable given the Solicitation's structure and other uses of the term, i.e., that each of the other strict compliance requirements preceded by the singular use of the term end after the sentence that follows the colon.

(capitalization in original; internal references omitted). Defendant responds,

> GovWave compares the Strict Compliance requirement for adverse contract performance to the Strict Compliance Requirements (plural) for the

Equipment List by suggesting that if the Army meant to hold GovWave to a strict compliance requirement, it ought to have labeled the whole paragraph Strict Compliance Requirement**S (plural)**. But unlike the Strict Compliance Requirement for past performance, the Strict Compliance Requirement for the Equipment List involves two entirely separate requirements — offerors were told they (1) had to provide the most current version of a certain spreadsheet, and (2) were not permitted to modify it. Whereas here, the Strict Compliance requirement concerning adverse contract performance comprised a single requirement communicated in multiple sentences to address adverse past performance. That is, the paragraph instructed that an offeror who had some sort of adverse past performance was required to indicate as much, and an offeror without it likewise had to indicate as much. The only difference was that an offeror with adverse past performance would provide details on that performance, whereas an offeror without it, obviously, would only indicate they had none.

(capitalization and emphasis in original). As noted by defendant, for the strict compliance requirements for the Equipment List, the Solicitation at Section L.5.1.1g provides:

g. Equipment List, electronic copy: Equipment List must remain in native MS Excel file format. Offerors proposed configuration information must be directly input in the proposed configuration field. Equipment List must not be password protected. Offeror proposed configuration input is only permitted in column D. STRICT COMPLIANCE REQUIREMENTS: Failure to provide the most current version of the RFP Attachment 0002 shall render the Offerors proposal non-compliant and will not be further considered for award. Unauthorized modifications to the Equipment List are not permitted and will render an Offerors proposal non-compliant and not further considered for evaluation. Linked inputs are not permissible and will render a proposal non-compliant.

(capitalization in original).

Regarding Past Performance, the Solicitation at Section L.5.3.2.b provides:

b. Adverse Contract Performance: STRICT COMPLIANCE REQUIREMENT: In addition to the contract references, the Offeror shall identify any recent and relevant Government contract(s) it was awarded that encountered any performance problems related to deliverables; services, security violations (i.e. data, physical, virtual, etc.), Environmental Protection Agency (EPA) violations, and every contract that was terminated (termination for default or termination for cause only), in whole or in part from 25 October 2019 through 16 October 2023. If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal. The number of contract references provided in response to this paragraph is unlimited. Submission

of Adverse Contract Performance information shall not count as part of the page count for Past Performance.

(capitalization in original).

The court understands the only plausible interpretation of the clause in Section L.5.3.2.b is that the "STRICT COMPLIANCE REQUIREMENT" applied to the entire paragraph. (capitalization in original). The "STRICT COMPLIANCE REQUIREMENT," (capitalization in original), demanded that an offeror identify any performance problems with recent, relevant government contracts from October 2019 through October 2023. The very next sentence states: "If there are no contracts that meet the description above, the Offeror shall state as such and include a statement in the Volume III of the proposal." The "[i]f there are no contracts that meet the description above," (alteration added), is directedly tied to the Solicitation requirement to identify any contract performance problems in the previous sentence and must be read in concert with the previous sentence. By contrast, the "STRICT COMPLIANCE REQUIREMENTS" for the Equipment List, quoted above, included three independent instructions, which did not relate to each other. The Army required the most current version of the Equipment List, the Army required no modifications to the Equipment List, and the Army required no linked inputs. Therefore, it was reasonable for the Army to identify them as multiple, separate requirements, and use the phrase strict compliance requirements to describe the obligations of the offerors when submitting the completed Equipment List.

The court finds that the language of the strict compliance requirement for past performance was not ambiguous. Given that the strict compliance requirement was "clear and unambiguous, it must be given [its] plain and ordinary meaning; we may not resort to extrinsic evidence to interpret [it]." Banknote Corp. of Am. v. United States, 365 F.3d at 1353 (alterations added). If GovWave believed it was not clear from the face of the Solicitation whether the government meant for the strict compliance requirement for past performance to also apply to the absence of any prior contract problems, it was incumbent on GovWave to seek clarity from the Army prior to submitting a proposal. GovWave failed to do so, and failed to indicate in its proposal there were no contracts with performance issues in the previous four years. The government rationally applied the strict compliance requirement for past performance to GovWave's proposal and found it non-compliant.

Defendant also argues that "if offerors were not strictly required to indicate no adverse past performance, an offeror would be free to stay silent and create ambiguity for the agency." The agency raised this very issue in its January 12, 2024 Memorandum for Record for GovWave's evaluation, which stated in part:

FINDING 1 – No Statement Acknowledging Adverse Performance: It is critical to the evaluation process that an Offeror provide a statement regarding whether any adverse past performance has occurred or not occurred. Acknowledgement of this requirement is important so that the USG may gather information about an Offeror's past performance in an efficient manner that allows for the evaluation of a proposal to reflect the

Offeror's past performance record. When an Offeror's proposal is silent about whether it has any adverse past performance, that silence effectively creates ambiguity and does not equate to a clear statement that the Offeror has none. If Offeror has no history of adverse contract performance, offeror must provide a statement as such.

(capitalization and emphasis in original). The court agrees.

As described above, both Government Acquisitions and Enterprise Technology Solutions also contend that the Solicitation at L.5.2 has a latent ambiguity. Government Acquisitions argues:

The Solicitation was latently ambiguous and self-contradictory. The Solicitation stated that "The Government will not assume a blank cell in Attachment 0004 represents a zero. . . ." However, Attachment 004, generated by the Army, itself did <u>exactly that</u> and treated Blank Cell G6 as zero – calculating additional cells accordingly. At a minimum, this discrepancy is ambiguous, but moreover, it is flatly contradictory. And the effect of the contradiction is not insignificant. Given the short amount of time to complete the new spreadsheet, Offerors such as GAI reasonably relied on the Army's representation that a blank cell would not be treated as a zero. Accordingly, when the spreadsheet performed its functions and executed its formulae in which it <u>did</u> treat Cell G6 as a zero, an Offeror (such as GAI) would not be on notice of the blank cell – and in fact would be placed on <u>false</u> notice that the spreadsheet had been appropriately completed. In short, the Army told Offerors such as GAI that a blank cell would not be treated as zero, then sent the Offerors a mandatory spreadsheet in which the Army <u>did</u> treat the blank cell G6 as zero, and then on review of that spreadsheet, changed course, and refused to treat the cell (already incorporated in the formulae as a zero) as a zero.

(footnotes and internal references omitted; emphasis and omission in original). Enterprise Technology Solutions argues to this court:

Whether the Army intended to do so or not, it set its own operational definition of a "cell" in its Volume II, Price Factor, Strict Compliance Requirements of Solicitation § L.5.2. That definition of "cell" set therein governs under standard logic rules and this Court's precedent for solicitation interpretation. Solicitation § L.5.2 defines a "cell" when it states the fact that "[a]ll cells contain an appropriate value." (emphasis added). The Solicitation then puts limitations specifically on such "cells" as already defined. It says, "Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors [sic] submission as noncompliant and the Offerors [sic] proposal will receive no further consideration or evaluation." (emphasis added). The next line confirms the earlier limited definition of a "cell" and, again, puts a requirement for an input of 0 on such

qualified "cells." It says: "Offerors <u>intending to propose zero dollars for a particular cell</u> must ensure the appropriate cell contains a 0." (emphasis added). Stating that the numerical value of 0 must be input for all "cells" further confirms that not all fields in the sheets can be considered "cells"— as some cannot be accurately proposed or expressed to the government as a 0 (as demonstrated above). The subsequent line in § L.5.2 further confirms this interpretation, saying: "The Government <u>will not assume a blank cell in Attachment 0004 represents a zero</u> as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award." (emphasis added). As expressed in an earlier line of § L.5.2, there are many fields that ETSI (and presumably others) did not <u>want</u> the Army to assume meant $0.00 for a listed product, as there was not an accurate proposed price of $0.00. So, subsequent lines of this section of the Solicitation merely reassured offerors that the Army will not incorrectly deem any fields without a 0 to mean a proposed price of $0.00—again, this is something ETSI found reassuring that its proposed pricing sheets would not contain any inaccurate representations unless ETSI put an actual 0 in the fields that ETSI didn't intend to propose a $0.00 price for.

(internal references omitted; emphasis and alterations in original).

In response to Government Acquisitions' argument, defendant argues that "GAI was on notice that <u>any cells</u> left blank will render the proposal non-complaint [sic] and that the Army would not assume a blank cell meant a zero. This is clear language in the 'instructions to offerors' of the RFP, which GAI ignored," and, "[m]oreover, the argument that the Army 'treated Blank Cell G6 as zero' is factually incorrect because, when conducting the Step 1 compliance review, the Army found GAI noncompliant and specifically stated that it was not treating the blank cell as a zero." (internal references omitted; emphasis in original; alterations added). Regarding Enterprise Technology Solutions' argument, defendant responds:

Ignoring the context that RFP § L.5.2. is providing instructions on how to fill-in a spreadsheet, ETSI's argument hinges on a non-sensical definition of "cell." Specifically, ETSI argues that "§ L.5.2 defines a "cell" in a narrow way when the RFP states that "[a]ll <u>cells</u> contain an appropriate value." Thus, ETSI's argument is that a cell is not a cell unless it has a value; stated differently, a blank cell is not a cell. ETSI's strained interpretation of the word "cell" ignores the plain language of RFP § L.5.2 and ignores the context of the provision that the offerors were filling in a spreadsheet with cells. It is a plainly unreasonable interpretation that does not demonstrate an ambiguity, much less a latent ambiguity.

(footnotes and internal references omitted; emphasis in original).

As reflected above, the Solicitation provided, regarding the Price requirements:

L.5.2 VOLUME II - Price Factor.

The volume shall be organized as follows:

(1) Electronic Copy. Price submission requirements: Files contained in the Volume II Price submission may not be password protected. Electronic links are not permissible. The Offeror shall not include pivot tables in Excel spreadsheets. The Offeror shall complete the Price Model in full. Offerors must ensure that Attachment 0004 is completed and submitted with the proposals. STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

(2) General Instructions. In accordance with FAR 15.402 and FAR 15.403-1, certified cost or pricing data is not required based on the fact that adequate competition is expected for this procurement. If after receipt of proposals the Contracting Officer determines that there is insufficient information available to determine price reasonableness, the Offeror may be required to submit other than certified cost or pricing data. Information other than certified cost or pricing data may be submitted in contractors chosen format to provide sufficient information in order to support price reasonableness. There are no page limitations for this volume. Proposal information included in this volume that is not directly related to Price will be disregarded. Proposed dollar values shall be identified in US Dollars with only two decimal places. Any cells with more than two decimal places will be rounded up or down to the next whole cent.

L.5.2.1 Instructions for the Price Model

a. A price must be proposed for every item in each catalog identified in the Price Model. Proposed prices shall be for new items/equipment only.

b. DO NOT alter any part of the Price Model other than the cells shaded in yellow and orange.

c. Do not enter any formulas into the Price Model.

d. Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the

Offeror ineligible for award. Further, all proposed prices and numbers shall be stated in U.S. Dollars, rounded, and displayed to two decimal places. It will be assumed that rows/columns containing zeros instead of prices are intentional and shall be considered as having no cost to the Government.

e. Pricing for catalog items, as discounted, shall not exceed the Offerors lowest available General Services Administration (GSA) Federal Supply Schedule price, other Government contract vehicle price, commercial catalog, or publicly published price list.

f. The Government anticipates receiving competitive proposals and using competition to determine price reasonableness. The Government reserves the right to request other than certified cost or pricing data to establish the reasonableness of the proposed contract and/or subcontract prices after receipt of proposals.

(capitalization in original).

Both Government Acquisitions and Enterprise Technology Solutions offer an unconvincing definition of "cell" as it applies to L.5.2 in the Solicitation. The Solicitation at L.5.2 provides a straight-forward requirement for completing the pricing spreadsheet at Attachment 0004. As quoted immediately above, the Solicitation informs the offerors:

The Offeror shall complete the Price Model in full. Offerors must ensure that Attachment 0004 is completed and submitted with the proposals. STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation. Offerors intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a 0. The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offerors proposal being deemed non-compliant and not further considered for award.

(capitalization in original). The Army took pains to explain that if an offeror intends to propose a price of $0.00 the offeror needed to reflect the price of $0.00 in a cell. Any blank cell would render the proposal non-compliant, and the Army would not consider the proposal further. The Army underlined this requirement by emphasizing "STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value." (capitalization in original). If an offeror was proposing a price, it could not leave any cell on the spreadsheet blank. Both Government Acquisitions and Enterprise Technology Solutions failed to completely fill out the pricing spreadsheet and were found to be non-compliant with the strict compliance requirements.

Enterprise Technology Solutions also cites to the decision in WaveLink, Inc. v. United States, 154 Fed. Cl. 245 (2021), to argue:

> In WaveLink, this Court said that the defendant-intervenors "appeared to be generally correct regarding the meaning of the phrase 'fair and reasonable,'" when they applied a plan language definition of the words. But the Court then clearly found that the agency's operationally defined term governed the procurement; it said, "their approach to the phrase in the Solicitation fails to account for the preceding verbiage [.]" Id. [WaveLink, Inc. v. United States, 154 Fed. Cl. 245, 275 (2021)] (emphasis added). In fact, in a footnote to that paragraph of the decision, the Court also noted that this was "not the only place in this Solicitation where particular terms of art do not have their ordinary meaning." Id. at n. 24 (emphasis added). And provided that the operationally defined terms were not contrary to any applicable federal regulations, the Court honored the agency's definitions. Id. Here, the plain language of the Solicitation states that "cells" must contain an "appropriate value." The next lines of the paragraph do not define "appropriate value." Those lines discuss other possible inputs in fields, and interpretations of certain values that could be inputted, but not what is an "appropriate value." The terms simply require that an "appropriate value" be applicable for something to be classified as a "cell."

(emphasis in original; second alteration added). Defendant responds that "ETSI's reliance upon WaveLink Inc. v. United States, 154 Fed. Cl. 245, 275 (2021), is misplaced."

In WaveLink, Inc. v. United States, 154 Fed. Cl. 245, a Judge of the United States Court of Federal Claims, explained:

> This post-award bid protest is yet another such case arising from the recent on-ramp procurement process for Pools 1, 3, and 4 of the One Acquisition Solution for Integrated Services Small Business ("OASIS SB") contract vehicle. Plaintiff, WaveLink, Inc. ("WaveLink"), submitted proposals for Pools 1 and 3, and alleges that Defendant, the United States, acting by and through the General Services Administration ("GSA" or the "Agency"): (1) improperly failed to allow WaveLink to update its relevant experience and past performance proposal volumes during the 10-month proposal evaluation period; (2) violated Federal Acquisition Regulation ("FAR") provisions in conducting discussions with other offerors without allowing all offerors, including WaveLink, to submit a fully revised proposal, known as a final proposal revision ("FPR"); and (3) erred in awarding contracts to ineligible offerors, in violation of a mandatory solicitation provision and the FAR.

WaveLink, Inc. v. United States, 154 Fed. Cl. at 254–55 (footnote omitted). Relevant to protestor Enterprise Technology Solutions' argument, the Judge in WaveLink noted:

The RFP provided in sections L.5.6.(h) and M.5.4.(f), respectively, as follows:

Offerors are strongly encouraged to propose a Direct Labor rate for each OASIS SB labor category within the ranges provided in Section J.2. **CAUTION:** Failure to provide clear and convincing rationale to support a lower or higher direct labor rate outside the ranges set forth in Section J.2., **will result in a determination the rate(s) are not fair and reasonable and the Offeror would not be eligible for award regardless of their technical score**.

. . . . .

If an Offeror does not meet one or more of these parameters for any labor category, the Offeror is strongly advised to provide clear and convincing rationale to support the proposed direct/indirect and/or profit rate(s). **In the event the rationale is not determined reasonable, the proposal will be deemed to have a ceiling rate(s) that is not considered fair and reasonable and the proposal would not be eligible for award, regardless of technical score.**

WaveLink, Inc. v. United States, 154 Fed. Cl. at 272 (capitalization, omission, and emphasis in original). The Judge in WaveLink determined:

As WaveLink correctly notes, the Solicitation's plain, unambiguous language specifies that an offeror "would not be eligible for award" if it fails to provide a "convincing rationale to support" a direct labor rate outside of a set range. The above-quoted direct labor provisions were mandatory Solicitation provisions that the Agency was not free to ignore. Thus, in awarding contracts to offerors with non-compliant direct labor rates – i.e., that were outside the specified range and without a required, supporting rationale – the Agency did not comply with these mandatory Solicitation provisions.

Id. at 273 (internal reference omitted). The Judge in WaveLink continued:

Applying those basic principles outlined in DigiFlight to this case leads to the ineluctable conclusion that the Agency violated a mandatory term of the Solicitation and, thus, improperly awarded contracts to perhaps as many as 30 offerors (spanning Pools 1 and 3) that submitted non-compliant proposals. Contrary to both the government's position and the Court's conclusion in DigiFlight, the Agency: (1) never amended the Solicitation pursuant to FAR 15.206(d) to remove the mandatory language in sections L.5.6.(h) and M.5.4.(f); (2) did not engage in discussions (i.e., negotiations) with non-compliant offerors to bring their proposals into compliance with sections L.5.6.(h) and M.5.4.(f); and (3) did not reject proposals that failed

to comply with sections L.5.6.(h) and M.5.4.(f). Accordingly, the Agency violated the terms of the Solicitation and, in turn, FAR 15.305.

The government argues that "GSA did not relax the requirements with respect to direct labor rates that were below those provided in Section J.2 because GSA's actions did not constitute a material change to the terms of the solicitation[.]" Put differently, the government maintains that "GSA did not change the solicitation requirement" but rather simply "interpreted the solicitation language to prohibit the agency from deeming a proposal unreasonable due to too low prices." The government thus contends that "rather than changing the solicitation requirements or evaluation requirements, GSA applied the solicitation requirements consistent with relevant legal principles."

The Court rejects the government's attempt to avoid the Solicitation's plain language by asserting that the Agency merely decided to read it differently. The Solicitation provides, in mandatory terms – following an all-caps "CAUTION" warning – that the "[f]ailure to provide clear and convincing rationale to support a lower or higher direct labor rate outside the ranges set forth in Section J.2., **will result** in a determination the rate(s) are not fair and reasonable and the Offeror would not be eligible for award regardless of their technical score." The Agency could have amended the Solicitation to remove or revise that mandatory language. See Beta Analytics Int'l, 44 Fed. Cl. at 139. Not having done so, however, the Agency was bound to follow the Solicitation's terms as written, not how the Agency wishes it had written them. Alfa Laval, 175 F.3d at 1367–68 (holding that, in waving a mandatory solicitation provision for an offeror, "the Navy violated a clearly applicable procurement statute and regulation").

WaveLink, Inc. v. United States, 154 Fed. Cl. at 274 (footnote and internal reference omitted; emphasis in original). The Judge in WaveLink noted that "[s]everal defendant-intervenors contend that 'fair and reasonable' is a term of art based on FAR principles that '"generally addresses whether a price is too high,"'" id. (emphasis in original; alteration added), however, in the WaveLink protest, the Judge explained:

While defendant-intervenors appear to be generally correct regarding the meaning of the phrase "fair and reasonable," their approach to the phrase in the Solicitation fails to account for the preceding verbiage – "failure to provide clear and convincing rationale to support a lower or higher direct labor rate outside the ranges[.]" (emphasis added). When interpreting a solicitation, the Court must harmonize provisions where possible, not create a conflict. Safeguard Base Operations, 989 F.3d at 1344 ("We must consider the Solicitation as a whole and interpret it in a manner that harmonizes and gives reasonable meaning to all of its provisions." (internal quotation marks omitted)). Rather than reason from the premise that "fair and reasonable" must refer exclusively to prices that are too high, the better

139

approach is understanding that the Agency has <u>operationally defined this term for purposes of this procurement</u> to refer to any price that is acceptably within the RFP's range or, if outside the range, has an accompanying acceptable rationale. This approach gives meaning to "fair and reasonable" without deleting the words "lower" and "outside the ranges" from the Solicitation.

<u>WaveLink, Inc. v. United States</u>, 154 Fed. Cl. at 275 (alteration and emphasis in original; internal reference omitted).

The facts of <u>WaveLink</u> are specific to the <u>WaveLink</u> protest, and do not apply to the facts of the above captioned bid protests. Notably, as explained by the Judge in <u>WaveLink</u>, the General Services Administration "never amended the Solicitation pursuant to FAR 15.206(d) to remove the mandatory language in sections L.5.6.(h) and M.5.4.(f); (2) did not engage in discussions (<u>i.e.</u>, negotiations) with non-compliant offerors to bring their proposals into compliance with sections L.5.6.(h) and M.5.4.(f); and (3) did not reject proposals that failed to comply with sections L.5.6.(h) and M.5.4.(f)." <u>Id.</u> at 274. By contrast, for the Solicitation at issue in the seven above captioned bid protests, when the Army decided to change the evaluation scheme it issued Amendments 0029, 0030, and 0031, as well as issued the October 2023 Memorandum for Record explaining the changes and the impact on the Solicitation. Furthermore, unlike the agency in <u>WaveLink</u>, the Army did not fail to follow mandatory Solicitation provisions, rather by interpreting L.5 the way the agency did, the Army's evaluation conformed to the strict requirements for the pricing spreadsheet. As described above, the Army provided that offerors had to complete all cells in the spreadsheet, and any blank cell would make a proposal non-compliant, and emphasized the cell requirement by explaining: "STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value." (capitalization in original). The Army properly determined that protestor Enterprise Technology Solutions' proposal included 42 blank cells, which rendered the proposal ineligible for award.

The court finds that the Solicitation at L.5.2 was not ambiguous, and, therefore, the court finds the Solicitation should be given its plain and ordinary meaning. <u>See Banknote Corp. of Am. v. United States</u>, 365 F.3d at 1353. The court finds the Army applied the ordinary meaning of cell, and the terms of L.5.2 in Solicitation to the offerors' proposals, and rationally eliminated the offerors with blank cells. As indicated above, GovWave, Government Acquisitions, and Enterprise Technology Solutions also each cite to the doctrine of <u>contra proferentem</u>. As the court has determined that the Solicitation at Section L.5.3.2.b and at Section L.5.2 are not ambiguous, the doctrine of <u>contra proferentem</u> does not apply. <u>See Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1313; <u>HPI/GSA 3C, LLC v. United States</u>, 364 F.3d at 1334.

<u>Documentation</u>

Enterprise Technology Solutions alleges that "[t]he Army inadequately documented its evaluation." (alteration added). Defendant responds: "ETSI does not cite any specific offeror in which a waiver or other decision was not documented but rather

speaks in generalities. However, ETSI is wrong as the Army provided adequate documentation."

The United States Court of Appeals for the Federal Circuit in Impresa explained:

The Supreme Court has established that the Administrative Procedure Act does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved. Pension Benefit Guaranty Corp. v. LTV Corp., 496 U.S. 633, 655–56, 110 S. Ct. 2668, 110 L. Ed. 2d 579 (1990); Camp v. Pitts, 411 U.S. 138, 142 n.3, 93 S. Ct. 1241, 36 L. Ed. 2d 106. (1973).

Contracting officers are not obligated by the APA to provide written explanations for their actions. Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing. See John C. Grimberg Co. v. United States, 185 F.3d at 1303. Nor are they formal rulemakings. As the government correctly points out, where the contracting officer makes a determination of responsibility, as opposed to the situation in which he makes a determination of non-responsibility, the regulations do not require the contracting officer to "make, sign and place in the contract file a determination of" responsibility which states the basis for the determination. 48 C.F.R. § 9.105–2(a).

However, under the APA even where an explanation or reason is not required, a reviewing court has power to require an explanation. The Supreme Court's recent decision in LTV, and earlier decisions in Overton Park and Pitts, make clear that, even if the agency is not obligated to provide reasons, a court may nonetheless order the agency to provide explanation if such an explanation is required for meaningful judicial review. LTV, 496 U.S. at 654, 110 S. Ct. 2668; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971); Pitts, 411 U.S. at 142–43, 93 S. Ct. 1241.

The cases also establish that, in determining whether to require an explanation, the agency decision is entitled to a presumption of regularity. Bowen v. Am. Hosp. Assn., 476 U.S. 610, 626–27, 106 S. Ct. 2101, 90 L. Ed. 2d 584 (1986); Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 n.9, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983); United States v. Chem. Found., Inc., 272 U.S. 1, 14–15, 47 S. Ct. 1, 71 L. Ed. 131 (1926). Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious. Cf. United States v. Armstrong, 517 U.S. 456, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (requiring a defendant asserting a selective prosecution claim to make a threshold showing in order to overcome the presumption of regularity of the agency decision to prosecute before the

defendant is entitled to discovery). The litigant challenging that presumption necessarily bears a heavy burden.

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1337-38 (footnote omitted). The Federal Circuit, however, also held,

> [n]evertheless, the record must be sufficient to permit meaningful judicial review consistent with the Administrative Procedure Act, 5 U.S.C. § 706. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 83 S. Ct. 239, 9 L. Ed. 2d 207 (1962))).

Palantir USG, Inc. v. United States, 904 F.3d at 994 (first alteration added); see also Orion Tech., Inc. v. United States, 704 F.3d at 1351; Weeks Marine, Inc. v. United States, 575 F.3d at 1371; CHE Consulting, Inc. v. United States, 552 F.3d at 1356.

As quoted above, the Army reviewed Enterprise Technology Solutions' proposal and found its Price proposal non-compliant under Step 1. The January 29, 2024 Memorandum for Record for Enterprise Technology Solutions' evaluation provided:

> Proposal submitted by Enterprise Technology Solutions, Inc. (ETSI), dated 16 October 2023

> 1. The purpose of this memorandum is to document the determination that made the above referenced proposal submitted by Enterprise Technology Solutions, Inc. (ETSI) Non-Compliant per the terms and conditions of subject solicitation for the Information Technology Enterprise Solutions – 4 Hardware (ITES-4H) multiple award IDIQ base contracts. The proposal was reviewed against the strict compliance requirements identified throughout the solicitation. The United States Government (USG) performed initial Step 1 Compliance Checks to ensure the accuracy of proposals and reduce risk to the Government. Adherence to the Strict Compliance requirements identified throughout the solicitation is vital to ensure the Government receives a complete and high-quality proposal. Strict Compliance requirements encourage consistency and accuracy of information presented. Further, ensuring the offeror has provided all necessary information is essential to the efficient evaluation of proposals. The following are excerpts directly from the Instructions to Offerors (Section L) and Evaluation Factors for Award (Section M) of the RFP:

> a. L.3 STRICT COMPLIANCE REQUIREMENT: All volumes and files have strict compliance requirements and strict compliance to those requirements will be evaluated. Any items identified as a STRICT COMPLIANCE

REQUIREMENT will be evaluated for compliance prior to any further evaluation of the Offerors proposal. Failure to abide by the strict compliance requirements for any of these factors will deem the Offerors proposal non-compliant and will eliminate it from further consideration. Factors and subfactors with strict compliance requirements are clearly identified throughout these instructions.

b. L.4.1.3 – A proposal is presumed to represent the Offeror's best efforts to respond to the RFP. The Offeror must provide adequately detailed information that complies with the solicitation requirements, allows for meaningful review by the Government evaluators, and affirmatively demonstrates the merits of its proposal. The Offeror shall provide sufficient detail to substantiate the validity of all stated assertions and must not merely repeat the RFP requirements, but rather must provide convincing documentary evidence of how contract requirements will be met. Data not submitted with the proposal, but submitted previously, or presumed to be known (i.e., previous projects performed for the United States Government (USG) [sic] will not be considered. **Clarity and completeness are essential.**

c. M.3 EVALUATION METHODOLOGY: Step 1 - STRICT COMPLIANCE REQUIREMENT: Proposals will be reviewed to determine if all compliance requirements set forth in the Instructions to Offerors are satisfied. Failure to provide proposals in compliance with the instructions specified as "STRICT COMPLIANCE REQUIREMENTS" in the Instructions to Offerors of this RFP shall render the Offeror's proposal non-compliant. Any Offeror's proposal determined non-compliant will not be evaluated and will not be further considered for award. Only Offerors whose proposals are determined compliant will move to Step 2 of the evaluation process.

2. Based upon a review of the strict compliance requirements set forth in the solicitation, the following findings contributed to the determination that above referenced proposal is non-compliant:

a. **Volume 2 – Price Model**. Offeror's Price Model (Attachment 0004) contained multiple blank cells. Please see table below for specific cells that are material to the evaluation process and were found blank with no additional explanations on the excel sheet

| Price Model Compliance Check | | | |
|---|---|---|---|
| Tab | Column D<br>Proposed Configuration | Column E<br>Catalog Item Number | Column H<br>Catalog Unit Price |
| [redacted] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |
| [redated] | [redacted] | [redacted] | [redacted] |

The STRICT COMPLIANCE REQUIREMENT identified in the solicitation states:

- L.5.2 VOLUME II - Price Factor (1) STRICT COMPLIANCE REQUIREMENT: All cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible in Attachment 0004 will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation. Offeror's intending to propose zero dollars for a particular cell must ensure the appropriate cell contains a "0." The Government will not assume a blank cell in Attachment 0004 represents a zero as any blank cell will result in the Offeror's proposal being deemed non-compliant and not further considered for award.

- L.5.2.1 (d) Instructions for the Price Model: Offerors shall completely fill out the updated Price Model (Attachment 0004) included with this Amendment [Amendment 0031]. Failure to provide prices for all items and catalogs identified in the Price Model of the solicitation will render the Offeror ineligible for award.

  FINDING 1 – Multiple cells that are color-coded for contractor-fill in are blank. Full completion of all highlighted/color coded cells required to be filled in by the Offeror is essential to ensure the Government clearly understands the price proposed in order to perform an accurate and complete evaluation. Additionally, it is particularly critical to the evaluation process that all fillable cells in Column D – Proposed Configuration of the Price Model are complete to ensure that the Price Model can be cross walked with Column D of the Equipment List. This ensures that the offeror consistently proposed its items on both solicitation attachments. Blank cells present a risk of ambiguity and misinterpretation to the USG, create uncertainty as to the proposed price, as well as impede the efficient evaluation of proposals because a blank cell does not allow the Government to clearly identify the proposed price for a particular product.

3. Based upon the above findings and in accordance with the terms of the RFP, Offeror AM [Enterprise Technology Solutions] is determined to be

non-compliant, and its proposal is removed from consideration for award. A letter communicating the details that make its proposal non-compliant will be provided along with a written debriefing.

(capitalization and emphasis in original; second alteration in original).

Enterprise Technology Solutions argues

there are inconsistencies within ETSI's evaluation, and between other offerors' evaluations. The Army in the AR discusses individual evaluations of offerors, including ETSI, and provides a memorandum that discusses the importance of strict compliance briefly. The Army, however, does not appear to document why between certain offerors the Solicitation terms were waived for deviated for some, but not others. The Army is expected to adequately document their evaluation. While the Army has provided memorandums within the Administrative Report for individual offerors, it does not provide documentation as to why the Army made the decision to only waive requirements of the Solicitation or deviate from the Solicitation terms for certain offerors. The Army certainly could do so, as the Army provided a memorandum discussing an ambiguity found within the equipment list.

The court determined above that the Enterprise Technology Solutions was not treated differently than any similarly situated offeror. Furthermore, as quoted above, the Army provided a detailed explanation for why Enterprise Technology Solutions' proposal did not meet the requirements for price. The agency also provided a detailed explanation for each eliminated offeror under Step 1 explaining why a proposal was not compliant with the strict performance requirements. As noted by defendant, the Army "also documented its responses to any debriefing questions raised by offerors after receiving the letters setting forth the basis for non-compliance." The Army adequately documented its decision for eliminating the non-compliant proposals under the strict compliance requirement for Step 1, including Enterprise Technology Solutions. The court finds that the Administrative Record before this court is "sufficient to permit meaningful judicial review consistent with the Administrative Procedure Act, 5 U.S.C. § 706." Palantir USG, Inc. v. United States, 904 F.3d at 994.

Deviation from Solicitation

As referenced in its documentation argument, Enterprise Technology Solutions argues "the Army's evaluation of ETSI deviated from the Solicitation," and contends "the Army chose not to follow its own Solicitation evaluation criteria when it evaluated the 'Additional Warranty' rows for the various products listed in Column A of Attachment 0004 (the Price Model)." Defendant responds that "[t]he Army's evaluation of ETSI did not deviate from the solicitation." (alteration added).

145

Enterprise Technology Solutions specifically argues:

ETSI's Price Model, on every single catalog, dashes are clearly displayed in both of the final two Columns (I and J) for each and every item and each and every numbered row for every area identified by the Army in its table as non-compliant, "material" to the Army's evaluation, and "blank with no additional explanations." In fact, there are other areas of the Army's evaluation where the Army demonstrates that a dash in one column of a row was sufficient for compliance of that entire row (regardless of any other columns' fields having no input in that row). See AR TAB 49, AR 5690 (showing rows in which fields are not filled out under "Catalog Item Number" and dashes utilized under price columns); see also AR TAB 126, AR 30898 and AR TAB 125, AR 30758 (only noting the rows on ETSI's Price Model for Catalog VII-B that did not have narrative in "Proposed Configuration," not the earlier lines with blanks in "Catalog Item Number").

For both Catalog [redacted] and Catalog [redacted], the only field the Army calls out as being included amongst the "specific cells . . . material to the evaluation process . . . found blank with no additional explanations on the excel sheet" is [redacted]. But in fact, [redacted] provided a price for the [redacted] - and [redacted] didn't include input for the "[redacted]" price because there was no applicable value to input in that field. Contrast this with [redacted] and [redacted] in both of those Catalogs where it is the exact same scenario, except there is a dash input for the "[redacted]" on [redacted]. Again, if the dash was the basis for this distinction—making those entire rows compliant, regardless of any fields without input in the other columns of that row—then why did the dashes in Columns I and J of every single row of the apparently "non-compliant" fields listed on the non-compliance table not do the same job? If the dashes in some columns made it clear to the Army what prices were and were not being proposed, but not in others, the Army should have stated that in the Solicitation—or clarified the understanding set forth in the Q&A, Question 2 (if that was not the Army's intent), instead of agreeing that any such "dash" would be found compliant without any further clarification whatsoever.

There are several other discrepancies amongst the Army's evaluation, that separately demonstrate that certain "Additional Warranty" fields without input were identified as "material to the evaluation" and without "additional explanations," and thus, non-compliant, in some catalogs. But they were not raised as concerns at all in others—an application of the criteria which fell in line with the Solicitation and Q&A incorporated therein and simply should have been applied consistently throughout.

(capitalization and omissions in original; internal references omitted). Initially, as reflected above, the Solicitation's strict compliance requirement at L.5.2 required "all cells contain an appropriate value. Any cells marked as contractor fill-in that are blank or unintelligible

in Attachment 0004 will render the Offerors submission as non-compliant and the Offerors proposal will receive no further consideration or evaluation." It was, therefore, insufficient to include the required information in just the "the final two Columns (I and J)" of Enterprise Technology Solutions' proposal. Furthermore, as explained by defendant:

> Column I (Discounted Unit Price) and Column J (Discounted Price) are shaded grey —indicating they are not columns filled out by the contractor. The Price Model was color-coded and contractors were instructed to complete only "the cells shaded in yellow and orange." The contractor was responsible for completing Column D (Product Configuration), Column E (Catalog Item Number), and Column H (Catalog Unit Price). The Price Model auto-populated Column I (Discounted Unit Price) and Column J (Discounted Price) based on the price the contractor input for Column H (Catalog Unit Price). The blank Price Model provided to the offerors automatically listed dashes in Column I (Discounted Unit Price) and Column J (Discounted Price). Those dashes remain until the contractor fills in Column H with a number. If, as ETSI suggests, dashes in Column I (Discounted Unit Price) and Column J (Discounted Price) — dashes that appeared in the blank Price Model — were sufficient to render an entire row compliant, regardless of any other blank cells, then every offeror's Price Model would be compliant before they filled in any information. This nonsensical result would contradict the solicitation's clear, strict compliance requirement that all cells be filled in. To the extent that ETSI is claiming that it always input a price or a "dash" for the price of each product, that is not correct. As previously explained, ETSI left multiple cells blank in [redacted].

(emphasis in original; footnotes and internal references omitted). Similarly, regarding Enterprise Technology Solutions' argument that there are other areas of the Army's evaluation where the Army demonstrates that a dash in one column of a row was sufficient for compliance of that entire row (regardless of any other columns' fields having no input in that row)," defendant argues:

> This is incorrect, and the examples cited by ETSI do not stand for this proposition, which is contrary to the RFP language. Indeed, the Solicitation is clear — any cells marked as contractor fill-in (shaded in yellow and orange) in Attachment 0004 left blank "will render the Offeror's submission as non-compliant and the Offeror's proposal will receive no further consideration or evaluation."

Defendant noted the sole exception was "If the context of a particular blank rendered the blank immaterial, the Army documented that finding and did not find the offeror non-compliant for an immaterial blank cell. The Government applied this exception when reviewing every offeror's proposal — including the proposal submitted by ETSI." As reflected on the Army's "Proposal Compliance Checklist" for Enterprise Technology Solutions, for the column, "*Meets terms and conditions of RFP*?" the Army indicated: "No." (capitalization and emphasis in original). The Proposal Compliance Checklist reflected

that Volume 2 was submitted and Attachment 0004 was submitted as an Excel file. For the column "*All contractor filled cells are completed? (blank/unintelligible fills are prohibited)*," the Army indicated "No," with the explanation:

> (1) Material Blank cells identified as Non-Compliant, which is described in the compliance MFR.

> (2) PLEASE NOTE: the USG reviewed Blanks Cells in Column E of all Catalogs. Except those noted in the compliance MFR, the remaining blanks in Column E are immaterial because of the offeror's response in Column D. The Offeror has noted that the [redacted], thus the offeror has provided a reason for not assigning a catalog number.  The compliance MFR notes cells where the offeror did not provide any rationale in Column D or E as to the blank cells.

> (3) PLEASE NOTE: The Government noted that there is a blank Unit Price [redacted] in Catalog [redacted] and in Catalog [redacted].  Because the Offeror has noted that [redacted] the Government does not find the Offeror non-compliant for these cells.  Effectively, the Offeror has provided a reason as to why some cells were left blank.  Thus, based on the particular circumstances of this Offeror's Price Model, the Government does not find the Offeror non-compliant for these blank cells.

(capitalization in original).

As defendant argues, "although ETSI has argued that the Government should have accepted some of its blanks, as it should have been clear what ETSI was offering, ETSI has no explanation for the blank cells [redacted] in Catalog [redacted] and Catalog [redacted]," and the defendant correctly notes that "for these products ETSI failed to include <u>any</u> of the required information. ETSI has not explained how the Government was to interpret ETSI's proposal for these products, where ETSI left <u>all three</u> columns — the only columns ETSI was required to complete for these products — blank." (emphasis in original). Additionally, as defendant contends:

> If there is any issue with the Government finding these blanks immaterial, that error is harmless, as ETSI was found non-compliant for <u>42</u> other blank cells. ETSI is essentially faulting the Government for not finding these other blank cells material and non-compliant. If ETSI is correct, that would result in ETSI being found non-compliant for *more* reasons. It does not change the fact that ETSI repeatedly violated the Strict Compliance Requirement regarding Attachment 004 and was therefore properly eliminated from the competition during Step 1.

(emphasis in original). The Army followed the strict compliance requirements for price, and even applied the strict compliance requirements in favor of all offerors in the situation

in which the government determined it had the information necessary to evaluate the proposal to meet the Step 1 initial review. The court finds the Army did not deviate from the Solicitation's evaluation requirements.

## CONCLUSION

For the foregoing reasons, each of the seven protestors in the above captioned bid protests did not meet the strict compliance requirements of the Solicitation when they were eliminated during Step 1 of the evaluations. The defendant's decisions to remove the protestors from the competition after the Step 1 evaluations, although harsh, were not arbitrary or capricious decisions. Defendant's omnibus cross-motion for judgment on the Administrative Record is **GRANTED**. Protestors' motions for judgment on the Administrative Record are **DENIED**. The protestors' bid protest complaints regarding the Step 1 evaluations are **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** in each of the seven above captioned bid protests consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**